UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X
                                                   :
DISTRICT ATTORNEY OF NEW YORK                      :
COUNTY,                                            :
                                                   :
                         Plaintiff,                :
                                                   :
            v.                                     :
                                                   :
THE REPUBLIC OF THE PHILIPPINES,                   :
*et al.*,                                          :
                                                   :
                         Defendants.               :
                                                   :
---------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 29, 2018

14 Civ. 890 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

The parties to this interpleader all claim ownership over certain property purchased with funds that Ferdinand and Imelda Marcos allegedly misappropriated during Mr. Marcos's presidency of the Philippines (the "Interpleader Property"). The property at issue includes approximately $15 million in cash and seized funds from several bank accounts; Claude Monet's *L'Église et La Seine à Vétheuil* and Alfred Sisley's *Langland Bay* (and other paintings); and sundry personal items (including jewelry, carpets, pens, boxes, and a jade and wooden screen). The District Attorney for New York County ("District Attorney" or "DANY") seized the contested assets during its criminal investigation and prosecution of Vilma Bautista, a confidante and personal secretary of Imelda Marcos. The DANY, an innocent stakeholder with no claim of ownership to the Interpleader Property, transferred the property to this Court so that the rightful owner or owners could be determined. Among the

claimants are: the Republic of the Philippines ("Republic"); a class of human rights victims led by Jose Duran, who are judgment creditors against Imelda Marcos ("Class Plaintiffs"); Vilma Bautista, who in addition to serving as Imelda Marcos's personal aide during the relevant time period also worked for the Philippine government from 1966 until 1986, including as a Foreign Service Officer for the Philippine Mission to the United Nations; and the Golden Budha Corporation along with the Estate of Roger Roxas (together, "Roxas").

Pending before the Court are seven motions, comprising five cross-motions for summary judgment, one motion to dismiss, and one motion for imposition of attorneys' retaining and charging liens. The motions are:

- Class Plaintiffs' motion for partial summary judgment against the Republic (Dkt. #193);

- Class Plaintiffs' motion for summary judgment against Roxas (Dkt. #369);

- Bautista's motion for summary judgment against Class Plaintiffs and the Republic (Dkt. #201);

- Bautista's motion for summary judgment against Roxas (Dkt. #377);

- Roxas's motion for summary judgment against Class Plaintiffs and Bautista (Dkt. #383);

- The Republic's motion to dismiss or, in the alternative, to stay the case (Dkt. #411); and

- Simon & Partners LLP's ("S&P's") motion to authorize imposition of attorneys' retaining and charging liens (Dkt. #357).

The Court addresses each motion in turn.  For the reasons set forth below, the

Court denies each motion except S&P's motion to authorize imposition of

attorneys' liens.

**BACKGROUND**[1]

## A.    Factual Background

This interpleader action is the latest in what is now a long series of

proceedings — spanning decades and pursued in numerous jurisdictions[2] — in

which claimants have sought ownership over assets that Ferdinand Marcos

and Imelda Marcos allegedly misappropriated during Mr. Marcos's tenure as

President of the Philippines.  A full recitation of the history of the disputes

between Mr. and Mrs. Marcos, on one side, and the claimants, on the other,

would fill volumes.  Rather than engage in such an exhaustive factual

---

[1]    The facts in this Opinion are drawn from the District Attorney's complaint ("Complaint" or "Compl." (Dkt. #2)); the affidavits and declarations submitted in connection with this litigation; and the parties' Rule 56.1 statements (cited using the convention "[Party] 56.1" or "[Party] Opp. [Counter-Party] 56.1"), other than the Republic's Rule 56.1 statement, which was stricken by the Court (*see* Dkt. #343).  For ease of reference, throughout this Opinion, the Court refers to the briefs submitted in support of, or in opposition to, the pending motions using the conventions "[Party] [SJ or MTD] Br. [Counter-Party]," "[Party] [SJ or MTD] Opp. [Counter-Party]," and "[Party] [SJ or MTD] Reply [Counter-Party]"; to Robert Swift's declaration in support of Class Plaintiffs' partial motion for summary judgment as "Swift Decl." (Dkt. #196); to Robert Swift's declaration in opposition to Bautista's motion for summary judgment as "Swift Decl. Opp." (Dkt. #311); to Daniel Cathcart's declaration in support of Roxas' motion for summary judgment against Class Plaintiffs and Bautista as "Cathcart Decl." (Dkt. #384); and to Daniel J. Brown's declaration in opposition to the Republic's motion to dismiss as "Brown Decl." (Dkt. #414).

[2]    Relevant cases include:  *Rep. of Philippines* v. *Pimentel*, 553 U.S. 851 (2008); *Golden Budha Corp.* v. *Canadian Land Co. of Am., N.V.*, 931 F.2d 196 (2d Cir. 1991); *Rep. of Philippines* v. *Marcos*, 806 F.2d 344 (2d Cir. 1986); *Merrill Lynch, Pierce, Fenner and Smith, Inc.* v. *ENC Corp.*, 464 F.3d 885 (9th Cir. 2006); *In re Estate of Ferdinand Marcos Human Rights Litig.*, 94 F.3d 539 (9th Cir. 1996); *Rep. of Philippines* v. *Marcos*, 862 F.2d 1355 (9th Cir. 1988); *N.Y. Land Co.* v. *Rep. of Philippines*, 634 F. Supp. 279 (S.D.N.Y. 1986); and *Rep. of Philippines* v. *Marcos*, G.R. No. 152154 (S.C., July 15, 2003) (Phil.).  This list is not exhaustive, however, and does not include many cases in which claimants to the Interpleader Property have been involved.

3

recitation, the Court instead focuses on the facts that pertain directly to the pending motions.

### 1. Ferdinand Marcos's Presidency, and the Presidential Commission on Good Government

Ferdinand Marcos served as President of the Philippines from 1965 until 1986. (Class Plaintiffs 56.1 ¶ 2). He was elected to two terms in office, in 1965 and 1969. Rather than leaving office at the end of his second term, as required under the Philippine Constitution, Mr. Marcos instead imposed martial law in September 1972. He "confiscated businesses[,] particularly those of his adversaries[,] and ordered mass arrest and detention which, in many instances, resulted in the torture of political opponents, critics, independent publishers[,] and journalists[.]" (Swift Decl., Ex. 15).

In February 1986, a popular uprising removed Mr. Marcos from office, and he and Mrs. Marcos fled to Hawaii. (Class Plaintiffs 56.1 ¶ 3). On February 25, 1986, Corazon Aquino was sworn in as the new President of the Philippines. (*Id.* at ¶ 4). Shortly after her inauguration, President Aquino enacted Executive Order No. 1, which, *inter alia*, created the Presidential Commission on Good Government ("PCGG"). (*Id.* at ¶ 5). The PCGG was charged with recovering assets that Mr. Marcos, Mrs. Marcos, and their family had misappropriated during the Marcos presidency. To date, the PCGG has collected over 8 million pages of documents relating to Mr. and Mrs. Marcos's assets. (*Id.* at ¶ 22).

In 1986, the PCGG established an office in New York City to track down assets that Mr. and Mrs. Marcos had acquired. (Class Plaintiffs 56.1 ¶ 23). It

identified artwork that had been removed from properties in New York City, including a townhouse at 13-15 East 66th Street, which was owned by the Republic but had been used as a residence by Mr. and Mrs. Marcos. (*Id.* at ¶¶ 7-8). Artwork had similarly been removed from an apartment in the Olympic Tower at 641 Fifth Avenue that Mr. and Mrs. Marcos had used as a private residence. (*Id.* at ¶ 9).

The PCGG inventoried the paintings that had been displayed at the New York properties. (Class Plaintiffs 56.1 ¶ 24). Using bills, invoices, and labels placed on the walls where the paintings had been hung, the PCGG created a list of specific works of art that had gone missing. (*Id.* at ¶¶ 25, 28). The PCGG then took several steps to try to locate the missing artwork. It served subpoenas *duces tecum* on art galleries and auction houses in New York and elsewhere, including Marlborough Gallery. (*Id.* at ¶ 26). It launched a campaign, called "Where's the Art?", aimed at increasing public awareness of the PCGG's efforts to recover the artwork and ratcheting up the pressure on Mr. and Mrs. Marcos to return whatever artwork they possessed. On June 23, 1986, the PCGG issued a press release in which it "ask[ed] artists, school children, media specialists, the general public and the press to cheerfully join the campaign by writing to Mrs. Marcos on Where's the Art? postcards[.]" (Swift Decl., Ex. 13). That press release included a list of missing paintings; the list made specific reference to Monet's *L'Église et La Seine à Vétheuil* and Sisley's *Langland Bay*, but made no mention of Monet's *Le Bassin aux Nymphéas.* (*Id.*).

## 2. Interpleader Property

The DANY seized most of the Interpleader Property from Bautista and from bank accounts holding funds in Bautista's or her sisters' names on July 18 and July 19, 2011. (Compl. ¶ 19). The seized property included: (i) 10 paintings, a Serafian Isfahan rug, and $251,142 in cash from Bautista's Manhattan residence; (ii) 114 items of jewelry and $2,386 in cash from the residence of Bautista's sisters; (iii) 42 paintings and a rug from Bautista's Long Island residence; and (iv) approximately $13,654,349.32 from bank accounts in Bautista's name and $1,270,000 from an account jointly controlled by Bautista and one of her sisters. (*Id.* at ¶¶ 19-20). The DANY also froze six life insurance or annuity accounts in Bautista's name. (*Id.* at ¶ 20). And on July 28, 2011, Hoffinger, Stern & Ross LLP, Bautista's former attorneys, surrendered two additional paintings in connection with the criminal action. (*Id.* at ¶ 21).

### a. The 1975 Acquisition of Monet's *L'Église et La Seine à Vétheuil* and Sisley's *Langland Bay*

On August 12, 1975, Marlborough Gallery in London sold six paintings on consignment — for a total of $450,000, of which $200,000 was paid at the time of sale — to Fe Gimenez, personal secretary and confidante of Imelda Marcos, on Mrs. Marcos's behalf. (Swift Decl., Ex. 2). The paintings included Monet's *L'Église et La Seine à Vétheuil*, which sold for $138,000, and Sisley's *Langland Bay*, which sold for $82,000. The Sales Report lists Mrs. Gimenez's address as "Study Room, Malacanang Palace, Manila, Philippines." (Swift Decl., Ex. 2). The delivery instructions state: "All taken except Moore[,] which should be delivered to the Philippines['] London Embassy." (*Id.*). The

6

Consignment Note, on Marlborough Gallery's letterhead and dated November 26, 1975 (when the paintings were dispatched), is addressed to "Madame Marcos, Malacanang Palace, Manila, Philippines." (*Id.*).

### b. The 1977 Acquisition of Monet's *Le Bassin aux Nymphéas*

On March 31, 1977, Mrs. Marcos purchased nine paintings from Marlborough Gallery for a total of $2.9 million. (Swift Decl., Ex. 3). The most expensive was Monet's *Le Bassin aux Nymphéas* (the "Water Lily" painting), which sold for $791,800. (*Id.*). The money used to purchase the paintings came from a Swiss bank account held in the name of Trinidad Foundation, a foundation created in 1970. (*Id.*, Ex. 5; Republic Opp. Class Plaintiffs 56.1 ¶ 17). Mrs. Marcos was the primary beneficiary of the Trinidad Foundation. (*Id.*).

In 1986, after Mr. Marcos was removed from office, the Swiss government froze several of the Trinidad Foundation's bank accounts. It did so based on the Republic's claim that all of the money in the accounts had been misappropriated by Mr. and Mrs. Marcos, and that the Republic was the rightful owner. (Class Plaintiffs 56.1 ¶ 31). In August 1991, the Swiss government provided documentation of transactions that had been processed through the Trinidad Foundation's bank accounts, including specific references to the March 29, 1977 payment of $2.9 million to the London bank account of Marlborough Fine Arts. (*Id.* at ¶¶ 32-33).

### c.  The Display and Subsequent Removal of the Paintings

During the Marcos presidency, artwork purchased on behalf of Mrs.

Marcos was displayed at the townhouse at 13-15 East 66th Street in New York

City.  (Class Plaintiffs 56.1 ¶¶ 7-8).  The Republic owned that property, which

served as the Philippine Consulate in New York, though it was also used by Mr.

and Mrs. Marcos as a private residence.  (*Id.*).  Mrs. Marcos also displayed

some of the artwork at a second residence in New York, an apartment in the

Olympic Tower.  (*Id.* at ¶ 9).

Bautista took possession of the paintings, though the timing of her

appropriation of the paintings is a point of speculation and of some contention.

Class Plaintiffs assert that, "[i]n late 1985 or early 1986, the three paintings

were removed and hidden by Bautista[.]"  (Class Plaintiffs 56.1 ¶ 20).  The

Republic, by contrast, is unwilling to provide even a general timeframe for

Bautista's appropriation of the paintings.  It states merely that "[t]he time

period when the[ ] [paintings] were taken is yet unclear."  (Republic Opp. Class

Plaintiffs 56.1 ¶ 20).  What is undisputed is that, when officials from the PCGG

searched for the paintings after Mr. Marcos was swept from power in 1986, it

did not find them in either the townhouse or the Olympic Tower apartment.

### d.  Bautista's Sale of the Water Lily Painting, and Her Subsequent Prosecution

#### i.  Sale of the Water Lily Painting

On September 14, 2010, Bautista sold the Water Lily painting to a

London gallery for $32 million.  (Class Plaintiffs 56.1 ¶ 34).  In connection with

that sale, Bautista provided the purchaser with a Certificate of Authority,

signed by Mrs. Marcos and dated June 21, 1991, stating that Bautista was "[Mrs. Marcos's] authorized representative to offer and negotiate, on [Mrs. Marcos's] behalf, the sale and/or disposition of [Monet's Water Lily painting.]" (Swift Decl., Ex. 11).  It further indicated that Bautista was "authorized to sign, on [Mrs. Marcos's] behalf, the corresponding deeds of transfer of ownership of [the] painting[ ]" and "to receive and/or sign receipts for the proceeds of the sale of [the] painting[ ]."  (*Id.*).

In a letter issued to the purchaser of the Water Lily painting, Bautista explained that, during one of Mrs. Marcos's visits to New York in 1991, "a number of original copies of a pro forma Certificate of Authority [were] prepared and notarized … and each one was signed by Mrs. Marcos."  (Swift Decl., Ex. 12).  For each, "the central section where the description of the asset to be sold … was left blank for later completion."  (*Id.*).  In February 2010, Bautista "used one of the signed and notarized Certificates of Authority and typed in the appropriate section therein the description for the painting now being sold."  (*Id.*).  She went on to note that "Mrs. Marcos believes that all her correspondence as well as other communications are always subject to constant monitoring and surveillance by the government (both Philippine and U.S.)," and thus that "confidentiality should always be preserved and maintained for all sensitive matters such as the sale of the [p]ainting in question."  (*Id.*).

Bautista further stated that she had "received instructions from [Mrs. Marcos] to sell the [p]ainting, and [Mrs. Marcos] [wa]s aware of the sale."  (Swift

Decl., Ex. 12). She was "acting as [Mrs. Marcos's] agent with authority to sell the [p]ainting of which [Bautista] ha[d] physical possession[.]" (*Id.*). The painting "ha[d] been in [Bautista's] possession for a good number of years and ha[d] been kept in different locations in New York." (*Id.*). Bautista did not "have any documentary record of when the [p]ainting was purchased by Mrs. Marcos, but to the best of [Bautista's] recollection … it was bought together with other paintings in London during the late 70s or early 80s." (*Id.*). Bautista closed by stating: "In entering into the Agreement and at the Closing, I shall continue to act as [Mrs. Marcos's] authorized agent and representative." (*Id.*).

### ii.    Bautista's Criminal Prosecution

In 2011, the DANY launched an investigation into the sale of the Water Lily painting, which investigation culminated in Bautista's indictment on October 8, 2012. (Bautista 56.1 ¶ 22). Bautista was "charged with having illegally conspired to possess and sell valuable works of art acquired by Marcos during her husband's presidency, keep the proceeds for herself, and hide those proceeds from New York State tax authorities and others." (Compl. ¶ 16). She and her co-conspirators "attempted to sell the paintings covertly using a variety of illicit means." (*Id.* at ¶ 17). After selling the Water Lily painting, Bautista received $32 million dollars, "paid her accomplices 'commissions,' and kept the rest of the money herself." (*Id.*). And in April 2011, Bautista filed a 2010 tax return that did not mention the sale or any income derived therefrom. (*Id.*).

On November 18, 2013, after a five-week trial, Bautista was found guilty on all counts, including Conspiracy in the Fourth Degree, Criminal Tax Fraud in the First Degree, and Offering a False Instrument for Filing in the First Degree. (Compl. ¶ 18). The criminal action determined that "Bautista was not the rightful owner of the [paintings], including the Water[ ] Lily painting[.]" (*Id.* at ¶ 22). On October 20, 2015, the Appellate Division reversed the conspiracy conviction (but affirmed the remaining convictions) after finding, *inter alia,* that "[t]he trial court erred in reading or paraphrasing approximately eight sentences from an order of the Supreme Court of the Philippines ... [where] [o]nly one sentence read by the court to the jury purported to state the law of the Philippines[.]" *People* v. *Bautista*, 18 N.Y.S.3d 47, 49 (1st Dep't 2015). The DANY elected not to retry Bautista on the conspiracy conviction.

### 3.    Prior Judgments That Claimants Seek to Enforce in This Interpleader

#### a.    Roxas's Hawaii Judgment

Roxas brought suit against Mr. and Mrs. Marcos in Hawaii state court on February 19, 1988, alleging then — as he[3] does now — that, in January 1971, he discovered a "lost treasure" that was reputed to have been left by General Tomoyuki Yamashita (the "Yamashita Treasure") in underground tunnels in Baguio City in the Philippines. (Roxas 56.1 ¶¶ 2-3, 32-33). The treasure included a Buddha statue made of one metric ton of gold, handfuls of uncut

---

[3]    The Court refers to Roxas as "he" throughout this Opinion, though Mr. Roxas is deceased, and the parties in interest are the Roxas Estate and the Golden Budha Corporation.

diamonds, and boxes filled with gold bars. (*Id.* at ¶¶ 4-7). Roxas further alleged that, in May 1971 and again in July 1972, he was taken into custody and tortured at President Marcos's direction. (*Id.* at ¶¶ 11-13). Roxas claimed that, in late 1974, government soldiers seized the Yamashita Treasure and that Marcos subsequently sold much, if not all, of the gold. (*Id.* at ¶¶ 16-30).

The Hawaii lawsuit sought compensation for Roxas's torture and false imprisonment, as well as for the treasure that [Mr. Marcos] had allegedly converted. (Roxas 56.1 ¶ 33). Mr. Marcos died on September 28, 1989, and Mrs. Marcos stipulated that she would serve as the decedent's representative. (*Id.* at ¶¶ 36-37). The case went to trial in the summer of 1996. On July 19, 1996, the jury issued a verdict: It found Mr. Marcos[4] liable and awarded Roxas $6 million in damages for battery and false imprisonment; $1.3 million for the golden Buddha statue; $100,000 for seventeen gold bars and $5,000 for a coin collection taken from Roxas's house; and $22 billion for the gold bullion that Mr. Marcos had converted from an underground storage area, which constituted the bulk of the Yamashita Treasure. (*Id.* at ¶¶ 45-50). The verdict was issued against Mr. Marcos and subsequently amended by the intermediate appellate court to reflect that it was a judgment against Mr. Marcos's estate (the "Marcos Estate" or the "Estate") and against Imelda Marcos as the Estate's personal representative. (*Id.* at ¶ 58).

---

[4]     The jury found Mrs. Marcos not liable in her individual capacity. *Roxas* v. *Marcos*, 969 P.2d 1209, 1232 (Haw. 1998).

Mrs. Marcos appealed. (Roxas 56.1 ¶ 51). The Hawaii Supreme Court addressed two issues relevant to the instant action. Preliminarily, it assessed whether the lower court had erred in appointing Mrs. Marcos as representative of the Marcos Estate. It held that, even though "an heir of an undistributed estate … is not a 'proper party' for substitution," Mrs. Marcos was "judicially estopped from attempting to renounce her prior disingenuous position regarding her legal status[.]" *Roxas* v. *Marcos*, 969 P.2d 1209, 1240 (Haw. 1998). For this reason, the court rejected Mrs. Marcos's argument that the judgment should not have been entered against her as representative of the Estate. As the court noted, "in order to achieve manifest justice consistent with the doctrine of judicial estoppel, the equities of this case require us to hold Imelda personally liable, at least to the extent of her interest in the assets of the Marcos Estate[.]" *Id.* at 1244.

The court next addressed whether Roxas had produced sufficient evidence to support the verdict. It began by noting that "Ferdinand's witnessed possession of large amounts of gold, combined with the testimony of [co-conspirators] that at least some of the gold was resmelted and surreptitiously sold, constitute[d] sufficient corroboration of the testimony that Ferdinand was attempting to launder and fraudulently convey Roxas's gold." *Roxas*, 969 P.2d at 1256. The court further found that there was sufficient evidence to support the jury's finding that Mr. Marcos had converted some of the Yamashita Treasure and had battered and falsely imprisoned Roxas. *Id.* at 1256-60. It therefore upheld the damage award as to the battery and false imprisonment

claims, as well as the damages flowing from the theft of the golden Buddha statue and the seventeen gold bars and coin collection taken from Roxas's home. *Id.* at 1266-75.

However, the court reversed the portion of the verdict awarding Roxas $22 billion for "one storage area" of gold bullion. *Roxas*, 969 P.2d at 1275. The court found that the testimony regarding the quantity of gold in the storage area was "extremely vague." *Id.* at 1260 ("For example, Jonsson testified that the room he had seen was '*[m]aybe* 40 feet by 20, *something like that*' … and that he 'believed' that the ceiling was twelve feet tall, '[m]aybe more. *I don't remember.*'" (emphases in original)). Because the testimony was so imprecise, it "afforded the jury no legitimate basis for determining damages." *Id.* The vacillations in the testimony concerning volume admitted a "margin of error comprising thousands of tons." *Id.* Accordingly, the court overturned the $22 billion award for the gold bullion. Roxas was left with a judgment of $6 million in damages for battery and false imprisonment, and $1,405,000 for the theft of the golden Buddha statue and the seventeen gold bars and coin collection taken from Roxas's house (the "Roxas Judgment").

### b.    Class Plaintiffs' Hawaii Judgment

Roxas was not the only victim of the Marcos regime that brought suit following Mr. Marcos's removal from power. Shortly after Mr. Marcos fled to Hawaii, human rights victims and their families brought actions against Mr. Marcos seeking damages for torture, summary execution, and disappearance. *See Hilao* v. *Estate of Marcos*, 103 F.3d 762, 763 (9th Cir. 1996). In 1991,

14

these actions were consolidated and certified as a class action in the U.S. District Court for the District of Hawaii comprising approximately 10,000 individuals. *Id.* The court entered a preliminary injunction prohibiting the Marcos Estate and its agents from disposing of any of the Estate assets. *Id.* The class obtained a verdict of liability against Marcos's Estate and an award of nearly $2 billion in damages, which made the preliminary injunction permanent. *Id.*

In 2011, the Class obtained a second judgment — which they seek to enforce in the instant action — in the amount of $353,600,000. *See In re Estate of Marcos Human Rights Litig.*, 496 F. App'x 759, 760 (9th Cir. 2012) (memorandum opinion). That judgment was entered after the court granted Class Plaintiffs' motion for entry of final judgment for civil contempt, stemming from violations of a February 19, 1995 Order enjoining the Marcos heirs from transferring or otherwise disposing of Estate assets. *See id.*; *see also Hilao*, 103 F.3d at 763-64. Both the 1995 and 2011 judgments have been transferred to and registered in the Southern District of New York.

**B.    Procedural Background**

On February 11, 2014, the DANY filed an interpleader complaint. (Dkt. #2). In that complaint, the DANY identified various parties that had already asserted or were expected to assert claims to the Interpleader Property, including: the Republic, Class Plaintiffs, Bautista and her sisters, Imelda Marcos, and an unnamed artist and museum in the Philippines. Of those parties, only the Republic, Class Plaintiffs, and Bautista remain in this action.

15

On July 11, 2016, Roxas filed a motion to intervene (Dkt. #237), which the Court granted on August 12, 2016 (Dkt. #262).

On April 22, 2015, Class Plaintiffs filed a Rule 12(b)(6) motion to dismiss the Republic's cross-claims and affirmative defenses. (Dkt. #76-79). The Court held oral argument on November 24, 2015, and again on December 28, 2015. (*See* Dkt. #131, 134). The Court denied the motion on January 20, 2016. (Dkt. #137). In doing so, the Court noted that, "[p]erhaps the most perplexing issue presented by the [m]otion arises from the choice-of-law analysis implicated by the parties' arguments." *Dist. Atty. of N.Y. Cty.* v. *Rep. of the Philippines* (hereinafter, "*Philippines I*"), No. 14 Civ. 890 (KPF), 2016 WL 9022580, at *3 (S.D.N.Y. Jan. 20, 2016). The Court observed that "neither party has proffered expert testimony to aid the Court in identifying, interpreting, or contextualizing the foreign law or laws that apply." *Id.* at *4. The Court further noted that it "cannot resolve the ownership arguments raised ... because the parties have not provided a sufficient basis for selecting the law that determines the ownership of the property at issue." *Id.* Nor could the Court conclude as a matter of law that "the Republic's claims [we]re barred by the applicable statutes of limitations in the face of the Republic's fact-intensive invocation of equitable estoppel." *Id.* at *5.

Currently pending before the Court are the following seven motions:

- Class Plaintiffs' motion for partial summary judgment against the Republic: Class Plaintiffs filed their opening papers on June 1, 2016 (Dkt. #193-196), the Republic filed its opposition brief on July 1, 2016 (Dkt. #225),

16

and Class Plaintiffs filed their reply on July 18, 2016 (Dkt. #240);

- Class Plaintiffs' motion for summary judgment against Roxas:  Class Plaintiffs filed their opening papers on July 24, 2017 (Dkt. #369-372), Roxas filed an opposition brief on August 25, 2017 (Dkt. #401), and Class Plaintiffs filed their reply on September 11, 2017 (Dkt. #417);

- Bautista's motion for summary judgment against Class Plaintiffs and the Republic:  Bautista filed her opening papers on June 1, 2016 (Dkt. #201-202, 208-209), Class Plaintiffs filed an opposition brief on June 30, 2016 (Dkt. #214), and an amended opposition brief on December 8, 2016 (Dkt. #313),[5] the Republic filed an opposition brief on July 1, 2016 (Dkt. #225), and Bautista filed a reply on July 18, 2016 (Dkt. #241);

- Bautista's motion for summary judgment against Roxas:  Bautista filed her opening papers on July 24, 2017 (Dkt. #377, 388-390), and Roxas filed his opposition brief on August 25, 2017 (Dkt. #401);

- Roxas's motion for summary judgment against Class Plaintiffs and Bautista:  Roxas filed his opening papers on July 28, 2017 (Dkt. #383-386), Class Plaintiffs filed an opposition brief on August 25, 2017 (Dkt. #398), which Bautista joined by letter dated August 25, 2017 (Dkt. #407), and Roxas filed a reply on September 11, 2017 (Dkt. #419);

- The Republic's motion to dismiss or, in the alternative, to stay the case:  the Republic filed its opening brief on July 24, 2017 (Dkt. #374), and then refiled the brief on

---

[5] The Court notes that this amended opposition brief was filed without leave of court or the consent of the parties, and that Bautista did not file an amended reply brief in response thereto.  Although the Court will not blind itself to the issues raised therein, in part because the brief has been on the public docket since December 2016, the Court will not consider any of the arguments therein to grant summary judgment against Bautista, given that the amended brief was untimely, filed without permission, and framed not as an offensive motion for summary judgment but instead as an opposition to Bautista's own motion.  If Class Plaintiffs wish to have the Court consider the arguments advanced in their late-filed amended opposition brief as a basis for summary judgment, they are invited to request leave to file a stand-alone motion for summary judgment against Bautista.

August 29, 2017, and again on September 11, 2017 (Dkt. #411, 415), Class Plaintiffs filed an opposition on August 25, 2017 (Dkt. #396), and a supplementary letter brief on January 23, 2018 (Dkt. #426), Roxas filed an opposition brief on August 29, 2017 (Dkt. #413), and the Republic filed its reply on September 18, 2017 (Dkt. #422);

- S&P's motion to impose attorneys' liens: S&P filed its opening papers on June 9, 2017 (Dkt. #357-359), and no opposition papers were filed.

The Court notes that, before the Republic filed the motion to dismiss mentioned above, it had moved for partial summary judgment against Class Plaintiffs. (*See* Dkt. #197-200, 242). After the Republic caused various delays by failing to make witnesses available for depositions (*see* Dkt. #332), and by failing to address four issues in a letter to the Court dated May 24, 2017 (Dkt. #341), that were critically important to the Court's adjudication of the Republic's claims (*see* Dkt. #343), the Court sanctioned the Republic by, *inter alia*, striking the Republic's pending motion (*see id.*). Accordingly, the Court will not consider that motion here, nor will the Court consider any of the associated documents or evidence cited therein.

## DISCUSSION

A.   **Applicable Law**

1.   **Summary Judgment Standard**

Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law[.]"  *Anderson*, 477 U.S. at 248.

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Catrett*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  In considering "what may reasonably be inferred" from witness testimony, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed

facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *Cty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, … conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita,* 475 U.S. at 587; *Wyler* v. *United States,* 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

### 2. Interpleader Actions

Interpleaders are "a handy tool to protect a stakeholder from multiple liability and the vexation of defending multiple claims to the same fund." *Washington Elec. Co-Op, Inc.* v. *Paterson, Walke & Pratt, P.C.*, 985 F.2d 677, 679 (2d Cir. 1993) (citations omitted). An interpleader is triggered by "a real and reasonable fear of double liability or … conflicting claims." *Id.* (internal quotation marks and citation omitted). "As a remedial joinder device, interpleader is to be liberally construed." *Weininger* v. *Castro*, 462 F. Supp. 2d 457, 500 (S.D.N.Y. 2006).

There are two forms of interpleader: rule interpleader, under Federal Rule of Civil Procedure 22; and statutory interpleader, under 28 U.S.C. § 1335. Both serve the same function of joining two or more adverse claimants to a single proceeding in order, in turn, to promote efficiency and to protect the stakeholder from multiple lawsuits. *Bradley* v. *Kochenash*, 44 F.3d 166, 168

(2d Cir. 1995). Differences between the two concern personal and subject matter jurisdiction, service of process, and venue. *See* 4 J. Moore et al., *Moore's Federal Practice* § 22.04[1] (3d ed. 2017). The most important distinction involves the requirements for subject matter jurisdiction. For rule interpleader, subject matter jurisdiction must be based on Article III of the Constitution and the jurisdictional statutes. In other words, "a traditional basis for subject matter jurisdiction must exist." *6247 Atlas Corp.* v. *Marine Ins. Co., Ltd., No. 2A/C*, 155 F.R.D. 454, 465 (S.D.N.Y. 1994). Statutory interpleader, by contrast, requires only minimal diversity — "that is, diversity of citizenship between two or more claimants, without regard to the circumstance that other rival claimants may be co-citizens." *State Farm Fire & Cas. Co.* v. *Tashire*, 386 U.S. 523, 530 (1967).

Here, the DANY filed the interpleader action under § 1335(a), according to which district courts "have original jurisdiction of any civil action of interpleader ... [involving] money or property of the value of $500 or more ... [and where t]wo or more adverse claimants [are] of diverse citizenship[.]" This interpleader involves parties that are citizens of the State of New York and of the Republic of the Philippines, and the amount in controversy far exceeds $500. (*See generally* Compl.). The Court may therefore exercise subject matter jurisdiction.

### a. Two-Step Analysis

Interpleader actions typically proceed in two stages. In the first stage, the Court determines "that the requirements of § 1335 are met and reliev[es]

the plaintiff stakeholder from liability[.]" *N.Y. Life Ins. Co.* v. *Conn. Dev. Auth.*, 700 F.2d 91, 95 (2d Cir. 1983).  In the instant matter, the Court has already determined that interpleader was proper and ordered the deposit of the Interpleader Property into the Court.  (*See* Dkt. #72).  The second stage of the interpleader process requires the Court to adjudicate the parties' adverse claims on the merits.  *See Truck-A-Tune, Inc.* v. *Re*, 856 F. Supp. 77, 79 (D. Conn. 1993), *aff'd*, 23 F.3d 60 (2d Cir. 1994).

### b.    Equitable Nature of Interpleader Remedy

Interpleader actions are often characterized as equitable in nature.  The Second Circuit has observed that "[i]nterpleader is an equitable proceeding," *Truck-A-Tune, Inc.*, 23 F.3d at 63, and district courts have long held similarly, *see, e.g.*, *William Penn Life Ins. Co.* v. *Viscuso*, 569 F. Supp. 2d 355, 362 (S.D.N.Y. 2008) ("Although sanctioned by statute, interpleader is fundamentally an equitable remedy."); *Citigroup Glob. Mkts., Inc.* v. *KLCC Invs., LLC*, No. 06 Civ. 5466 (LBS), 2007 WL 102128, at *7 (S.D.N.Y. Jan. 11, 2007) ("[I]nterpleader is an equitable remedy that should be applied liberally[.]"); *Irving Tr. Co.* v. *Nationwide Leisure Corp.*, 93 F.R.D. 102, 110 (S.D.N.Y. 1981) ("Interpleader is an equitable device[.]").  References to interpleaders as an equitable remedy appear with such frequency — but with such little exposition — that claimants would be forgiven for wondering what role, if any, the remedy's equitable nature plays in a court's adjudication of the merits.

This Court therefore pauses to provide some explanation of the contours of interpleaders' equitable nature.  The Court is compelled to do so here, in

part because some of the claimants evince a rather expansive — and, in this Court's view, impermissibly broad — understanding of interpleaders' equitable nature. For example, in Roxas's opposition to Class Plaintiffs' motion for summary judgment, Roxas suggests that this Court may consider equitable principles even where they might conflict with traditional legal principles and that the Court may exercise its broad discretion to fashion a remedy that achieves equity but derogates well-established legal principles. (*See* Roxas SJ Opp. Class Plaintiffs 14 ("In sum, in weighing the equities among the parties, the Court should favor [Roxas].")).

The Court does not understand its discretion to be quite so broad, nor the equitable principles that apply to interpleader actions to be quite so far-reaching. To be sure, interpleader is an equitable remedy. But the Court is still required to apply legal principles in adjudicating the merits of the parties' claims. The U.S. Supreme Court has advised that "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Armstrong* v. *Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015) (quoting *I.N.S.* v. *Pangilinan*, 486 U.S. 875, 883 (1988)). In the interpleader context, courts in this Circuit have held — properly so — that legal, rather than equitable, principles govern the adjudication of the merits. *See, e.g.*, *XL Specialty Ins. Co.* v. *Lakian*, 243 F. Supp. 3d 434, 448 (S.D.N.Y. 2017) ("[Party's] appeal to the Court's equitable powers does not justify deviating from the clear legal principles in this case.").

A review of the context in which courts discuss the equitable nature of interpleaders is revealing:  Courts most often do so in deciding whether to allow an interpleader to go forward at all; they rarely do so in adjudicating the merits of the parties' competing claims.  *See, e.g.*, *Truck-A-Tune*, 23 F.3d at 63; *Great Wall De Venezuela C.A.* v. *Interaudi Bank*, 117 F. Supp. 3d 474, 483-84 (S.D.N.Y. 2015); *Viscuso*, 569 F. Supp. 2d at 362.  The equitable nature of the remedy, in other words, applies principally at step 1 (determining whether interpleader is proper), not at step 2 (deciding the merits).  To the extent that a court has greater discretion in the interpleader context than it does in other contexts, that discretion finds its currency in a court's decision to permit a plaintiff to consolidate multiple adverse claims into a single action in order to "protect [the plaintiff] from vexatious and multiple litigation."  *State Farm Fire & Cas. Co.*, 386 U.S. at 534.  It does not provide courts with latitude to eschew clear legal principles in favor of an amorphous sense of equity.  *Lakian*, 243 F. Supp. 3d at 448.

With that, the Court turns to the choice of law issue, which this Court previously addressed, but was unable to decide, at the motion to dismiss stage because the parties "ha[d] not provided the Court with sufficient information[.]" *Philippines I*, 2016 WL 9022580, at *3.

### 3.    Choice of Law

The Court addresses the threshold issue of which law should apply to the parties' claims.  At the motion to dismiss stage, this issue was raised, with Class Plaintiffs and the Republic advancing competing views of the applicable

law.  Then, the Republic argued that Philippine Law R.A. 1379 applies to —

and is dispositive of — the question of ownership of the Interpleader Property.

(*See* Dkt. #89 at 9-10).  Class Plaintiffs, for their part, argued that Philippine

law did not apply, and that the action instead was governed by New York law.

(*See* Dkt. #99 at 3-7).  Class Plaintiffs suggested, in the alternative, that the

law of Switzerland or Liechtenstein might apply to some subset of questions

regarding the funds that the Trinidad Foundation had deposited in a Swiss

bank account, but that, in any event, Philippine law could not apply.  (*Id.* at

3 n.3).

    In denying the motion to dismiss, this Court wrote at some length on the

choice of law issue, which it characterized as "[p]erhaps the most perplexing

issue presented[.]"  *Philippines I*, 2016 WL 9022580, at *3.  It observed that two

statutory schemes arguably were relevant to determining the controlling law:

(i) the interpleader statute, 28 U.S.C. § 1335; and (ii) the Foreign Sovereign

Immunities Act (the "FSIA"), 28 U.S.C. §§ 1602-1611.  The Court found that,

under either statute, New York choice of law principles apply.  As the Court

explained, "[w]hen a federal interpleader action 'is based on [ ] diversity of

citizenship ... courts apply the [choice of law rules] of the forum state[.]'"  *Id.*

(alterations in original) (quoting *KLCC Invs., LLC*, 2015 WL 5853916, at *6).

And, "in FSIA cases, we use the forum state's choice of law rules to resolve all

issues, except jurisdictional ones."  *Id.* (quoting *Karaha Bodas Co., LLC* v.

*Perusahaan Pertambangan Minyak Dan Gas Bumi Negara* ("*Pertamina*"), 313

F.3d 70, 84 (2d Cir. 2002)).  Therefore, "whether by operation of the

25

interpleader statute or the FSIA, New York's choice-of-law rules apply in this case." *Id.*

The Court then recited the New York choice of law principles. It explained that, under New York law, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Philippines I*, 2016 WL 9022580, at *4 (brackets in original) (quoting *Pertamina*, 313 F.3d at 85). It further observed:

> [I]n property disputes, if a conflict is identified, New York choice of law rules require the application of an interests analysis, in which the law of the jurisdiction having the greatest interest in the litigation [is] applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.

*Id.* (quoting *Pertamina*, 313 F.3d at 85). Finally, it noted that, as in property disputes, "'the relevant analytical approach to choice of law in tort actions in New York' is the 'interest analysis.'" *Id.* (original alterations omitted) (quoting *GlobalNet Financial.Com, Inc.* v. *Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006)).

The Court found that "the parties ha[d] not provided the Court with sufficient information to perform a proper choice-of-law analysis[.]" *Philippines I*, 2016 WL 9022580, at *3. In particular, "neither party ha[d] proffered expert testimony to aid the Court in identifying, interpreting, or contextualizing the foreign law or laws that may apply." *Id.* at *4. Without that information, "the Court cannot determine whether a conflict of law exists, let alone ascertain

26

which jurisdiction has a greater interest in the outcome of this case." *Id.*
Similarly, though Class Plaintiffs asserted that the Court may not apply the
Philippine law advanced by the Republic, "in the absence of expert testimony
on the contours of that law, the Court cannot conclude … that the Philippine
law is categorically unenforceable." *Id.*

By discussing the deficiencies in the parties' choice of law analyses, the
Court understood itself also to be inviting the parties to provide additional
information in any future motion practice. It thought that it had made clear to
the parties that, to decide the choice of law issue, the Court would require
expert testimony regarding any foreign law that might apply. Yet the parties
have largely failed to take up the Court's invitation. Just one party — Class
Plaintiffs — filed an expert affidavit on foreign law. And Class Plaintiffs' affiant,
Mr. Federico Agcaoili, opined on just one of the issues implicated by this
action — namely, the validity *vel non* of the 1993 Deed of Assignment that
purportedly transferred ownership over various paintings from Mrs. Marcos to
Bautista. (*See* Dkt. #312). And as the Court explained *supra* in note 5, it will
only consider the expert affidavit for limited purposes, as it was submitted
alongside an amended brief that was filed late and without leave of Court or
consent of the parties.

The parties' briefs themselves fail adequately to address the choice of law
issues. If anything, choice of law seems to have receded from the parties' view.
Whereas the Republic devoted several pages to the issue in its opposition to the
motion to dismiss (*see* Dkt. #89 at 9-14), its opposition to Class Plaintiffs'

pending summary judgment motion contains but a single parenthetical on point (Republic SJ Opp. Class Plaintiffs 4). The Republic merely states that, "[i]n the end, regardless of what law applies (i.e.[,] even if R.A. 1379 does not apply, which we do not concede), the general principle that no [one] may take advantage of their own wrong ... forecloses any statute of limitations argument[.]" (*Id.*). Far from providing the Court with the requisite analysis or expert testimony on point, the Republic instead opines that it "perhaps ... spent too much of the Court's time addressing the choice-of-law analysis [at the motion to dismiss stage.]" (*Id.*). To the contrary: The Court had expected that the Republic would expend more effort, and provide greater analysis, to elucidate the choice of law issue. Instead, the Republic and the other claimants have analyzed each of the issues in this interpleader action — with two exceptions discussed below — under New York law.

The Second Circuit has held that courts need not "examine foreign legal sources independently ... in the absence of any suggestion that such a course will be fruitful or [that the court will receive] any help from the parties." *Bartsch* v. *Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 155 n.3 (2d Cir. 1968). And courts in this District have noted that where "there is a failure of proof of foreign law, the court may presume that it is the same as local law." *In re Parmalat,* 383 F. Supp. 2d 587, 595 (S.D.N.Y. 2005). Similarly, where a party cites both New York and foreign law but "ma[kes] no objection to the application of New York law and has not briefed the choice of law question," the court may "deem the parties to have implicitly consented to having New York

law apply, and this 'implied consent … is sufficient to establish choice of law' on the question." *Amusement Indus., Inc.* v. *Stern*, 693 F. Supp. 2d 327, 341 (S.D.N.Y. 2010) (quoting *Krumme* v. *WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)); *accord Clarex Ltd.* v. *Natixis Sec. Am. LLC*, No. 12 Civ. 7908 (PAE), 2013 WL 2631043, at *2 n.3 (S.D.N.Y. June 11, 2013) ("[T]he Court applies New York law for both plaintiffs, because all parties apply New York law in their submissions:  Where '[t]he parties' briefs assume that New York law controls … such implied consent … is sufficient to establish choice of law.'" (quoting *Wolfson* v. *Bruno*, 844 F. Supp. 2d 348, 354 (S.D.N.Y. 2011))).

In the instant action, there are only two areas where parties have suggested that non-New York law applies and have adequately briefed the issue.  *First*, Roxas asserts that Hawaii law applies to determine the preclusive effect, if any, of the Roxas Judgment.  The Court agrees.  It is well established that, "[t]o determine the effect of a state court judgment, federal courts, including those sitting in diversity, are required to apply the preclusion law of the rendering state." *Conopco, Inc.* v. *Roll Intern.*, 231 F.3d 82, 87 (2d Cir. 2000) (citing *Migra* v. *Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)); *see also id.* ("Federal courts may not employ their own rules … in determining the effect of state judgments, but must accept the rules chosen by the State from which the judgment is taken." (internal quotation marks and citation omitted)).  Because a Hawaii court issued the Roxas Judgment, this Court must apply Hawaii preclusion law to determine the *res judicata* effect, if any, of that judgment.

*Second*, Class Plaintiffs argue that the validity of Bautista's Deed of Assignment must be assessed under Philippine law. As mentioned, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Pertamina*, 313 F.3d at 85. As attested by Mr. Agcaoili, Article 748 of the Philippine New Civil Code establishes that, for any donation of personal property worth more than five thousand Philippine pesos (equivalent to approximately $95, as of the date of this Opinion), "the donation and acceptance shall be made in writing. Otherwise, the donation shall be void." (Dkt. #312 ¶ 24). The Philippine Supreme Court has enforced this requirement: In a case involving a donation of 3,297,800 pesos, where the acceptance was not in writing, the court held that the donation was invalid under Article 748. (*Id.* at ¶ 25). New York law, by contrast, does not require written acceptance of a gift of value. *See, e.g.*, *Gruen* v. *Gruen*, 68 N.Y.2d 48, 57 (1986) ("[W]hen a gift is of value to the donee, as it is here, the law will presume an acceptance on his part[.]") (internal citations omitted); *Anagnostou* v. *Stifel*, 562 N.Y.S.2d 490, 491 (1st Dep't 1990) ("[Acceptance] can be presumed where, as here, the works of art are of intrinsically significant value[.]" (internal citation omitted)).

Having found that a conflict of law exists, the Court turns to the second step of New York's choice of law analysis to determine which jurisdiction has the greatest interest in adjudicating the issue. In property disputes, "New York choice of law rules require the application of an interests analysis, in which the

law of the jurisdiction having the greatest interest in the litigation [is] applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Pertamina*, 313 F.3d at 85 (internal quotation marks and citation omitted).

As to the Deed of Assignment's validity, there can be little doubt that the Republic has the greatest interest in having its law apply. The Deed was signed on August 5, 1983, by Imelda Marcos, then-First Lady of the Philippines, at the Malacanang Palace in Manila. (Dkt. #208-5). The notary public who witnessed the signature, Eliseo A. Razon, attested that the Deed was executed "in the City of Manila." (*Id.*). And the Deed itself is being held by the Clerk of Court at the Regional Trial Court in Manila. (*Id.*). A review of the Deed's contents reveals but a single connection to New York: At the time, Bautista resided at 210 West 70th Street in New York. (*Id.*). But even that fact does not militate against applying Philippine law, given that Bautista was sent to New York by the Philippine government in connection with her work as a Philippine Foreign Service Officer. This constellation of facts establishes that the Republic has the greatest interest in having its law determine the validity of the Deed. Accordingly, the Court will apply Philippine law to that issue.

## B. Analysis

The Court analyzes the seven pending motions in turn. With one exception, the Court considers each motion separately, as the motions raise unique questions of fact and law. The only motions that are sufficiently similar

to justify joint consideration are Class Plaintiffs' and Bautista's motions for summary judgment against Roxas.

1. **Class Plaintiffs' Motion for Partial Summary Judgment Against the Republic Fails**

   a. **The Court Remains Unpersuaded That Class Plaintiffs Have Standing to Bring This Motion**

The Court begins by addressing an issue that it raised in its January 20, 2016 Order denying Class Plaintiffs' motion to dismiss — namely, Class Plaintiffs' standing to file a motion against cross-claims in which they are not named. *Philippines I*, 2016 WL 9022580, at *1-3. Then, the Court was "concerned about their standing to file a motion to dismiss given the state of pleadings." *Id.* at *2. It noted the tension between procedures that apply to interpleader actions — whereby each claimant is adversarial to the others and is expected to respond to the others' claims — and rules governing motion practice more generally in federal court, according to which a party "lacks standing to attack the legal sufficiency of those other counts" to which "he has not been named as a defendant." *Id.* (quoting *Dover Ltd.* v. *A.B. Watley, Inc.*, No. 04 Civ. 7366 (FM), 2006 WL 2987054, at *8 (S.D.N.Y. Oct. 18, 2006)). The "seeming incongruity between interpleader law and federal procedure" left the Court "concerned about [Class Plaintiffs'] standing to file [the motion]." *Id.*

The Court was unpersuaded by Class Plaintiffs' assertion that their levy confers standing. Class Plaintiffs had "not offered any basis for concluding that a levy filed by a party in connection with a state court action confers standing on that party in federal court to move to dismiss claims in which the

party was not named." *Philippines I*, 2016 WL 9022580, at *2. And even if the levy had been filed in this Court, "Class Plaintiffs ha[d] not cited any law, rule, or precedent allowing a party, by operation of a levy, to move to dismiss claims in which it is not named." *Id.* In an effort to convince the Court to the contrary, Class Plaintiffs cited *United States* v. *Barry Fisher Law Firm, LLC*, No. 10 Civ. 7997 (TPG), 2012 WL 591396 (S.D.N.Y. Feb. 23, 2012). The Court found that case to be inapposite as it "does not involve a co-defendant moving to dismiss state law cross-claims in which it is not named as a party." *Philippines I*, 2016 WL 9022580, at *2 n.2. It therefore "d[id] not fully assuage the Court's concerns[.]" *Id.*

The Court's concerns apply with equal force to Class Plaintiffs' present motion for summary judgment against the Republic. The fact that the dispositive motion is now brought under Rule 56, rather than Rule 12, does not render the issue moot. *See Dover, Ltd.*, 2006 WL 2987054, at *8 ("[D]efendant lacks standing to move for dismissal or summary judgment with respect to count in which he is not named[.]" (citing *Std. Chlorine of Del., Inc.* v. *Sinibaldi*, No. 91-188-SLR, 1994 WL 796603, at *7 n.5 (D. Del. Dec. 8, 1994)). In their motion for summary judgment, Class Plaintiffs assert that "[t]his Court's January 20, 2016 decision …, questioning the standing of one interpleader defendant to attack the claims of another, was limited to Rule 12 motions." (Class Plaintiffs SJ Br. Republic 11 n.8). The Court does not share Class Plaintiffs' view. To be sure, the Court stated that it was "concerned about [Class Plaintiffs'] standing to file a *motion to dismiss* given the state of the

33

pleadings." *Philippines I*, 2016 WL 9022580, at *2 (emphasis added). But nothing in the Opinion suggests that the Court's analysis would somehow not apply equally to summary judgment motions. To the extent the Court focused its analysis on Class Plaintiffs' standing to bring a motion to dismiss, it did so because that was the motion pending before it, not because its concern was confined to Rule 12(b)(6) motions. And Class Plaintiffs have provided no reason to distinguish — for purposes of the standing issue — between motions to dismiss and motions for summary judgment.

The Court is struck that Class Plaintiffs' most recent submissions fail to address the Court's concerns in any meaningful way. Class Plaintiffs merely restate, in conclusory terms, their previous position that "[t]he nature of a statutory interpleader is that a defendant may assert his own claims to the property at issue and dispute the claims of others to that property." (Class Plaintiffs SJ Br. Republic 11). They cite no new authority; as before, they rely on the *Barry Fisher Law Firm* decision that this Court previously found unpersuasive. And though they still maintain that they have a levy on the property and that such levy confers standing, they have provided no authority at all suggesting that a party may, by operation of a levy, move for summary judgment against claims in which it is not named. (*See id.* at 11-12).

Class Plaintiffs have failed to assuage any of the Court's concerns regarding standing. For this reason, the Court continues to question Class Plaintiffs' standing to file dispositive motions, including this motion for summary judgment. Still, the Court proceeds to address Class Plaintiffs'

substantive claims that (i) the Republic lacks standing to bring most of its cross-claims, and (ii) all of the cross-claims are time-barred under the relevant statutes of limitations.  For the reasons stated below, the Court rejects both claims on their merits.

### b.    The Republic Has Standing to Bring Each Cause of Action

Class Plaintiffs seek summary judgment on seven of the Republic's eight causes of action,[6] arguing that those claims "must be dismissed for lack of standing because the Republic is not the 'owner' of the paintings or the proceeds therefrom."  (Class Plaintiffs SJ Br. Republic 18).  As Class Plaintiffs would have it, the Republic lacks standing to bring the following claims: conversion, aiding and abetting conversion, unjust enrichment, misappropriation of public property, New York Executive Law § 632-a(3), monies had and received, and replevin.  (*Id.* at 18-20).  Class Plaintiffs' position is that each of these causes of action may be brought solely by the owner of property at issue, and "[s]ince the Republic is not the owner of the paintings, it has no legally protected interest in the paintings or the proceeds from their sale, and may not assert the rights of the owner."  (*Id.* at 18).

Despite Class Plaintiffs' claims to the contrary, the Court cannot find, as a matter of law, that the Republic lacks standing to bring these claims.  To begin, Class Plaintiffs misconstrue the law when they suggest that these seven

---

[6]    Class Plaintiffs do not attack the Republic's standing to bring a constructive trust claim because it is "[t]he only cause of action asserted by the Republic which would permit 'tracing' of the Marcos artwork[.]"  (Class Plaintiffs SJ Reply Republic 4).

causes of action may only be brought by parties who owned and possessed the personal property at stake. In *Torrance Construction, Inc.* v. *Jaques*, an employer brought claims for, *inter alia*, aiding and abetting conversion, money had and received, and constructive trust against defendants who had stolen money and used that money for personal purchases used to make improvements to defendants' home. 8 N.Y.S.3d 441, 443-44 (3d Dep't 2015). Though the plaintiff had not physically possessed any of the items purchased with the stolen money, the court upheld each of these claims. So too have courts in this District. For example, a court in this District explained that, "[t]o establish a cause of action in conversion, the plaintiff must show legal ownership *or an immediate superior right of possession* to a specific identifiable thing[.]" *Dore* v. *Wormley*, 690 F. Supp. 2d 176, 183 (S.D.N.Y. 2010) (emphasis added) (internal quotation marks and citation omitted). To establish standing to bring a replevin claim, a plaintiff need only "establish that the defendant is in possession of certain property of which the plaintiff claims to have a superior right." *Id.* (internal quotation marks and citation omitted). Here, the Republic claims to have a right to the property superior to any of the other claimants. It need not establish that it physically possessed any of the Interpleader Property to bring these claims.

Similarly, unjust enrichment, misappropriation, and § 632-a(3) claims are actionable to recover property purchased with ill-gotten funds. As Class Plaintiffs note, "[a] claim arising under New York Executive Law § 632-a(3) requires that the Republic be a 'victim' of a crime." (Class Plaintiffs SJ Br.

Republic 20); *see also Ciafone* v. *Kenyatta*, 807 N.Y.S.2d 114, 119 (2d Dep't 2005). The Republic has alleged as much here. It has also sufficiently alleged a claim of misappropriation of public property. So too a claim of unjust enrichment, which requires only "that [i] the other party was enriched, [ii] at that party's expense, and [iii] that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Cohen* v. *BMW Invs. L.P.*, 668 F. App'x 373, 374 (2d Cir. 2016) (summary order) (quoting *Corsello* v. *Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012)). That the property was purchased with misappropriated funds, rather than stolen directly from the Republic, would not strip the Republic of standing to bring these claims.

But Class Plaintiffs' argument fails for a more fundamental reason: The Court cannot conclude at this juncture that Mrs. Marcos, and not the Republic, owned and possessed the paintings when purchased and subsequently displayed at the townhouse in New York City. The fact that Mrs. Marcos was First Lady of the Philippines at the time of the purchase raises genuine disputes as to whether she owned and possessed the paintings in her personal capacity, or if she did so in her capacity as a public servant. The Republic's claim that Mrs. Marcos paid for the paintings with public funds means that this Court cannot conclude that Mrs. Marcos ever owned the paintings. And the record creates genuine questions of material fact on this point. The Sales Report for Monet's *L'Église et La Seine à Vétheuil* and Sisley's *Langland Bay* lists the purchaser's address as "Study Room, Malacanang Palace, Manila, Philippines" (Swift Decl., Ex. 2), and the paintings were

37

"delivered to the Philippines['] London Embassy" (*id.*). The Consignment Note is addressed to "Madame Marcos, Malacanang Palace, Manila, Philippines." (*Id.*). Similarly, the Sales Report for Monet's Water Lily painting indicates that it was sold to the "First Lady of the Philippines." (Swift Decl., Ex. 2). And, during the Marcos presidency, the artwork was displayed at a townhouse in New York City that was owned by the Republic. (Class Plaintiffs 56.1 ¶¶ 7-8). The question of ownership would persist even if Mrs. Marcos had physical possession over the paintings, and is captured, rather poignantly, by the dual status of the townhouse in which the paintings were displayed: The property served as both the Philippine Consulate and as one of Mrs. Marcos's private residences. (*Id.*).

On this record, the Court cannot find that, at the time of purchase or at any time thereafter, the paintings were properly owned and possessed by Mrs. Marcos rather than by the Republic. The fact that Mrs. Marcos was a public figure, who allegedly misused public funds to purchase paintings delivered to the Philippine Embassy in London and displayed at the Philippine Consulate in New York, raises genuine disputes of fact as to the paintings' ownership. Even if Class Plaintiffs had construed New York law correctly — which they have not — lingering questions surrounding ownership of the paintings preclude any finding that the Republic lacks standing to bring the contested causes of action.

### c. Rule 41 Does Not Preclude the Republic's Claims

Class Plaintiffs also attack the Republic's standing by relying on Federal Rule of Civil Procedure 41(a)(1)(B), which provides that a plaintiff may dismiss

a lawsuit against a defendant unilaterally and without prejudice, "[b]ut if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits." Fed. R. Civ. P. 41(a)(1)(B). Known as the "two-dismissal rule," this provision under Rule 41(a)(1) may be asserted to bar a new suit based on a claim that has twice been dismissed without court order.

Class Plaintiffs observe that, in 1986, the Republic brought suit against Mr. and Mrs. Marcos in the Southern District of New York ("S.D.N.Y."), the Southern District of Texas ("S.D. Tex."), and the Central District of California ("C.D. Cal."). The Republic voluntarily dismissed all three lawsuits, twice by filing stipulations of voluntary dismissal that were "so-ordered" by the courts. (*See* Class Plaintiffs SJ Br. Republic 21; Swift Decl., Ex. 9-10). Class Plaintiffs note that, in all three cases, "[t]he Republic contended that [Mrs. Marcos] participated and conspired in looting billions of dollars belonging to the Republic during the entire period of the Marcos presidency." (Class Plaintiffs SJ Reply Republic 7). "That is also the rationale of the Republic's interpleader claims in the instant lawsuit." (*Id.*).

The Republic disagrees with Class Plaintiffs on two critical points. *First*, it contends that the prior cases were dismissed pursuant to Rule 41(a)(2), not 41(a)(1), such that the two-dismissal rule cannot apply.[7] It claims that the

---

[7] Rule 41(a)(1) allows a plaintiff to file a notice of dismissal without a court order, either before the opposing party serves an answer or a motion for summary judgment, or by stipulation of dismissal signed by all the parties who have appeared. *See* Fed. R. Civ. P. 41(a)(1). Rule 41(a)(2), by contrast, may only be filed "by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2).

dismissal of the S.D.N.Y. and S.D. Tex. actions "were done *pursuant to Court Order.*" (Republic SJ Opp. Class Plaintiffs 38). *Second*, it disagrees with Class Plaintiffs' suggestion that the claims in this interpleader action are the same as those in the prior cases. "Each and every one of these lawsuits by the Republic involved similar legal *theories*, i.e.[,] a theory of misappropriation of government monies to acquire assets for themselves, but the *claims* in each case were different." (*Id.* at 39).

The Court agrees with Class Plaintiffs that the S.D.N.Y. and S.D. Tex. actions were dismissed pursuant to Rule 41(a)(1), not Rule 41(a)(2). The Stipulation of Dismissal for the S.D.N.Y. action, dated April 22, 1994, was executed by the Republic and several of the defendants. (Swift Decl., Ex. 9). The district judge's signature appears under a "So Ordered" stamp. (*Id.*). On its face, the dismissal does not appear to have been ordered by the court under Rule 41(a)(2). Similarly, the S.D. Tex. dismissal, issued by the judge on July 2, 1986, specifically indicates that it was issued pursuant to Rule 41(a)(1). It states: "Upon consideration of Plaintiff's Notice of Dismissal, it is hereby [ordered] that this action be ... dismissed without prejudice[.]" (Swift Decl., Ex. 10). The text of that order makes clear that the Republic had already filed a notice of dismissal.

Still, the Court finds that the two-dismissal rule does not apply. The Court disagrees with Class Plaintiffs' assertion that these actions all advance the same claims. The Second Circuit has explained that the two-dismissal rule is to be strictly construed. *See Poloron Prods., Inc.* v. *Lybrand Ross Bros. &*

*Montgomery*, 534 F.2d 1012, 1017 (2d Cir. 1976). Applying a narrow construction of the "same claim" requirement, the Court cannot find that the claim here — where the Republic seeks recovery of the Interpleader Property — is the same as the claim in the S.D.N.Y. action, which involved five pieces of New York real estate; the claim in the S.D. Tex. action, which involved Texas real estate; or the C.D. Cal. action, which involved currency and personal property in certain banks in California and Hawaii. (Republic SJ Opp. Class Plaintiffs 39). Though each case involved claims of misappropriation of public property, the contested property was distinct. That is sufficient to distinguish the claims, for purposes of the two-dismissal rule.

But even if this Court were to find that the present claims are identical to those pursued in previously dismissed cases, it still would not apply the two-dismissal rule. The Second Circuit has held that the two-dismissal rule is "an exception to the general principle, contained in Rule 41(a)(1) and honored in equity prior to the adoption of the Federal Rules, that a voluntary dismissal of an action does not bar a new suit based upon the same claim." *Poloron Prods., Inc.*, 534 F.2d at 1017. For that reason, "[w]here the purpose behind the 'two[-]dismissal' exception would not appear to be served by its literal application, and where that application's effect would be to close the courthouse doors to an otherwise proper litigant, a court should be most careful not to construe or apply the exception too broadly." *Id.*

Application of the two-dismissal rule in the present action would not serve the statute's intended purpose. There is no evidence that the Republic

has acted in bad faith or that it seeks to harass Mrs. Marcos or any of the claimants by filing, dismissing, and then refiling identical claims. The Republic did not, strictly speaking, bring this action. And the previously dismissed cases were brought more than two decades ago. Applying the two-dismissal rule here would prevent a purported victim of a sprawling crime — one where items purchased with misappropriated funds turn up decades apart and in numerous jurisdictions — from asserting a claim to the fruits of the crime. That, this Court believes, would be anathema to the purpose of the two-dismissal rule. For that reason, the Court will not apply the two-dismissal rule to the Republic's claims.

### d. The Statute of Limitations Applies to Four of the Republic's Claims, Though Even Those Claims Survive by Operation of Equitable Tolling

Class Plaintiffs next assert that (i) all of the Republic's causes of actions are barred by the applicable New York statutes of limitations and (ii) equitable tolling does not apply. The Court agrees that four of the Republic's eight causes of action were brought outside the statutory period, but it cannot find, on this record, that equitable tolling does not apply.

### i. The Statutes of Limitations Apply to Four of the Republic's Eight Causes of Action

The Court begins by noting that "[a] federal court sitting in diversity applies the forum state's statute of limitations provisions, as well as any provisions that govern the tolling of the statute of limitations." *Vincent* v. *Money Store*, 915 F. Supp. 2d 553, 562 (S.D.N.Y. 2013) (citing *Diffley* v. *Allied-Signal, Inc.*, 921 F.2d 421, 423 (2d Cir. 1990)). Where a defendant asserts that

plaintiff's claims are time-barred, the defendant bears the burden of proof. *See id.* (citing *Romano* v. *Romano*, 19 N.Y.2d 444 (1967)). By contrast, "the plaintiffs bear the burden of proving that a particular statute of limitations has been tolled." *Id.*

> ### (A) The Replevin, Conversion, and Aiding and Abetting Conversion Claims Were Timely Filed

Claims for replevin, conversion, and aiding and abetting conversion are subject to New York's three-year statute of limitations. *See* N.Y. C.P.L.R. § 214. Typically, the statute of limitations begins to run at the time of the wrongful appropriation, even if the true owner is unaware of the theft. *See, e.g.*, *Ferring B.V.* v. *Allergan, Inc.*, 932 F. Supp. 2d 493, 510 (S.D.N.Y. 2013); *Marketxt Holdings Corp.* v. *Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 393-94 (S.D.N.Y. 2010); *Grosz* v. *Museum of Modern Art*, 772 F. Supp. 2d 473, 481-82 (S.D.N.Y. 2010). However, the analysis differs where an innocent buyer has taken possession of the contested property. Under New York's demand-and-refusal rule, "an innocent purchaser of stolen goods becomes a wrongdoer only after refusing the owner's demand for their return." *Kunstsammlungen Zu Weimar* v. *Elicofon*, 678 F.2d 1150, 1161 (2d Cir. 1982) (citations omitted). And "a cause of action accrues against a bona fide purchaser when the purchaser refuses to return the property in question." *Grosz*, 772 F. Supp. 2d at 482. As the New York Court of Appeals has stated: "The rule in this State is that a cause of action for replevin against the good-faith purchaser of a stolen chattel accrues when the true owner makes demand for return of the chattel and the person in

possession of the chattel refuses to return it[.]" *Solomon R. Guggenheim Found.* v. *Lubell*, 77 N.Y.2d 311, 317-18 (1991). It further explained, in considering the merits of a reasonable diligence requirement, that, "[i]n our opinion, the better rule gives the owner relatively greater protection and places the burden of investigating the provenance of a work of art on the potential purchaser." *Id.* at 320.

The demand-and-refusal rule clearly applies to the Water Lily painting, which was sold in 2010 to a *bona fide* purchaser. The Republic never demanded that the purchaser of the Water Lily return it. Because "a cause of action for conversion or replevin accrues against a person who lawfully comes by a chattel ... not upon the stealing or the taking, but upon the defendant's refusal to convey the chattel upon demand," *Grosz*, 772 F. Supp. 2d at 482 (internal quotation marks and citation omitted), the Republic's conversion, aiding and abetting conversion,[8] and replevin claims as to the Water Lily painting were brought within the statutory period.

Whether the demand-and-refusal rule applies to the remainder of the Interpleader Property, which was not sold to a *bona fide* purchaser, presents a more complicated question. New York courts typically discuss the demand-and-refusal rule in the context of *bona fide* purchasers, not donees or others who might have innocently taken possession of the property. To be sure, this Court is unaware of any case in which a New York court has distinguished

---

[8] "The statute of limitations for each aiding and abetting claim is determined by the underlying tort [ — in this case, conversion]." *Marketxt Holdings Corp.* v. *Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 393 (S.D.N.Y. 2010).

between purchasers and donees for purposes of the demand-and-refusal rule. And language adopted by some courts strongly suggests that the demand-and-refusal rule applies to innocent possessors, not just innocent purchasers. *See, e.g., Grosz*, 772 F. Supp. 2d at 482 (noting that the demand-and-refusal rule applies to "a[ny] person who lawfully comes by a chattel"). Yet given the paucity of cases explicitly applying the demand-and-refusal rule to donees, the Court has some reservations in deciding that it applies to the remainder of the Interpleader Property. And of course, the demand-and-refusal rule would not apply to Bautista if she had been complicit with Mrs. Marcos in misappropriating the paintings or the funds used to purchase them.

Despite these misgivings, the Court cannot foreclose the possibility that the demand-and-refuse rule applies to the remainder of the Interpleader Property. It can neither hold that the demand-and-refusal rule, as a matter of law, only applies to *bona fide* purchasers, nor, on this record, that Bautista was complicit in misappropriating the Interpleader Property. And because Class Plaintiffs bear the burden of proving that the statute of limitations applies, the Court cannot find that the replevin, conversion, and aiding and abetting conversion claims fail on that basis as to any of the Interpleader Property.

### (B) The Constructive Trust Claim Was Not Brought Within the Statutory Period

A constructive trust claim operates differently. Under New York law, a cause of action to impose a constructive trust is subject to a six-year limitations period. *See Mazzone* v. *Mazzone*, 703 N.Y.S.2d 282, 283 (2d Dep't

2000). The statutory period "begins to accrue 'upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered.'" *City of Almaty* v. *Ablyazov*, 278 F. Supp. 3d 776, 805 (S.D.N.Y. 2017) (quoting *Reiner* v. *Jaeger*, 855 N.Y.S.2d 613, 614 (2d Dep't 2008)). Here, as Class Plaintiffs rightly note, "the wrongful act giving rise to all [of the Republic's] causes of action was the misappropriation of public monies, not the purchase of the paintings[.]" (Class Plaintiffs SJ Br. Republic 12). That conduct occurred, if at all, during the Marcos presidency, and not later than 1986. The Republic's constructive trust claim, therefore, was brought outside the statutory period.

Contrary to the Republic's assertions, the demand-and-refusal rule does not apply to constructive trust claims like the one advanced here. Where the act giving rise to the constructive trust — here, the misappropriation of public funds — involves a wrongful taking, the demand-and-refusal rule is inapplicable. As one New York court has explained:

> A determination of when the wrongful act triggering the running of the Statute of Limitations occurs depends upon whether the constructive trustee acquired the property wrongfully, in which case the property would be held adversely from the date of acquisition … or whether the constructive trustee wrongfully withholds property acquired lawfully from the beneficiary, in which case the property would be held adversely from the date the trustee breaches or repudiates the agreement to transfer the property[.]

*Maric Piping, Inc.* v. *Maric*, 705 N.Y.S.2d 684, 685 (2d Dep't 2000) (internal quotation marks and citation omitted). In other words, the demand-and-refusal rule only applies to constructive trusts where the refusal to return the

46

property (rather than an initial misappropriation) constitutes the principal wrongdoing.

Here, the Republic does not allege that the wrongful conduct giving rise to the constructive trust claim was a refusal to return lawfully obtained property. Instead, its claim centers on Mr. and Mrs. Marcos's alleged misappropriation of public funds. In this instance, therefore, the demand-and-refusal rule does not apply, and the statute of limitations began to run on the constructive trust claim at the time of the misappropriation, or no later than 1986.

**(C)** **The Republic's Unjust Enrichment, Money Had and Received, and Misappropriation of Public Property Claims Were Brought Outside the Statutory Period**

Claims for unjust enrichment, money had and received, and misappropriation of public property are governed by a six-year statute of limitations. *See* N.Y. C.P.L.R. § 213; *Equitable Life Assurance Soc'y of U.S.* v. *Branch*, 302 N.Y.S.2d 958, 960 (2d Dep't 1969).[9] As a sister court in this District has explained, "[t]he statute of limitations begins to run on a claim for money had and received or unjust enrichment as soon as the initial payment is made." *Onanuga* v. *Pfizer, Inc.*, 369 F. Supp. 2d 491, 500 (S.D.N.Y. 2005); *accord Swain* v. *Brown*, 24 N.Y.S.3d 598, 602 (1st Dep't 2016). Similarly, the limitations period for misappropriation begins to run at the time of the

---

[9] The limitations period for misappropriation of public property is also subject to a two-year limitation from the time of discovery. *See State of N.Y.* v. *Seventh Regiment Fund*, 98 N.Y.2d 249, 258 (2002).

wrongful act.  *See State of N.Y.* v. *Seventh Regiment Fund*, 98 N.Y.2d 249, 258 (2002).

The relevant question here is whether the alleged enrichment, money had and received, and misappropriation were committed (i) when Mr. and Mrs. Marcos stole funds from the Republic (in which case the statute of limitations would have run), or (ii) when Bautista sold Monet's Water Lily painting (in which case the claims would have been brought within the statutory period). Although the Republic asserts the enrichment and money had and received claims against Bautista, her sisters, and Mrs. Marcos, and the misappropriation claim against Bautista and Mrs. Marcos, the gravamen of the Republic's pleadings is the misappropriation of public funds by Mr. and Mrs. Marcos in the 1970s and 1980s.  Under the Republic's theory, any further enrichment or payments — for example, from the sale of the painting — stemmed from the initial misappropriation, and must therefore be considered derivative of the initial theft.  Accordingly, the Republic's misappropriation, unjust enrichment, and money had and received claims were filed outside the statutory period, which began to run at the time of the alleged misappropriation of public funds.

### (D)     The § 632-a(3) Claim Was Timely Filed

A claim under § 632-a(3) is subject to a three-year statute of limitations. *Coleman* v. *Pataki*, 358 F. Supp. 2d 185, 186 (W.D.N.Y. 2004).  The law allows crime victims to bring civil actions to recover money damages within three years of discovery of any "profits from the crime."  N.Y. Exec. Law § 632-a(3).

The statute of limitations for filing such actions is three years "from the date of discovery of any funds of a convicted person[.]"  *Coleman*, 358 F. Supp. 2d at 186.  The limitations period only begins after (i) the defendant has been convicted of the crime and (ii) the profits of the crime have been discovered.  As a sister court explained, "§ 632-a provides that even after all other relevant statutes of limitations have expired, a crime victim will have an additional three-year period to sue a convicted person in a civil action to recover for injury caused by that convicted person's crime."  *Vincent* v. *Sitnewski*, No. 10 Civ. 3340 (TPG), 2011 WL 4552386, at *1 (S.D.N.Y. Sept. 30, 2011).  Because Bautista was only convicted in November 2013, the limitations period had not run before the Republic brought this claim.

### ii.    The Court Cannot Conclude That Equitable Tolling Does Not Apply

Yet even the causes of action that might otherwise be time-barred survive this motion for summary judgment because the Court cannot find, on this record, that equitable tolling does not apply.  Under New York law, "familiar principles of equitable estoppel will prevent a wrongdoer from asserting the statute of limitations defense and thereby 'take refuge behind the shield of his own wrong.'"  *Elicofon*, 678 F.2d at 1163 (quoting *Gen. Stencils, Inc.* v. *Chiappa*, 18 N.Y.2d 125, 127 (1966)).  As one court has stated, "[a]llegations of deceptive conduct may constitute a basis to equitably estop a defendant from raising the statute of limitations as a defense[.]"  *Morando* v. *Morando*, 840 N.Y.S.2d 593, 596 (2d Dep't 2007).  "Where concealment without actual misrepresentation is claimed to have prevented a plaintiff from commencing a timely action, the

plaintiff must demonstrate a fiduciary relationship ... which gave the defendant an obligation to inform him or her of facts underlying the claim." *St. John's Univ., N.Y.* v. *Bolton*, 757 F. Supp. 2d 144, 186-87 (E.D.N.Y. 2010) (internal quotation marks and citations omitted).  In addition, "'due diligence on the part of the plaintiff in bringing an action' ... is an essential element of equitable relief." *Abbas* v. *Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) (quoting *Doe* v. *Holy See (State of Vatican City)*, 793 N.Y.S.2d 565, 569 (3d Dep't 2005)).

Class Plaintiffs argue that equitable tolling does not apply.  Curiously, they focus almost exclusively on the status of Mrs. Marcos and Bautista — that is, whether each woman owed a fiduciary duty to the Republic affirmatively to disclose the location of the paintings by virtue of her government employment. (Class Plaintiffs SJ Br. Republic 15).  If such a duty existed, then a material omission might suffice to trigger equitable tolling.  *See Zumpano* v. *Quinn*, 6 N.Y.3d 666, 675 (2006).  In the absence of such a duty, failure to disclose, without more, would not support the application of equitable tolling.  *Corsello*, 18 N.Y.3d at 789.  Instead, the Republic would have to allege "some conduct on the part of the defendant after the initial wrongdoing; mere silence or failure to disclose the wrongdoing is insufficient." *Indoafric Exps. Private Ltd. Co.* v. *Citibank, N.A.*, 696 F. App'x 551, 553 (2d Cir. 2017) (summary order) (quoting *Ross* v. *Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 491 (2007)).

Class Plaintiffs fail to address the possibility that Mrs. Marcos and Bautista engaged in active misrepresentations and ongoing efforts to conceal the Interpleader Property that would justify application of equitable tolling in

the absence of a fiduciary duty. They seem to have understood this Court's January 20, 2016 Opinion as having already decided that there was no active concealment and misrepresentation, and thus that equitable tolling could only apply if Bautista and Mrs. Marcos owed the Republic a fiduciary duty. Yet that Opinion did no such thing. To be sure, the Opinion states that "Class Plaintiffs' argument fails … because it ignores the Cross-Claims' allegations concerning Marcos's and Bautista's positions in the Philippine government[.]" *Philippines I*, 2016 WL 9022580, at \*5. Yet in stating that the Court could not grant a motion to dismiss because Class Plaintiffs failed to address the fiduciary duty issue, the Court did not — expressly or implicitly — opine on the antecedent question of whether Mrs. Marcos and Bautista engaged in active concealment and misrepresentation. The Court turns to that question now.

On the record before it, the Court cannot exclude the possibility — or even find that it was improbable — that Mrs. Marcos and Bautista engaged in a campaign of active concealment that included affirmative misrepresentations aimed at preventing other parties from seeking to recover the Interpleader Property. In July 1983, Mrs. Marcos executed a Deed of Assignment of questionable legality, purporting to transfer ownership of several paintings — including the three paintings at issue here — to her personal confidante and aide (i.e., Bautista) who, shortly after the revolution that swept Mr. Marcos from office, took the paintings to her private residence in Long Island.

The record includes evidence that Mrs. Marcos and Bautista actively concealed, including by making material misrepresentations, their possession

of the paintings. As Class Plaintiffs acknowledge, in 1985, Bautista was required to disclose her assets to the Republic. She executed, under oath, a Statement of Assets and Liabilities. (Dkt. #213-1). In it she "listed assets totaling $117,000, consisting of a car, jewelry, furniture/appliances and bank deposits." (Class Plaintiffs SJ Opp. Bautista 2).[10] She did not make any mention of any paintings, which she now claims had been gifted to her in 1983.

Bautista has also made what appear to be affirmative misrepresentations under oath about the 2010 sale of the Water Lily painting. At her deposition — as she has done in this interpleader action — she claimed to be the owner of the Interpleader Property, including the Water Lily painting. (Swift Decl. Opp., Ex. 1 at 88-90). Yet the Certificate of Authority that Bautista produced to the purchaser indicates that the painting belonged to Mrs. Marcos and that Bautista was merely acting as Mrs. Marcos's authorized representative. (Dkt. #213-2).

Similarly, the Purchase and Sale Agreement, executed in connection with the sale of the Water Lily painting on August 2, 2010, states that Bautista was "acting as the exclusive agent for an undisclosed owner" and that Bautista had "been authorized by the Owner to sell the Painting[.]" (Dkt. #213-4). And the

---

[10] Class Plaintiffs also claim that "Bautista testified that she bought the 'Langland Bay' painting with her own money and for herself." (Class Plaintiffs SJ Opp. Bautista 2). However, the deposition transcript that Class Plaintiffs attach as an exhibit does not support that proposition. The only mention of the painting is when Bautista is asked, "At some point, did you have in your possession and turned over to the [DANY] a painting by Alfred Sisley called 'Langland Bay' and a painting by Claude Monet called 'Vetheuil'?," to which Bautista replies, "Yes." (Dkt. #311-1 at 23:14-19). For this reason, the Court does not ascribe any weight to Class Plaintiffs' assertion that Bautista claimed under oath to have purchased the painting herself.

letter of explanation that Bautista provided to the buyer, dated September 9, 2010, provides further circumstantial evidence of active concealment by Mrs. Marcos and Bautista. It states that Mrs. Marcos "believes that ... confidentiality should always be preserved and maintained for all sensitive matters such as the sale of the Painting in question"; "[t]he Painting has been kept in [Bautista's] possession for a good number of years ... in different locations in New York"; and Bautista "d[id] not have any documentary record of when the Painting was purchased[.]" (Dkt. #213-3). Mrs. Marcos, for her part, steadfastly refused to answer questions regarding the artwork and invoked her Fifth Amendment privilege throughout a deposition in a related matter pending in the Central District of California. (Republic SJ Opp. Class Plaintiffs 33).

Taken together, these facts preclude a finding that Bautista and Mrs. Marcos were not actively concealing the paintings by, *inter alia*, making material omissions and affirmative misrepresentations to opposing parties and the purchaser of the Water Lily painting.

Nor can the Court find that the Republic has failed to make reasonable efforts or exercise due diligence in their attempts to recover the artwork, as required under New York law. *See Martin Hilti Family Tr.* v. *Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 467 (S.D.N.Y. 2015). On the contrary, the evidence suggests that the PCGG has made concerted efforts to track down various assets, in multiple jurisdictions, that Mr. and Mrs. Marcos allegedly misappropriated from the Republic. The PCGG went to considerable lengths to identify specific works of art that had gone missing. (Class Plaintiffs 56.1

¶¶ 24-25).  It served subpoenas on art galleries and auction houses in New York and elsewhere, including Marlborough Gallery.  (*Id.* at ¶ 26).  It launched a "Where's the Art?" campaign, and on June 23, 1986, issued a press release asking the public to "join the campaign by writing to Mrs. Marcos on Where's the Art? postcards[.]" (Swift Decl., Ex. 13).  And since then, it has participated in numerous lawsuits aimed at acquiring whatever assets it has been able to trace to the funds that Mr. and Mrs. Marcos had allegedly misappropriated. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *ENC Corp.*, 464 F.3d 885 (9th Cir. 2006); *In re Rep. of Philippines*, 309 F.3d 1143 (9th Cir. 2002).  On this record, the Court cannot find that the PCGG failed to exercise reasonable diligence in their attempts to recover the Interpleader Property.

For these reasons, the Court denies in full Class Plaintiffs' motion for summary judgment against the Republic.  It turns next to the motions for summary judgment against Roxas, filed by Class Plaintiffs and Bautista. Although the motions were filed separately, Bautista's argument is analytically similar to, and subsumed by, Class Plaintiffs' arguments.  In the interest of economy, the Court considers the motions together.[11]

---

[11]  Roxas similarly considered both motions together, submitting a single, consolidated memorandum of law in opposition to Class Plaintiffs' and Bautista's motions for summary judgment.  (*See* Dkt. #401).

## 2. The Court Denies Class Plaintiffs' and Bautista's Motions for Summary Judgment Against Roxas

### a. The Court Cannot Conclude That the Roxas Judgment Is Unenforceable

Class Plaintiffs begin by asserting that the Roxas Judgment is unenforceable because it was entered against the Marcos Estate, and is only enforceable against Mrs. Marcos to the extent of her interest in the Marcos Estate. They assert that "[i]t is well established on the record in this case that the four paintings were purchased by or on behalf of Imelda Marcos in the 1970's." (Class Plaintiffs SJ Br. Roxas 3). "There is no evidence," they claim, "that the paintings were ever the property of Ferdinand Marcos." (*Id.*). From this, they deduce that "the paintings could not form part of the Marcos Estate" and therefore cannot be used to satisfy the Roxas Judgment. (*Id.*).

This argument has some superficial appeal. After all, it is uncontested that the Roxas Judgment was entered against Mrs. Marcos not to the full extent of her personal assets, but only to the extent of her interest in the Marcos Estate. It is similarly well-established that the paintings at issue were purchased on behalf of Mrs. Marcos, and that Ferdinand Marcos's name does not appear in any of the documents related to the purchase and sale of those paintings. And it is tempting to conclude, as Class Plaintiffs have done, that those facts alone establish that the Interpleader Property could not have been part of the Marcos Estate and therefore preclude enforcement of the Roxas Judgment in the present action.

Yet to do so would be to assume away the very question driving this interpleader:  Which party has the strongest claim to the Interpleader Property?  The Court has already explained that there is a genuine dispute of material fact as to whether the Republic, rather than Mrs. Marcos, owned the Interpleader Property during the Marcos presidency.  That alone suggests that Class Plaintiffs are wrong to argue that Mrs. Marcos must have owned the paintings because they "were purchased by or on behalf of Imelda Marcos."  (Class Plaintiffs SJ Br. Roxas 3).  The paintings may well have been purchased on her behalf, but that does not mean that she, and she alone, owned the paintings.

Just as the circumstances surrounding the paintings' purchase do not necessarily establish Mrs. Marcos's ownership, they also do not disprove Ferdinand's (and, by extension, the Marcos Estate's) interest in or ownership of the paintings.  To the extent that Mrs. Marcos can credibly claim ownership over the paintings, a genuine dispute arises as to whether Mr. and Mrs. Marcos exercised joint ownership and control over the paintings.  That dispute raises legal and factual questions — regarding the provenance of the money used to purchase the paintings, the distinctions between joint and personal property under Philippine law, and the manner in which Mr. and Mrs. Marcos divided their property, to name a few — that this Court cannot answer on the record before it.  Accordingly, the Court rejects Class Plaintiffs' argument that the Roxas Judgment is necessarily unenforceable here.

### b.    Roxas's Constructive Trust Claim Survives Summary Judgment

Class Plaintiffs next take aim at Roxas's ability to recover under a theory of constructive trust, which theory hinges on Roxas's ability to trace the funds used to purchase the Interpleader Property back to the treasure that Mr. Marcos stole from Roxas.  As Class Plaintiffs state:  "Because [Roxas] has no evidence the proceeds from the Roxas treasure were used to purchase the paintings at issue in this interpleader, its claim must be dismissed."  (Class Plaintiffs SJ Br. Roxas 7; *see also* Bautista SJ Br. Roxas 6 ("[Roxas's] failure to provide any evidence that the paintings or any of [ the other ] property at issue in this interpleader were purchased with the proceeds from the Roxas treasure warrants that summary judgment be granted.")).  Class Plaintiffs' and Bautista's argument raises fact-intensive questions that themselves implicate complex legal issues.  In particular, the Court must first address (i) whether the Roxas Judgment has issue-preclusive effect over the instant matter, (ii) whether to relax the tracing requirements, and (iii) which of Roxas's evidence the Court may consider in determining the viability of his constructive trust claim.  The Court addresses each in turn.

### i.    The Roxas Judgment Has Issue-Preclusive Effect

Issue preclusion "bars a plaintiff from relitigating an *issue* that has already been fully and fairly litigated in a prior proceeding."  *Bank of N.Y.* v. *First Millennium, Inc.*, 607 F.3d 905, 918 (2d Cir. 2010) (citing *Purdy* v. *Zeldes*, 337 F.3d 253, 258 (2d Cir. 2003)).  As previously noted, "[t]o determine the effect of a state court judgment, federal courts, including those sitting in

diversity, are required to apply the preclusion law of the rendering state."
*Conopco, Inc.*, 231 F.3d at 87 (citing *Migra*, 465 U.S. at 81).  This Court
therefore applies Hawaii law to determine the issue-preclusive effect of the
Roxas Judgment.

Under Hawaii law, "[i]ssue preclusion applies to a subsequent suit
between the parties or their privies on a *different* cause of action and prevents
the parties or their privies from relitigating *any issue* that was actually litigated
and finally decided in the earlier action."  *Exotics Haw.-Kona, Inc.* v. *E.I. Dupont
De Nemours & Co.*, 90 P.3d 250, 257 (Haw. 2004) (internal quotation marks
and citation omitted).  The party asserting issue preclusion must establish
that:

> [i] the issue decided in the prior adjudication is identical
> to the one presented in the action in question; [ii] there
> is a final judgment on the merits; [iii] the issue decided
> in the prior adjudication was essential to the final
> judgment; and [iv] the party against whom [issue
> preclusion] is asserted was a party or in privity with a
> party to the prior adjudication.

*Bremer* v. *Weeks*, 85 P.3d 150, 160 (Haw. 2004) (internal quotation marks and
citation omitted).  Hawaii courts "have also noted that the United States
Supreme Court has permitted and applied nonmutual *offensive* issue
preclusion[,] … [and] has applied [issue preclusion] liberally to foreclose
repeated attempts to litigate issues."  *Exotics Haw.-Kona, Inc.*, 90 P.3d at 258
(internal quotation marks and citations omitted).

Here, the first three requirements for issue preclusion have easily been
met.  To begin with, central to Roxas's claim in the present action is whether

Ferdinand Marcos stole Roxas's treasure. That issue was raised in the Hawaii action, and a jury found that Mr. Marcos was in fact liable on that very issue. The Roxas Judgment is final. And it is undisputed that the issue before this Court was central to the prior action.

The more complicated question is whether, for *res judicata* purposes, Class Plaintiffs can be considered to be in privity with either Mr. or Mrs. Marcos, both of whom were parties to the Hawaii action. Roxas attempts to sidestep the issue by arguing, unpersuasively, that the Court need not consider identity of parties because an interpleader action is an *in rem* proceeding. Yet "the Supreme Court has held that interpleader is an *in personam* proceeding." 4 James W. Moore et al., *Moore's Federal Practice* § 22.04[3][a] (3d ed. 2017) (citing *N.Y. Life Ins. Co.* v. *Dunleavy*, 241 U.S. 518, 521 (1916) (holding that a state action involving an interpleader proceeding was *in personam*, requiring personal service upon claimants)).

A better argument, which this Court adopts, is that Class Plaintiffs, as judgment creditors, stand in the shoes of the judgment debtors. *See D.C.A. Grantor Tr.* v. *Rep. of Argentina*, 616 F. App'x 30, 32 (2d Cir. 2015) (summary order) ("The judgment creditor stands in the shoes of the judgment debtor[.]" (internal quotation marks and citation omitted)). In the instant action, Class Plaintiffs seek to assert the rights that Mrs. Marcos might have to the Interpleader Property. In this sense, they share an identity of interests and claims with Mrs. Marcos. Because Mrs. Marcos is a predecessor in interest to Class Plaintiffs, and the parties are for *res judicata* purposes in privity, the

59

Roxas Judgment is preclusive on the issue adjudicated previously — namely, that Marcos stole at least part of Roxas's treasure. *See Amalfitano* v. *Rosenberg*, No. 04 Civ. 2027 (NRB), 2005 WL 2030313, at *3 (S.D.N.Y. Aug. 22, 2005) ("[In the context of issue preclusion … [privity applies to] those who are successors to a property interest[.]"); *see also Italverde Trading, Inc.* v. *Four Bills of Lading*, No. 04 Civ. 2793 (NGG) (VVP), 2009 WL 499502, at *10 (E.D.N.Y. Feb. 27, 2009) ("[P]rivity … includes those who are successors to a property interest." (brackets in original) (internal quotation marks and citation omitted)).

The Court notes that Class Plaintiffs address this issue, if at all, only in conclusory terms. They assert, without any analysis or reference to factual or legal support, that Class Plaintiffs "were not parties in [Roxas's] Hawaii cases and did not attend depositions or trial and examine witnesses." (Class Plaintiffs SJ Reply Roxas 6). Yet, as explained above, they need not have been parties to the action for the Roxas Judgment to have issue-preclusive effect. Moreover, the Court is troubled by Class Plaintiffs' inconsistency across their various briefs regarding the identity of issues between the instant action and prior lawsuits involving many of the same parties. In this instance, Class Plaintiffs assert that "[t]he subject matter of th[e] [Hawaii action] was totally different than the subject matter of this case." (Class Plaintiffs SJ Reply Roxas 6). But in their motion for summary judgment against the Republic, Class Plaintiffs took the opposite position. There, they argued that Rule 41(a)(1) bars the Republic's standing because "[e]ach of the complaints [in prior actions]

60

alleged in the broadest terms the misappropriation of the Republic's property." (Class Plaintiffs SJ Br. Republic 21). To be sure, Class Plaintiffs did not cite the Hawaii action when they advanced their Rule 41 argument. But the broader point remains: Where it suits Class Plaintiffs, they see sufficient similitude between the present action and prior actions to strip the Republic of standing; where, as here, it does not, they find stark differences. Still, the Court does not hold Class Plaintiffs' inconsistency across briefs against them; instead, it finds that their issue preclusion argument fails on the merits.

For the reasons stated above, the Court finds that the Hawaii action has issue-preclusive effect on the present action, but only to the extent of the findings upheld by the Hawaii Supreme Court. That is, the Hawaii action is issue-preclusive as to whether Mr. Marcos committed battery against Roxas and converted some of Roxas's property — and that the damages included $6 million for battery and $1,405,000 for conversion of the golden Buddha statue and the seventeen bars of gold and personal coin collection taken from Roxas's residence. (Roxas 56.1 ¶¶ 47-48). By contrast, the Court will not extend issue-preclusive effect to the jury's finding that Mr. Marcos converted $22 billion of gold, as the Hawaii Supreme Court found that the evidence was insufficient to support any such finding.

### ii. This Court Will Relax, But Not Eliminate Altogether, the Tracing Requirement

Having found that the Court is bound to accept the Hawaii court's adjudication as to whether Marcos stole from Roxas, the Court next turns to whether Roxas must trace the Interpleader Property to the stolen funds. Class

Plaintiffs correctly note that, unless a court relaxes the tracing requirement, a constructive trust claim may only proceed where the claimant can trace the contested property back to the misappropriated funds. The Second Circuit has termed it "hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer." *United States* v. *Benitez*, 779 F.2d 135, 140 (2d Cir. 1985). As a court in this District more recently held, "[a] constructive trust may be imposed on property belonging to and traceable to the principal but possessed by the third party, where the third party 'may not in good conscience retain the beneficial interest.'" *Wilde* v. *Wilde*, 576 F. Supp. 2d 595, 604 (S.D.N.Y. 2008) (quoting *Sharp* v. *Kosmalski*, 40 N.Y.2d 119, 121 (1976)).

Courts rarely relax the tracing requirement. The New York Court of Appeals has stated that tracing may only be relaxed in "exceptional circumstances[.]" *Rogers* v. *Rogers*, 63 N.Y.2d 582, 587 (1984). The court did not elaborate on the types of "exceptional circumstances" that might warrant such treatment. It did, however, explain that "in view of equity's goal of softening where appropriate the harsh consequences of legal formalisms, in limited situations the tracing requirement may be relaxed." *Id.* at 586.

Working from this premise, courts have found the requisite "exceptional circumstances" to be present in a variety of cases. One did so where a fiduciary had breached his duty by licensing and selling properties that did not belong to him, for his own enrichment. *See, e.g.*, *Martha Graham Sch. & Dance Found., Inc.* v. *Martha Graham Ctr. of Contemporary Dance, Inc.*, 224 F. Supp.

2d 567, 610-12 (S.D.N.Y. 2002), *aff'd in relevant part*, 380 F.3d 624, 646 (2d

Cir. 2004). Another relaxed the tracing requirement to achieve the purpose of a

separation agreement and provide a decedent's ex-wife with life insurance

benefits that the decedent had promised to her and her children. *See, e.g.*,

*Simonds* v. *Simonds*, 45 N.Y.2d 233 (1978); *see also Rogers*, 693 N.Y.2d at 582.

Yet another did so where an attorney-in-fact had misappropriated property by

misuse of his powers of attorney. *See, e.g., Wilde*, 576 F. Supp. 2d at 595.

And, in *Benitez,* the Second Circuit relaxed the tracing requirement where

victims of financial fraud vied with the wrongdoer's judgment creditor for

recovery in an interpleader action. 779 F.2d at 140-41.

The Court considers the present action to be an "exceptional

circumstance" warranting relaxation of the tracing requirement. The very fact

that the individual alleged to have misappropriated Roxas's assets was

President of the Philippines at the time of the conversion sets this case apart.

So too does the complex web of offshore foundations and secret bank accounts

that Mr. and Mrs. Marcos used to move allegedly misappropriated funds.

Finally, the amount of time that has passed since the misappropriation makes

it particularly unreasonable to require Roxas to produce evidence that

illustrates, step by step, how Roxas's misappropriated funds were funneled

from one account to another. For this reason, the Court will not require Roxas

to trace, with scientific precision or forensic evidence, the money used to

purchase the Interpleader Property back to the misappropriated funds.

But that does not mean that the Court will not require Roxas to establish a close nexus between the stolen funds and those used to purchase the Interpleader Property.  Even where courts have relaxed the tracing requirement, they have tended not to abandon it altogether.  For example, in *Wilde*, the court relaxed the tracing requirement only "[t]o the extent that a small part of these purchases is not traceable to the Citibank Accounts[.]"  576 F. Supp. 2d at 607.  This Court adopts a similar approach.  Though the Court will not require Roxas to produce detailed forensic accounting reports or similar evidence that traces the money from the moment of misappropriation to the moment of purchase of the Interpleader Property, Roxas must still produce credible evidence that the funds used to purchase the Interpleader Property originated from Roxas's treasure, and not from any of Mr. and Mrs. Marcos's other putative sources of wealth.

The Court next turns to relevant questions regarding Roxas's proffered evidence — its admissibility, and its sufficiency at this stage of the litigation to meet the relaxed tracing standard that this Court has just described.

### iii.    Deposition Transcripts Proffered by Roxas Are Admissible and Sufficient to Survive Summary Judgment

Class Plaintiffs argue that substantially all of Roxas's evidence — which consists primarily of deposition transcripts from prior litigations — is inadmissible pursuant to Federal Rule of Civil Procedure 32(a)(8).  That Rule states that "[a] deposition previously taken may … be used as allowed by the Federal Rules of Evidence."  Fed. R. Civ. P. 32(a)(8).  Here, Roxas asserts that

Federal Rule of Evidence 807(a) — known as the "residual exception" to the hearsay rules — permits this Court to admit the contested evidence. Roxas also claims that Rule 32(a)(8) provides an independent basis upon which this Court may consider the evidence.

The Court begins by assessing the admissibility of the deposition testimony under Rule 32(a)(8), which provides:

> A deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action.

Fed. R. Civ. P. 32(a)(8). "The 'same subject matter' and 'same parties' requirements have been 'construed liberally in light of the twin goals of fairness and efficiency.'" *Fed. Hous. Fin. Agency* v. *Merrill Lynch & Co., Inc.*, No. 11 Civ. 6202 (DLC), 2014 WL 798385, at *1 (S.D.N.Y. Feb. 28, 2014) (quoting *Hub* v. *Sun Valley Co.*, 682 F.2d 776, 778 (9th Cir. 1982)). Construed liberally, the current action involves the same subject matter as the previous lawsuits for which the depositions at issue were prepared — namely, Mr. Marcos's theft of Roxas's treasure, and Roxas's attendant right to the contested property. While the contested property at issue here may be different than that in prior cases, the subject matter at issue has not changed.[12]

---

[12] The Court notes that, in deciding *supra* whether the two-dismissal rule bars the Republic's claims, the Court found that the present action was sufficiently distinct from prior actions involving Marcos property as to preclude application of the two-dismissal rule. Here, by contrast, the Court finds that the present action and the Hawaii action involve the same claims for *res judicata* purposes. These divergent holdings are warranted in light of the different standards the Court applies in construing the "same claim" requirement in either context: narrowly, in the two-dismissal rule context, *see*

Nor are the parties different, for purposes of Rule 32(a)(8). As the Court mentioned above, judgment creditors (Class Plaintiffs) stand in the shoes of judgment debtors (Mr. and Mrs. Marcos). It is undisputed that Mr. and Mrs. Marcos were represented by counsel at the prior actions, and at the depositions that Roxas seeks to admit as evidence. (*See* Cathcart Decl., Ex. 2-4, 6-11, 16, 49-51).[13] In at least one instance, Class Plaintiffs themselves were represented by counsel at the deposition. (*See, e.g.*, *id.*, Ex. 51). But even where they were not, their predecessors in interest — Mr. and Mrs. Marcos — were represented and had "the same motive to cross-examine the deponent" as Class Plaintiffs would have. *Fed. Hous. Fin. Agency*, 2014 WL 798385, at *1. In each prior deposition, Mr. and Mrs. Marcos had every incentive to establish that Mr. Marcos had not stolen Roxas's treasure or, in the alternative, that whatever was stolen was of little value. Here, Class Plaintiffs have the same interest. *See, e.g.*, *Fed. Hous. Fin. Agency* v. *Nomura Holding Am., Inc.*, No. 11 Civ. 6201 (DLC), 2015 WL 714747, at *2 (S.D.N.Y. Feb. 19, 2015). For this reason, under

---

*Poloron Prods., Inc.* v. *Lybrand Ross Bros. & Montgomery*, 534 F.2d 1012, 1017 (2d Cir. 1976); liberally, here, *see Fed. Hous. Fin. Agency* v. *Merrill Lynch & Co., Inc.*, No. 11 Civ. 6202 (DLC), 2014 WL 798385, at *1 (S.D.N.Y. Feb. 28, 2014).

[13]    The deposition transcripts considered by the Court in connection with the pending motions include those of Danilo Roxas, Roger Roxas, Olaf Jonsson, Robert H. Curtis, Romulo Quijon, Juan Quijon, Michael O'Brien, Norman Dacus, Imelda Marcos, and John W. Buckley. These depositions were taken in connection with actions in which Mr. and Mrs. Marcos or Class Plaintiffs were represented by counsel and had an opportunity to cross-examine the witnesses. *See Roxas* v. *Marcos*, No. 88-0522-02 (Haw. Cir. Ct. Feb. 19, 1988), and *Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Arelma Inc.*, No. 00 Civ. 595 (MLR) (D. Haw. Jul. 12, 2004).

Rule 32(a)(8), Roxas may use the prior deposition testimony as evidence to support his claim to the Interpleader Property.[14]

The question, then, becomes whether the deposition transcripts proffered by Roxas are sufficient to create a genuine dispute of material fact — that is, a genuine dispute as to whether the money used to purchase the Interpleader Property is derivative of the theft of Roxas's treasure. The Court notes that the Hawaii Supreme Court found much of the testimony regarding Roxas's treasure to have been too vague to support a $22 billion judgment for conversion of a storage area of gold. *Roxas*, 969 P.2d at 1260. As the court observed, Roxas's "evidence concerning the *quantity* and *value* of the gold observed by the percipient witnesses ... w[as] extremely vague." *Id.* (emphases in original). For example, one of the percipient witnesses testified that "the room he had seen was '*[m]aybe* 40 feet by 20, *something like that*' ... and that he 'believed' that the ceiling was twelve feet tall, '[m]aybe more. *I don't remember.*'" *Id.* (emphases in original). Another testified that the room containing the gold was "*roughly* 40 by 40" with a ceiling that was "*at least* ten-foot high." *Id.* (emphases in original). He further testified that "[t]here were '*at least* two, *possibly* three aisles,' which were '*not more than* four or five feet' wide, amidst the piles of gold which were 'stacked *almost* to the top.'" *Id.* (emphases in original).

---

[14]    Having found that the deposition transcripts are admissible under Rule 32(a)(8), the Court need not — and will not — assess the merits of Roxas's other grounds for admissibility.

And yet, even if the evidence may have been too imprecise to allow a jury to calculate $22 billion in damages, it suffices to create a genuine dispute as to whether the vast majority of Mr. Marcos's wealth derived from the Yamashita Treasure, such that Roxas may meet the relaxed tracing standard that the Court discussed above. The testimony of John Buckley, a forensic accountant hired by the Republic to review Mr. and Mrs. Marcos's assets, helps Roxas survive this motion for summary judgment.[15] In relevant part, Buckley testified as follows:

> I don't care how successful Mr. Marcos was as an attorney, you don't generate wealth in the hundreds of millions of dollars and billions of dollars. ... So it came from somewhere. The most likely source, the most probable source, is the treasure that the Japanese buried in [the Philippines] when they exited the country.

(Cathcart Dec., Ex. 51 at 29). While this testimony is not stated with the kind of precision that would likely sway a factfinder, at this stage of the litigation, it suffices to create a genuine dispute of fact regarding the source of the funds used to purchase the Interpleader Property. The constructive trust claim therefore survives summary judgment.

---

[15] Class Plaintiffs object to Buckley's testimony on the theory that Buckley "was presented as a fact witness ..., not as an expert witness" and that his lay opinion is inadmissible under Federal Rule of Evidence 701. (Class Plaintiffs SJ Opp. Roxas 10). However, the deposition transcript does not establish that Buckley was testifying as a fact witness. During the deposition, Roxas objected to counsel's statement that Mr. Buckley was testifying as a fact witness, and counsel proceeded to ask some questions about Mr. Buckley's qualifications as a forensic expert. (Roxas SJ Reply Class Plaintiffs 12 n.4). On this record, the Court cannot conclude that Buckley's testimony is inadmissible under Federal Rule of Evidence 701.

### c. Equitable Tolling Applies, Defeating Class Plaintiffs' Statute of Limitations Arguments

Finally, Class Plaintiffs argue that Roxas's causes of action are time-barred by operation of the relevant statutes of limitations. This Court has already found that, in light of the compelling evidence of Bautista's and Mrs. Marcos's affirmative misrepresentations and efforts to conceal the Interpleader Property, it cannot conclude that equitable tolling does not apply, unless Roxas has failed to act with reasonable diligence. *See Martin Hilti Family Tr.*, 137 F. Supp. 3d at 467 ("Ultimately, tolling can apply only when a plaintiff has acted with reasonable diligence[.]" (internal quotation marks and citation omitted)). The Court therefore will not revisit the concealment or misrepresentation questions here.

Instead, the Court examines whether Roxas has exhibited reasonable diligence in pursuing his claims against Mr. and Mrs. Marcos such that equitable tolling may apply. The Court notes that Roxas has participated in multiple lawsuits against Mr. and Mrs. Marcos. He intervened in a case brought before this Court in 1986 regarding ownership of Marcos property. *See Rep. of the Philippines* v. *Marcos*, No. 86 Civ. 2294 (PNL), 1992 WL 167353 (S.D.N.Y. June 26, 1992). He also brought a suit of his own in Hawaii in 1988, which resulted in the Roxas Judgment. Where possible, he has sought to execute the Hawaii judgment. Given the lengths to which Mr. and Mrs. Marcos appear to have gone to conceal ill-gotten assets, including the Interpleader Property, and given Bautista's possession of the artwork at issue here, the Court cannot find that Roxas's failure previously to assert claims against the

69

Interpleader Property resulted from a lack of diligence. Rather, the record suggests that any such delay was likely caused by Mrs. Marcos's and Bautista's actions. Accordingly, the Court finds that Roxas has exhibited sufficient diligence for equitable tolling purposes.

For these reasons, the Court denies Class Plaintiffs' and Bautista's motions for summary judgment against Roxas. The Court next turns to Roxas's own motion for summary judgment against Class Plaintiffs and Bautista.

### 3. Roxas's Motion for Summary Judgment Against Class Plaintiffs and Bautista Fails

Roxas's motion for summary judgment against Class Plaintiffs and Bautista is in many respects the mirror image of Class Plaintiffs' and Bautista's motions against Roxas. The difference is that Roxas here asserts that the record conclusively establishes Roxas's right to the Interpleader Property. The Court disagrees.

Roxas maintains that his claims are superior to those advanced by Class Plaintiffs and Bautista. His theory is that *all* of the Interpleader Property was purchased with funds originating from Roxas's stolen treasure. As Roxas states: "[T]he Hawaii litigation conclusively proves that Marcos stole a great treasure from Roxas," which "formed the foundation of the Marcos[es'] wealth." (Roxas SJ Br. Class Plaintiffs, Bautista 13). Pointing to Buckley's testimony, Roxas "submit[s] that the bulk, if not all, of the Marcos[es'] wealth came from the treasure." (*Id.* at 14). In particular, Roxas leans on Buckley's statement that, "[t]he most likely source [of Marcoses' wealth], the most probable source,

70

is the treasure that the Japanese left buried in [the Philippines] when they exited the country." (*Id.* (quoting Cathcart Decl., Ex. 51 at 29)).

Contrary to Roxas's suggestion, there remain genuine disputes of material fact regarding the source of the funds used to purchase the Interpleader Property. In fact, for the reasons detailed above, the evidence barely suffices to allow Roxas to survive Class Plaintiffs' and Bautista's motions for summary judgment. The deposition testimony on which Roxas relies is vague and fails conclusively to establish the size or value of the treasure that Mr. Marcos stole from Roxas. This Court shares the Hawaii Supreme Court's concern with the proffered testimony regarding the size of the storage area of gold from which, Roxas claims, Mr. and Mrs. Marcos derived substantially all of their wealth. The Hawaii Supreme Court rightly characterized the evidence of the quantity of gold observed by the percipient witnesses as "extremely vague." *Roxas*, 969 P.2d at 1260.

And Buckley's testimony, on which Roxas also relies heavily, is similarly vague. Buckley testifies that the Yamashita Treasure constituted the "most likely source" of the Marcoses' wealth. (Cathcart Dec., Ex. 51 at 29). While this testimony suffices to create a genuine dispute of fact as to the source of the Marcoses' wealth, it does not foreclose the possibility — or even the strong probability — that Mr. and Mrs. Marcos derived much of their wealth from others sources, and that the funds used to purchase the Interpleader Property came from those other sources. *See, e.g.*, The World Bank, *Stolen Asset Recovery (StAR) Initiative: Challenges, Opportunities, and Action Plan*, § 2.3

(2007) ("The channels whereby the money was allegedly stolen [by Mr. Marcos] were diverse, including the takeover of private companies; creation of monopolies ...; fraudulent government loans; bribes from companies; and skimming off foreign loans and raiding the public treasury.").

Roxas's motion for summary judgment rests on the claim that "the facts as found in [the Hawaii action], common sense, coupled with the Buckley deposition lead to the inescapable conclusion that the property in this action traces its roots back to the treasure found by Roxas." (Roxas SJ Br. Class Plaintiffs, Bautista 15-16). And yet the facts as found in Hawaii merely establish that Mr. Marcos battered Roxas and stole a golden Buddha statue, gold bars, and coins worth approximately $1.4 million. It does not establish that the seed money for substantially all of Mr. and Mrs. Marcos's vast wealth came from the Yamashita Treasure. Nor does Buckley's testimony establish as much. As mentioned, that testimony barely suffices to create a genuine dispute of material fact to defeat Class Plaintiffs' and Bautista's summary judgment motions. Even under the relaxed tracing standard that the Court has adopted, Roxas is not entitled to summary judgment.

The Court next turns to Bautista's motion for summary judgment against Class Plaintiffs and the Republic.

### 4. Bautista's Motion for Summary Judgment Against Class Plaintiffs and the Republic Fails

In her motion for summary judgment against Class Plaintiffs and the Republic, Bautista advances two principal claims: (i) Class Plaintiffs and the

Republic lack standing, and (ii) the Republic's claims are time-barred under the relevant statutes of limitations. Both are unavailing.

### a. Class Plaintiffs and the Republic Have Standing to Bring Causes of Action Against Bautista

Bautista attacks Class Plaintiffs' and the Republic's standing to bring any claims against her on the theory that the record conclusively shows that she is the rightful owner of the Interpleader Property. Bautista focuses primarily on the paintings at issue in this case. In her view, documentary evidence conclusively establishes that "the owner of the property since August 5, 1983 has been Bautista … [and that] [o]n August 8, 1983, Mrs. Marcos … formally conveyed title [to the paintings] to Ms. Vilma Bautista" by executing a Deed of Assignment. (Bautista SJ Br. Republic, Class Plaintiffs 12-13). As Bautista would have it, the Deed establishes that neither Class Plaintiffs nor the Republic owns the Interpleader Property and, in turn, requires this Court to grant her motion for summary judgment. (*Id.* at 13-20).

Bautista's argument, while ambitious, fails for several reasons. *First,* there is a genuine dispute as to the Deed's validity under Philippines law.[16] The Court has received an expert affidavit from Class Plaintiffs stating that under Philippine law, the Deed qualifies not as an assignment but rather as a donation, because the conveyance was executed for no consideration. (Class Plaintiffs SJ Opp. Bautista 9). Bautista's own testimony supports the view that

---

[16]     The Court previously found that Philippine law governs the validity of the Deed.

this was a gift. (*Id.* (quoting Bautista's deposition in which she states unequivocally, with respect to the Deed, "It's a gift.")).

As noted by Class Plaintiffs' expert, and as confirmed by this Court, Article 748 of the New Civil Code of the Philippines dictates that a donation in excess of five thousand pesos is void unless the donation and acceptance is made in writing. (Class Plaintiffs SJ Opp. Bautista 9). Nothing in the record suggests that Bautista accepted the conveyance of property from Mrs. Marcos in writing. Though the Court will not construe Class Plaintiffs' opposition brief as seeking summary judgment against Bautista — both because Class Plaintiffs have not moved for summary judgment against Bautista and because Class Plaintiffs' amended brief was filed late and without leave of court or consent of the parties — it has considerable misgivings regarding the Deed's validity under Article 748.[17]

*Second*, Bautista fundamentally misconstrues the Republic's claims. The Republic does not, as Bautista's argument implies, attack only the validity of the transfer of the paintings from Mrs. Marcos to Bautista. They also attack Mrs. Marcos's own claim to ownership over the Interpleader Property. If the Republic had conceded that Mrs. Marcos was the rightful owner of the property, and had it merely attacked the validity of the transfer to Bautista, a

---

[17]     The Court is mindful that, even if the Deed were invalid under Philippine law, Bautista might still survive a motion for summary judgment. Bautista might have a viable claim that Mrs. Marcos conveyed the paintings to Bautista as a gift; that said gift was effectuated in New York when Bautista took physical possession of the paintings; and that the gift (as distinguished from the Deed) was valid under New York law. The Court will not speculate further as to claims that Bautista may make and will not *sua sponte* examine the validity of the gift under New York law.

valid deed might provide a compelling basis to seek summary judgment against the Republic. But the Republic also contests Mrs. Marcos's ownership over the Interpleader Property; in the Republic's view, *it* was the rightful owner *ab initio*. The Republic's view is that, even if Mrs. Marcos and Bautista had satisfied the requirements of Article 748, the conveyance would still have been ineffective because Mrs. Marcos purchased the property with misappropriated funds. Indeed, a victim has the right to "follow [the] assets as far as it can trace them, and can recover its property from those with whom it has had no direct dealings." *T.D. Bank, N.A.* v. *JP Morgan Chase Bank, N.A.*, No. 10 Civ. 2843 (JG) (ARL), 2010 WL 4038826, at *5 (E.D.N.Y. Oct. 14, 2010). For this reason, Bautista's argument regarding the Deed's validity misses the mark.

*Finally*, Class Plaintiffs and the Republic have produced compelling evidence — including Bautista's own actions and statements — suggesting that Mrs. Marcos never transferred ownership of the paintings to Bautista. For example, in 1985, Bautista "did not list the paintings as her property in her [ ] sworn Statement of Assets and Liabilities." (Class Plaintiffs SJ Opp. Bautista 10). In 2010, when she sold the Water Lily painting, Bautista provided the purchaser with a Certificate of Authority stating that Bautista was "[Mrs. Marcos's] authorized representative" and that Bautista was "authorized to sign, on [Mrs. Marcos's] behalf, the corresponding deeds of transfer of ownership of [the] painting[ ]" and "to receive and/or sign receipts for the proceeds of the sale of [the] painting[ ]." (Swift Decl., Ex. 11). In a letter to the purchaser, Bautista further stated that she had "received instructions from [Mrs. Marcos]

to sell the [p]ainting, and [Mrs. Marcos] [wa]s aware of the sale." (Swift Decl., Ex. 12). She was "acting as [Mrs. Marcos's] agent with authority to sell the [p]ainting of which [Bautista] had physical possession[.]" (*Id.*). Finally, Bautista also represented that, "[i]n entering into the Agreement and at the Closing, I shall continue to act as [Mrs. Marcos's] authorized agent and representative." (*Id.*).

Even if the Deed were valid under Philippine law — something this Court will not decide at this juncture — Bautista's statements raise genuine disputes of fact regarding her ownership of any of the Interpleader Property. For these reasons, the Court denies Bautista's motion for summary judgment against Class Plaintiffs and the Republic.

### b.    None of the Republic's Causes of Action Is Time-Barred

Like Class Plaintiffs, Bautista claims that the Republic's causes of action are time-barred under the relevant statutes of limitations. Bautista's arguments mirror those advanced by Class Plaintiffs, which the Court has already addressed above. Rather than repeat that discussion here, the Court incorporates it by reference and, for the reasons stated therein, rejects Bautista's argument that the Republic's claims are time-barred.

### 5.    The Republic's Motion to Dismiss or Stay This Case Fails

Having addressed the parties' motions for summary judgment, the Court now turns to the Republic's motion to dismiss this case in its entirety or, in the alternative, to stay the proceedings. The Republic's motion rests on three principal arguments: (i) the PCGG's limited waiver of sovereign immunity was

invalid; (ii) international comity requires dismissal of this action; and (iii) the act of state doctrine mandates that this Court decline to exercise jurisdiction.

The Court begins with a brief review of the history of the Republic's involvement in this litigation. In November 2013, the Republic retained S&P to represent it in this action. S&P entered an appearance on March 7, 2014. (Dkt. #17). By letter dated February 11, 2014, PCGG Chairman Andres D. Bautista and PCGG Commissioner Maita V. Chan-Gonzaga sent a letter to S&P authorizing it "to exercise a limited waiver of sovereign immunity on behalf of the Republic and/or the PCGG with respect to the matter to be commenced in the Southern District of New York concerning Vilma H. Bautista and assets seized from her possession[.]" (Brown Decl., Ex. 1). The letter indicates that copies were furnished to the Philippine Solicitor General, Francis H. Jardeleza, and the Ambassador of the Philippines to the United States, Jose L. Cuisia, Jr. (*Id.*). The terms of the Republic's waiver expressly authorized the Republic to appear in this interpleader; it did not include any mechanism for revocation. (*Id.*).

Thereafter, the Republic actively participated in this action: It filed an answer and cross-claims, participated in discovery, defended a motion to dismiss, and filed and defended motions for summary judgment. It never so much as hinted at the possibility of revocation of the waiver. Quite to the contrary, at the first conference in this litigation — and in response to criticism from counsel for Class Plaintiffs regarding its unwillingness to appear in a

related action in New York State Supreme Court — the S&P lawyer representing the Republic stated as follows:

> [W]e clearly have a very colorable claim to this property, and indeed I think if we were not willing to waive our foreign sovereign immunity both these matters should be dismissed, because as a necessary party we have certain rights. As a necessary party, these cases cannot go forward without us. What we could do is not show up here, run to the Philippines and try and get a judgment against the property there and then enforce it under U.S. law through the Department of Justice and State Department and other means that allow us to do that.
>
> We are not doing that. We are going to litigate this case, and we are here to do it. And we are offering limited immunity, but here in the federal court. We have a right to do that. It is a rare case indeed where I represent a sovereign nation that has these sort[s] of rights, your Honor. But we have that right. We can appear here. We don't have to. And we won't appear [in state court].
>
>           \*\*\*
>
> So I am not going to apologize for the fact that we are willing to waive our immunity. In fact, I think what we are doing goes above and beyond. We don't have to do this. We want to move the ball up the field.

(Dkt. #44 at 17-18). The Court took several actions in this litigation in reliance on this waiver, including in particular issuing oral and written decisions staying the state court action. (Dkt. #57 (transcript of proceedings of February 19, 2015), 72 (written order)).

### a. The Republic Has Waived Sovereign Immunity, and Such Waiver May Not Be Withdrawn at This Advanced Stage of the Litigation

The Republic seeks dismissal under the theory that the PCGG lacked authority when it issued a limited waiver of sovereign immunity. Despite

having actively litigated this case since 2014, the Republic now seeks to withdraw the PCGG's waiver because, the Republic claims, the waiver had not been authorized by the Office of the Solicitor General. The Republic further claims that counsel's failure to raise immunity until now cannot be deemed an implied waiver. (Republic MTD Br. 10). The Court disagrees, and it denies the Republic's request to withdraw its waiver of sovereign immunity for four reasons.

*First*, the PCGG entered a valid waiver of sovereign immunity. Even if the PCGG required the Solicitor General's approval to issue the waiver — something that the Court cannot confirm on this record — the evidence suggests that the PCGG had secured such approval. The February 11, 2014 waiver, signed by the PCGG's Chairman and Commissioner, was copied to Ambassador Cuisia and Solicitor General Jardeleza. (Brown Decl., Ex. 1). The fact that the Solicitor General was copied belies the Republic's claim, advanced for the first time years into this litigation, that the Solicitor General had not been made aware of any such waiver. (Republic MTD Br., Ex 1 ("Munsayac Aff.") at 3). The Republic has produced no evidence to suggest that the Solicitor General's approval had to be sought in any particular form, or that approval would be communicated expressly in writing.

Despite having been copied on the PCGG's letter to S&P, neither the Solicitor General nor the Ambassador objected to the waiver. And, on numerous prior occasions in this District and elsewhere, the Republic had similarly waived its sovereign immunity and participated in litigation over

Marcos assets; it was, in other words, a repeat player that cannot now claim to have been unaware of the effect of its waiver (in the case of the PCGG) or silence (in the case of the Solicitor General). *See, e.g.*, *Rep. of the Philippines* v. *Marcos*, 806 F.2d 344 (2d Cir. 1988); *Rep. of the Philippines* v. *Christie's*, No. 98 Civ. 3871 (RPP), 2000 WL 1056300 (S.D.N.Y. Aug. 1, 2000); *Sotheby's* v. *Garcia*, 802 F. Supp. 1058 (S.D.N.Y. 1992). The Republic has failed to advance a credible claim that the limited waiver of sovereign immunity presented to this Court lacked validity; to the contrary, the record suggests that the PCGG had authority to exercise the waiver and that the Solicitor General and Ambassador had actual or constructive knowledge of the waiver but never objected to its validity.

*Second*, even if the PCGG lacked actual authority to issue a waiver of sovereign immunity, the Republic implicitly waived its immunity by prosecuting this case for nearly three years. The Second Circuit has held that "the failure to assert sovereign immunity in a responsive pleading is a waiver[.]" *Canadian Overseas Ores Ltd.* v. *Compania de Acero del Pacifico S.A.*, 727 F.2d 274, 278 (2d Cir. 1984); *see also Drexel Burnham Lambert Grp. Inc.* v. *Comm. of Receivers for Galadari*, 12 F.3d 317, 326 (2d Cir. 1993) ("[a]n implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity." (internal quotation marks and citation omitted)).

Here, the Republic's implied waiver was "'unmistakable' and 'unambiguous.'" *Drexel Burnham Lambert Grp. Inc.*, 12 F.3d at 326 (quoting

80

*Shapiro* v. *Rep. of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991)). The PCGG's February 11, 2014 letter to S&P explicitly waived the Republic's immunity and failed to reserve any revocation rights. The Republic proceeded actively to litigate this case by, *inter alia*, filing an answer and cross-claims (that did not include a sovereign immunity defense); participating in numerous court conferences, where it never suggested that it might later withdraw its waiver; obtaining a stay of related state court litigation in which it refused to appear; defending against Class Plaintiffs' motion to dismiss; and filing and defending cross-motions for summary judgment. Over the course of the nearly three years that elapsed between the Republic's initial appearance in this matter and its decision to file the pending motion to dismiss, the Republic never made any mention that it might seek to withdraw its waiver.

The Republic attempts — unsuccessfully — to persuade the Court that its failure to raise an immunity defense cannot be construed as an implied waiver. To support that claim, the Republic relies principally on *Ford Motor Co.* v. *Department of Treasury*, 323 U.S. 459, 467 (1945). But unlike the case at bar, *Ford Motor Co.* involved an involuntary waiver of sovereign immunity. As the U.S. Supreme Court has held, *Ford Motor Co.* does not apply where, as here, a sovereign has implicitly waived its immunity after voluntarily appearing in a lawsuit. *Lapides* v. *Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 622 (2002) (noting that "*Ford* involved a State that a private plaintiff had *involuntarily* made a defendant in federal court"). Where a sovereign voluntarily appears, by contrast, failure to assert a waiver defense results in an

implied waiver. *Lapides*, 535 U.S. at 622 (noting that the Court has consistently found an implied waiver where the sovereign voluntarily invokes the court's jurisdiction).

The Republic also relies on *Republic of Philippines* v. *Pimentel*, which involved an interpleader "to determine the ownership of property allegedly stolen by Ferdinand Marcos when he was the President of the Republic of the Philippines." 553 U.S. 851, 854-55 (2008). In *Pimentel*, the U.S. Supreme Court held that the interpleader could not proceed without the Republic of the Philippines and the PCGG. *Id.* at 687. The Court noted that, "[w]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Id.* Yet *Pimentel* is readily distinguishable from the instant action. There, the Republic and the PCGG asserted sovereign immunity from the beginning of the action, and had neither expressly nor implicitly waived their immunity. Here, of course, the Republic seeks to assert immunity years after its express waiver, and after the Republic has actively participated in all aspects of the case. For this reason, *Pimentel* has little bearing on the present action or on this Court's adjudication of the Republic's pending motion. Contrary to the Republic's assertions, neither *Pimentel* nor *Ford* suggests that the Republic may now withdraw its limited waiver of sovereign immunity.

*Third*, the Republic is barred from withdrawing its waiver, which did not include any provision for withdrawal, under the FSIA, which states, in relevant part:

> [a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case … in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver[.]

28 U.S.C. § 1605(a)(1). As a court in this District has held, the statutory language implies that "where a proper waiver does not contain a procedure for the future revocation of that waiver, a foreign state's waiver of jurisdictional immunity is irrevocable." *Themis Cap., LLC* v. *Dem. Rep. of Congo*, 881 F. Supp. 2d 508, 516 (S.D.N.Y. 2012). Here, the Republic's February 11, 2014 letter contained no such procedure or reservation of rights. In light of the FSIA, and because the Republic appeared in this action voluntarily, the Republic lacks any grounds on which to withdraw its waiver.

*Finally*, judicial estoppel prevents the Republic from seeking to withdraw its waiver at this advanced stage of the litigation, after it has consistently represented that it waived its immunity and has vigorously defended this case for years. The U.S. Supreme Court has explained that:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

*New Hampshire* v. *Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks and citation omitted).  The purpose of the doctrine is to "'protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment,' and because [it] is designed 'to prevent improper use of judicial machinery,' it is 'an equitable doctrine invoked by a court at its discretion.'"  *Intellivision* v. *Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (summary order) (quoting *New Hampshire,* 532 U.S. at 749-50).  By seeking to withdraw its waiver of sovereign immunity years into this case, and thereby to dismiss the matter in its entirety, the Republic has put the integrity of the judicial process squarely at issue.  The Court therefore finds that judicial estoppel applies, and that the Republic may not now assume a position contrary to that which it has maintained since the inception of this interpleader in 2014.

### b.    The Act of State Doctrine Does Not Require Dismissal

The Republic next asserts that "[t]he act of state doctrine mandates that this [C]ourt decline to exercise jurisdiction in this action."  (Republic MTD 17).  That doctrine "precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory."  *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 401 (1964).  As the Republic notes, the doctrine is "designed primarily to avoid judicial inquiry into the acts and conduct of the officials of the foreign state, its affairs and its policies and the underlying reasons and motivations for the actions of the foreign government."  *O.N.E. Shipping Ltd.* v. *Flota Mercante*

*Grancolombiana, S.A.*, 830 F.2d 449, 452 (2d Cir. 1987). From this general principle, the Republic asks this Court to conclude that "[t]o re-examine how and why the waiver was improvidently done involves an inquiry into [ ] the politics and policies of the former government that appointed previous counsel and the present appointment of new counsel under a new government." (Republic MTD 17).

This, the Court cannot do. Contrary to the Republic's suggestion, in upholding the validity of the PCGG's waiver, the Court is not inquiring into the policies of the Philippines' former or current government. It is not second-guessing the acts or conduct of the officials of a foreign state. It is merely ascribing due weight to the government's actions: its waiver of sovereign immunity, its decision to submit an answer and cross-claims, and its decision to prosecute this case — and vigorously assert its right to the Interpleader Property — over the course of several years. That does not contravene or even implicate the act of state doctrine.

Curiously, the Republic fails to explain why the act of state doctrine, to the extent it applies at all, militates in favor of dismissal. Presumably, the doctrine would apply equally to the Republic's initial waiver of immunity as to the Republic's more recent decision to seek to withdraw that waiver. After all, the decision to waive sovereign immunity is at least as much an "act of state" as the subsequent decision to seek withdrawal. Striking though it may be, the Republic has not offered any theory under which the act of state doctrine would require this Court to defer to the later act (withdrawal) but not the

earlier act (waiver).  The Court therefore rejects the Republic's claim that the act of state doctrine mandates dismissal of this action.

### c. Neither International Comity Nor the U.N. Convention Against Corruption Requires This Court to Dismiss or Stay This Action

The Republic's remaining arguments fare no better.  The Republic claims that dismissal is required under the United Nations Convention Against Corruption ("UNCAC"), which the U.S. Congress ratified on October 30, 2006. *See* S. Exec. Rept., No. 109-18, at 3 (2006).  (Republic MTD 17).  In particular, it points to Article 55 of the UNCAC, which states that a "[s]tate [p]arty that has received a request from another [s]tate [p]arty having jurisdiction over an offence established in accordance with this Convention for confiscation of proceeds of crime" must submit the request to its competent authorities in order to obtain an order of confiscation, or submit to its authorities an order of confiscation issued by the requesting state.  *See* UNCAC art. 55, Oct. 31, 2003, S. Exec. Rept., No. 109-18, UN Doc. A/55/383.

The Republic has failed to explain why Article 55 might apply to the present action.  As an initial matter, the Republic does not allege that this Court or any other "state party" has "received a request from [the Republic] … for confiscation of proceeds of crime[.]"  UNCAC art. 55, Oct. 31, 2003, S. Exec. Rept., No. 109-18, UN Doc. A/55/383.  More importantly, by its very terms, Article 55 appears to apply only to instances where one sovereign seeks another's cooperation in tracing, seizing, and confiscating proceeds of criminal activity.  *Id.* ("Following a request made by another State Party having

86

jurisdiction over an offence …, the requested [s]tate [p]arty shall take measures to identify, trace and freeze or seize proceeds of crime … for the purpose of eventual confiscation[.]").  The Court finds no basis to conclude that Article 55 applies in instances, like the one at bar, where the property has already been confiscated and where legal proceedings are already underway to determine ownership over said property.  In light of the Republic's failure adequately to address why UNCAC Article 55 might apply to the present action, the Court denies its claim that dismissal is required.

The Republic next argues that international comity requires dismissal. The U.S. Supreme Court has described international comity as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton* v. *Guyot*, 159 U.S. 113, 164 (1895). The doctrine is "concerned with maintaining amicable working relationships between nations, a shorthand for good neighbourliness, common courtesy and mutual respect[.]" *JP Morgan Chase Bank* v. *Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 423 (2d Cir. 2005) (internal quotation marks and citation omitted).  It is "not an imperative obligation of courts but rather is a discretionary rule of 'practice, convenience, and expediency.'" *Id.* (quoting *Pravin Banker Assocs., Ltd.* v. *Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997)).

The fact that the Republic appeared in this case, and for years prosecuted the case without objecting to it on international comity grounds, undercuts the Republic's present appeal for dismissal. So too does the fact that the Republic began the parallel action in the Philippine Sandiganbayan court *after* it waived its limited sovereign immunity in order to appear in the instant interpleader. And, in its March 31, 2016 letter to the Court explaining its decision to pursue parallel litigation in the Philippines, the Republic made no mention of any intention to move to dismiss on comity grounds. (Dkt. #178). Instead, it stated that it was asserting claims in the Philippines "[o]ut of an abundance of caution" and in response to Class Plaintiffs' "repeated reference to the Republic's failure to utilize its own courts to pursue these claims." (*Id.* at 2-3). Having appeared in the instant action, waived its sovereign immunity, litigated the case for several years, obtained a stay of a related state action, and subsequently commenced parallel litigation in the Philippines, the Republic's late appeal to comity falls flat.

Were the Court to grant the Republic's request, it could set a troubling precedent. Sovereign states could waive sovereign immunity and participate in litigation merely to test the waters of American jurisprudence, with the knowledge that they could, on a whim and at almost any point in the litigation, dismiss the case on comity grounds. That cannot be — and is not — what the doctrine of international comity requires. And the Republic has not cited any cases that suggest otherwise. Dismissing the case at this late stage would cause undue prejudice to the other claimants that have diligently pursued their

claims since 2014. Accordingly, the Court rejects the Republic's motion to dismiss.

The Court similarly rejects the Republic's request, in the alternative, to stay the case. This Court has already granted one such stay, in effect from February 23, 2017, until May 24, 2017. (*See* Dkt. #323). It did so "solely in recognition of the evolving political and administrative changes in the Republic of the Philippines ... that were discussed during the [February 22, 2017] conference[.]" (*Id.*). At the time, the Court stated that the stay "will not be extended." (*Id.*). Though the Republic here is not requesting an extension of that earlier stay, the Court sees no reason to grant another stay in this case, which has been pending since 2014. Because any such stay would prejudice the other parties to this litigation, and because the Republic has failed to identify compelling reasons for the stay, the Court denies the Republic's request.

### 6.     S&P's Motion for Attorneys' Liens Is Granted

Lastly, the Court addresses a motion by S&P, the Republic's former counsel, for attorneys' retaining and charging liens against the case file and any potential proceeds from the interpleader action. Though the motion is unopposed, the Court addresses its merits below. *See Katz* v. *Image Innovations Holdings, Inc.*, No. 06 Civ. 3707 (JGK), 2009 WL 1505174, at *1-3 (S.D.N.Y. May 27, 2009) (analyzing the merits of an unopposed motion for retaining lien).

In November 2013, the Republic retained S&P to represent it in this action. (S&P Br. Republic 2). It signed a retainer three months later. (*Id.*). S&P filed responsive pleadings on May 13, 2014, February 19, 2016, and March 21, 2016 (Dkt. #28, 150, 161); attended court conferences (*see, e.g.*, Dkt. #44); defended against a motion to dismiss (*see* Dkt. #89); and represented the Republic in the pending cross-motions for summary judgment (*see, e.g.*, Dkt. #219). Throughout, S&P represented the Republic capably. And for more than three years, the Republic paid S&P's invoices. (S&P Br. Republic 2). However, beginning in November 2016, the Republic stopped paying. (*Id.*). As a result, on February 8, 2017, S&P moved to withdraw as counsel. (Dkt. #319). By Order dated May 25, 2017, the Court granted S&P's motion effective June 9, 2017. (Dkt. #343).

There are two separate bases on which this Court might award attorneys' liens. The first is under New York common law: In this Circuit, "[i]t is settled that an attorney may claim a lien for outstanding unpaid fees and disbursements on a client's papers which came into the lawyer's possession as the result of his professional representation of his client." *Pomerantz* v. *Schandler*, 704 F.2d 681, 683 (2d Cir. 1983) (citing *In re San Juan Gold Inc.*, 96 F.2d 60 (2d Cir. 1938)). The right to a retaining lien "is grounded in common law, and is enforced in federal courts unless a specific federal law alters the parties' rights." *Katz*, 2009 WL 1505174, at *1. "An attorney who has been discharged without cause [ — including where the attorney is relieved by the Court — ] is entitled to be paid a fee on a *quantum meruit* basis for the

reasonable value of the legal services that were provided." *Viada* v. *Osaka Health Spa, Inc.*, No. 04 Civ. 2744 (VM) (KNF), 2005 WL 3481196, at *2 (S.D.N.Y. Dec. 19, 2005). "Unless a client can demonstrate exigent circumstances, counsel need not release papers subject to the lien until his fee has been paid or secured." *Kariman* v. *Time Equities, Inc.*, No. 10 Civ. 3773 (AKH) (JCF), 2011 WL 1900092, at *6 (S.D.N.Y. May 11, 2011) (citing *Allstate Ins. Co.* v. *Nandi*, 258 F. Supp. 2d 309, 312 (S.D.N.Y. 2003)).

In this case, the Court granted S&P leave to withdraw. (Dkt. #343). S&P's withdrawal was therefore without cause. And the Republic has failed to oppose S&P's motion for retaining and charging liens, much less shown that there are any "exigent circumstances" that this Court might need to consider in deciding whether to impose the requested liens. *Kariman*, 2011 WL 1900092, at *6. For these reasons, the Court finds that, under New York common law, the retaining and charging liens are warranted.

A second basis upon which the Court may enforce attorneys' liens is § 475 of the New York Judiciary Law. The statute "codified the charging lien and enlarged it to the extent that it attache[s] to the cause of action upon its commencement, not when the judgment is subsequently rendered." *Picciolo* v. *State*, 732 N.Y.S.2d 60, 62 (2d Dep't 2001). "Under Judiciary Law § 475, a charging lien automatically comes into existence, without notice or filing, upon commencement of the action, and is measured by the reasonable value of the attorney's services in the action, unless fixed by agreement." *Resnick* v. *Resnick*, 806 N.Y.S.2d 200, 201 (1st Dep't 2005); *accord Hampshire Grp. Ltd.* v.

91

*Scott James Co., LLC*, No. 14 Civ. 2637 (JGK) (MHD), 2015 WL 5306232, at *5

(S.D.N.Y. July 27, 2015). The charging lien gives the attorney "equitable

ownership interest in the client's cause of action." *LMWT Realty Corp.* v. *Davis*

*Agency*, 85 N.Y.2d 462, 467 (1995).

Because the statutory lien "attache[s] to the cause of action upon its

commencement," *Picciolo*, 732 N.Y.S.2d at 62, and because S&P withdrew

without cause, there can be little doubt that it is entitled to the requested liens

under both the common law and New York Judiciary Law § 475. S&P has

failed to submit any documentation regarding the balance of fees owed to S&P

or to request a hearing to determine the amount of the lien. Accordingly, the

Court will refrain from affixing the amount of the attorneys' lien for the services

rendered until after it has held a hearing or comparable proceeding to

determine same. *Antonmarchi* v. *Consol. Edison Co. of N.Y.*, 678 F. Supp. 2d

235, 241 (S.D.N.Y. 2010) (noting that, under New York law, a hearing is

required to determine the amount of attorney's fee on a *quantum meruit* basis

(citing *Mason* v. *City of N.Y.*, 889 N.Y.S.2d 24, 25 (1st Dep't 2009))).

## CONCLUSION

For the reasons stated above, the Court denies each of the parties'

motions for summary judgment, as well as the Republic's motion to dismiss.

The Court grants S&P's motion for attorneys' charging and retaining liens.

The Clerk of Court is directed to terminate Docket Entries 193, 201, 357,

369, 377, 383, and 411.

The parties are hereby ORDERED to attend a conference on **May 3, 2018, at 2:00 p.m.**, in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, at which time a trial schedule will be set.

SO ORDERED.

Dated:     March 29, 2018
           New York, New York

_____
       KATHERINE POLK FAILLA
       United States District Judge