```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   DISTRICT ATTORNEY OF NEW YORK
     COUNTY's,
 4
                       Interpleader Plaintiff,
 5
                 v.                          14 cv 890 (KPF)
 6
     THE REPUBLIC OF THE
 7   PHILIPPINES, et al.,

 8                      Interpleader Defendant.

 9   ------------------------------x
                                      New York, N.Y.
10                                    June 16, 2029
                                      3:15 p.m.
11
     Before:
12
                       HON. KATHERINE POLK FAILLA,
13
                                          District Judge
14
                             APPEARANCES
15
     ARVIN GOMEZ AMATORIO
16       Attorney for Interpleader Defendant

17   PRADO & TUY, LLP
         Attorneys for Interpleader Defendant
18   BY:  SALVADOR ENRIQUEZ TUY, JR.

19   KENNETH C. MURPHY
         Interested Party
20

21

22

23

24

25
```

1            (Case called)

2            THE DEPUTY CLERK:  Counsel, please state your name for

3     the record.

4            THE COURT:  Let me do this, please.  Someone's got

5     their phone on speaker, and I'm asking you, please, to turn

6     that off because it's going to echo over and over again

7     throughout this conference.

8            Mr. Murphy, I see you on the line.  Good afternoon to

9     you, sir.

10            MR. MURPHY:  Good afternoon, your Honor.

11            THE COURT:  And, Mr. Tuy, I see you as well in this

12     proceeding.  Good afternoon to you, sir.

13            MR. TUY:  Good afternoon, your Honor.

14            THE COURT:  Mr. Tuy, do you have your phone on speaker

15     at this point?

16            MR. TUY:  I don't know if it's on speaker.  Let me

17     find out.

18            THE COURT:  I'm still hearing the reverberations.  My

19     voice is sounding over and over again.

20            Is it possible, Mr. Tuy, that you can turn it off to

21     make it -- thank you for that, sir.

22            All right.

23            Do I have Mr. Amatorio on the line?

24            MR. AMATORIO:  I'm here, your Honor.  Good afternoon,

25     everyone.  Good afternoon, your Honor.

1              THE COURT:  Sir, good afternoon to you as well.

2    Please excuse me.  I want to make sure I can see you, if I'm

3    able to do that.  And there you are.  Excellent.

4              Mr. Amatorio, I was a little bit confused by your most

5    recent email to me.  So I'd like to make sure I understand.

6              As you understand the situation today, do you

7    represent the Republic of the Philippines or the Presidential

8    Commission on Good Government or some subset or some

9    governmental agency of the Republic of the Philippines, sir?

10             MR. AMATORIO:  Your Honor, I know you're familiar with

11   the situation.  In my email, your Honor, I didn't want to

12   overstep my authority.  Although I told them that that part is

13   communicating with me because at this point, there is no other

14   attorney representing them.  So the Court is communicating with

15   me.

16             So they gave me the authority, your Honor, to

17   represent today pending the confirmation of my retainer, your

18   Honor.

19             THE COURT:  I see.  And I want to say that on the

20   record so that I can be clear.

21             You have been authorized to represent whom, sir?

22             MR. AMATORIO:  The Republic of the Philippines, your

23   Honor.

24             THE COURT:  Thank you.

25             You have been authorized to represent the Republic of

1    the Philippines at least for purposes of today's proceeding and

2    you anticipate on a going-forward basis pending the resolution

3    of your retainer agreement.

4            Is that correct?

5            MR. AMATORIO:  That is correct, your Honor.

6            THE COURT:  Mr. Amatorio, I appreciate that.  I

7    imagine I will have some questions for you.

8            For now, let me ask:  Are your clients participating

9    by phone today?

10           MR. AMATORIO:  No, your Honor.  They are not

11   participating.  I am the only one, your Honor, for the

12   Republic.

13           THE COURT:  That is fine, sir.  I wanted to welcome

14   them if they were on the call.  But I thought, given the time

15   difference, that they might not be available.  Thank you.

16           Let me please do this.  I wanted so very much to have

17   this proceeding in person because it's been over a year since

18   I've seen all of you, and I would love to do so again.  We have

19   this pandemic.  Unfortunately, these conferences have to be

20   done by video instead.

21           I want to begin by explaining to each of you my

22   sincerest wishes that you and your family and all of those that

23   you hold dear are doing well during this pandemic.  I want to

24   move forward from where we were at our last conference.

25           When we last had a hearing on this issue, there were

 1   some concerns about conflicts and some concerns about what

 2   statements could be made.  What I hope to do today is to speak

 3   with you, and we'll figure out something going forward.

 4            Mr. Murphy, I'm going to begin with you, sir.  Again,

 5   I recognize that you have been extremely patient for going on

 6   more than two years.  And I hope you appreciate that there are

 7   issues which I must deal with as well.  So I appreciate your

 8   patience, sir.

 9            MR. MURPHY:  Of course.

10            THE COURT:  Mr. Murphy, to begin, in connection with

11   these proceedings, I was given by the Republic a document that

12   has at its title Commission on Audit Circular No. 95-011.  It's

13   dated December 4 of 1995.

14            As I think I -- first of all, sir, have you seen this

15   document before?

16            MR. MURPHY:  I don't know it -- it's not coming to

17   mind.  But if it was filed publicly on the docket, then I've

18   seen it.

19            THE COURT:  What I understand it to say, sir, is that

20   when the Republic wishes to retain outside counsel, that there

21   must be permission or authority retained from the Solicitor's

22   General for the Republic of the Philippines or the corporate

23   counsel and that there also must be concurrence from the

24   Commission on Audit.

25            Even if you don't have that document in front of you,

1    is the idea or the understanding of the need for permission

2    from these entities something that you've heard of previously?

3              MR. MURPHY:  No, your Honor.  Indeed, this was never

4    even mentioned until about a year ago or a year and a half ago.

5              THE COURT:  Mr. Murphy, let me pause you for just a

6    moment, please, sir.  Thank you.  I want to ask an even more

7    precise question.

8              That would be my follow-up question, that you may not

9    have heard about this at the time that your retainer agreement

10   was entered into.

11             I'm really asking whether you've ever heard at all

12   that this was a precondition to an outside firm being hired to

13   represent the Republic or one of its entities.

14             MR. MURPHY:  No.  Never.

15             THE COURT:  Okay.  Have you seen, Mr. Murphy, in

16   submissions made in this case relevant to your request for

17   attorney's fees references to this obligation?

18             MR. MURPHY:  Yes.  I saw it in some filing.  I don't

19   have it in front of me.  Because of the nature of the computer,

20   I don't want to switch to Pacer and pull it up.  But I have

21   seen it at some point.

22             THE COURT:  Fair enough.  I really appreciate your

23   willingness to stay on this call and not go to another program

24   because, like you, if I switch to another window, I will mess

25   up all of this.

1          Sir, in reading this document, it suggests to me that

2     there was an obligation on the part of those who hired you to

3     run their particular decision to hire you or to retain you past

4     these two entities.

5          And I appreciate what I think you're saying, which is

6     that you never heard about it until much more recently, until

7     long after your retainer.

8          MR. MURPHY:  That's correct.  It never came up until

9     it was brought up maybe a year ago or something of that nature.

10    I don't frankly believe that if that rule is effective in the

11    Philippines, I don't believe it was ever followed in most

12    instances under the last administration.

13         I just go back to general common law agency

14    principles.  I signed an engagement letter with the Chairman of

15    the Presidential Commission on Good Government.  We had much

16    discussion back and forth about the terms of the engagement and

17    everything else.

18         He actually informed me more than one time that he was

19    in direct consultation with the president himself at the time,

20    President Aquino, who was aware of my retention, aware of our

21    issues in New York.

22         As your Honor can appreciate, I'm sure there were many

23    discussions about the waiver of sovereign immunity which we

24    went over time and time again because that was a significant

25    decision by the Republic of the Philippines.  That was not done

1    hastily.

2          And all of these conversations were had with Juan

3    Andrés Bautista and Reynold Munsayac, both of whom were

4    commissioners, one of whom was the chairperson.  One was simply

5    another commissioner.  They visited me in New York at least

6    twice.

7          A simple Google search could show that Andrés Bautista

8    was the chairperson on the Commission of Good Government.

9    There was a great deal of public filings in other litigations

10   in the U.S. about the PCGG.

11         These people are -- I would argue obviously apparent

12   authority, but they had actual authority to enter it on behalf

13   of the government.  If there was some internal protocol that

14   they didn't follow, vis-à-vis New York common law and my

15   retention, it's really irrelevant I would argue under the terms

16   of my engagement letter.

17         This is an argument that was brought up years later,

18   after I was relieved.  And I believe it's just an effort --

19   it's a pretext to try to withhold the funds that we're entitled

20   to.

21         THE COURT:  One of the other things I've seen,

22   Mr. Murphy, is there's reference to a notice of disallowance

23   that is dated January 9 of 2018.  And in a submission by

24   Commissioner Bulay, which was filed on the docket in this case,

25   there was in fact a notice of disallowance that was attached as

1    an exhibit.

2             Have you seen that document, sir?

3             MR. MURPHY:  Only in the context of which it was filed

4    in this proceeding.  Nothing was ever mailed to me or sent to

5    me independently to inform me of that.

6             THE COURT:  All right.  So to that very point, sir,

7    are you telling me that no one ever attempted to, if I use the

8    vernacular, claw back money that had been paid to you

9    previously?

10            MR. MURPHY:  No.  Indeed, I think we served 25

11   invoices over the course of my engagement, and I never even

12   heard a single peep of an objection to any of those invoices.

13            No one ever objected to an entry.  No one ever said

14   anything until I think it was within the last 12 or 18 months

15   when the issue started to percolate on what the fees were.

16            THE COURT:  Could you remind me, sir.  When was the

17   last time that you received a payment from your client?

18            MR. MURPHY:  I'm going to go by memory here.  I

19   believe it would have been 2016, say maybe September or August

20   or July of 2016, sometime thereabouts.

21            THE COURT:  Thank you.

22            Actually, what I'm seeing in this notice of

23   disallowance, sir -- and I don't mean at all to hide the ball

24   from you -- is there are four references to disallowed invoices

25   to Simon & Partners, your former firm.  Two of them are dated

1    August 3 of 2016, one is dated September 15 of 2016, and one is

2    dated September 25 of 2016.

3            But is it your recollection, Mr. Murphy, that actually

4    you did receive payment for invoices that were billed in or

5    about August and September of 2016?

6            MR. MURPHY:  I don't believe I received payment for

7    work in August and September of 2016.

8            As I recall it -- I'd have to go back and look at my

9    notes -- September of 2016 is when I went to the Philippines to

10   do depositions.  I'm pretty sure I hadn't gotten payment for a

11   little bit of time before then.

12           As I think I mentioned in my affirmation or

13   declaration filed in support of my request for the fees at or

14   about that time, they had fallen behind on their payments.

15           I believe May of 2015 is when the administration

16   switched from President Aquino to President Duterte.  So it was

17   right on or around that time period that the payments stopped I

18   believe.  I can of course confirm all of that.

19           THE COURT:  That's fine.  I do see in your affirmation

20   to me in connection with this proceeding that you're recalling

21   it as late summer of 2016 when you incurred or when you found

22   difficulty in getting paid back.  I'm sure if I looked back at

23   your motion to withdraw, I would see when you actually received

24   your last payment from them.

25           Again, to the best of your recollection, sir, there

 1    were invoices that were unpaid, but there were no invoices that

 2    were paid and then they sought to claw back the money.

 3            Is that correct?

 4            MR. MURPHY:  That's correct.  That's correct.

 5            THE COURT:  Thank you.

 6            Sir, I'd like to understand as well the contingency

 7    fee.  And I appreciate the efforts that you've made to

 8    distinguish the DANY assets from the non-DANY assets.  And I do

 9    see that in your retainer agreement.

10            I guess I'd like to understand what you understood to

11    be the circumstances that result in your relying on this

12    contingency fee.  Let me be a little bit better in my

13    formulation of the question.

14            What I read it say is to reflect an entitlement that

15    your former firm would have to a percentage of any recovery of

16    DANY assets and a different percentage of any recovery of

17    non-DANY assets.  And then it says "whether recovered by way of

18    suit, settlement, judgment, or otherwise."

19            I'm focusing, Mr. Murphy, on the term "recovery"

20    because your former client -- I was about to say your

21    adversary, and perhaps it was a Freudian slip -- client says

22    that in fact you didn't recover it.  You weren't there.  You

23    weren't involved in the negotiations.  If I may use the ball

24    analogy I've been using internally, you didn't get the ball

25    over the goal line.

1          So what did you understand to be the recovery?

2          MR. MURPHY:  Any sums that were obtained as a result

3    of the litigation.  The only reason I was not the one that was

4    involved in the settlement is because they refused to honor

5    their agreement and pay their fees.  I believe firmly, your

6    Honor, that if I had been involved in this case to the end,

7    candidly, the recovery would have been far more substantial.

8          What had happened is as a result of their refusal to

9    produce a witness, as you'll recall, you struck a motion for

10   summary judgment we had.  And then everything went south, for

11   lack of a better term, thereafter.

12         So it is not possible to say that I failed to have any

13   involvement in the recovery simply because I wasn't present

14   when the ultimate settlement agreement was executed.  That is

15   just a false premise.

16         The amount of work that I did on this case on behalf

17   of this client was truly enormous.  Everything that I did is

18   what led to them even getting the settlement.  I do believe

19   that if I was around, it would have been a bigger settlement.

20         Indeed, I had confirmed with them -- and I can share

21   this with you.  Since we're in attorney's fees, I don't believe

22   that I'm constrained by attorney-client restrictions when we're

23   in a circumstance such as these.

24         In September of 2016, when issues were arising with

25   the new administration, I said, let me engage in settlement

 1   discussions.  Now is the time to do it.  I believed with

 2   Mr. Swift I could have hammered out a deal that would have been

 3   even more favorable to the Republic of the Philippines at that

 4   time, but they wouldn't allow me to do that at that time for

 5   whatever reason.

 6           So to say that I had to ultimately be involved in a

 7   part of the recovery is contrary to I think general case law in

 8   New York.  My services were rendered, and I'm entitled to be

 9   paid for them I think.

10           There is nothing in there that says if I'm relieved or

11   if they fail to pay the fees, I don't get any participation in

12   it.  Anyone that could say that my work -- no one that's

13   involved in this case, I submit, including the other lawyers on

14   the other side who I think would gladly testify, if they had

15   to, to my role and the amount of work that I did for the sake

16   of this client would ever say that Ken Murphy was uninvolved in

17   the recovery.

18           THE COURT:  I'm just wondering whether I can consider

19   this as -- what you've asked me to do is to consider this a

20   contractual entitlement to say that you must get 7 percent.

21           I don't even need to think about it.  I don't even

22   need to do the analysis that I would do if this were a question

23   of a charging lien because you and your former client have

24   worked out in advance the money to which you are entitled.  And

25   I do understand that.

1          I presume you're arguing in the alternative, that if I

2     do go under a more common law charging lien theory, that I

3     should come up with at least you would argue the same amount.

4          MR. MURPHY:  Yes.  I tried to put that in my papers

5     when I looked this morning to prepare for this call.  If you

6     look at the number of hours, which I believe I estimated as

7     1,350, and even if you multiply that by the billable rate of

8     475, it exceeds the amount I'm asking for here.

9          It comes up to in the vicinity of $620,000.  The sum

10    total for the amount I'm seeking is $580,000 for the work that

11    assisted in a $4 million recovery which is something in the

12    vicinity of 14 percent which is eminently reasonable.  I think

13    I keep coming back to this tax agency case from the Second

14    Circuit which is at 140 F.3d 442.

15         At the end of the decision, you see the Second Circuit

16    says because the lawyer possessed the charging lien under

17    Section 475 by operation of law, the district court's task

18    would have been simply to fix the amount of the lien under the

19    retainers as found by the court.  The fact that the lawyer may

20    have been accorded a measure of justice under a separate U.S.

21    code does not change the result here.

22         Section 475 says:  "Provided a lien in all cases and

23    not merely where the client failed to provide some other form

24    of security or protection and the courts cannot themselves

25    substitute another form of protection for that provided in the

1   statute."

2          So I think that the black-letter law of these cases

3   says that where you have a clear retainer agreement --

4   remember. Remember. I was relieved because they didn't pay

5   the fees. I was not relieved for cause or anything of that

6   nature.

7          I think the case law supports that where there is a

8   clear and unambiguous agreement that entitles me the fee, then

9   I'm entitled to it. And I think Mr. Tuy is as well.

10          Obviously he has to argue his own case, but they

11   entered into an agreement with him after that. They knew that

12   when they entered into the agreement with Mr. Tuy, they were

13   well aware of the fact that I was asserting my right to my

14   payment after all the work that I had done towards this

15   endeavor.

16          So I think that the charging lien and New York law

17   support my position that you can indeed just follow the letter

18   of the agreement and afford me that fee based upon the letter

19   of the agreement.

20          If I can go on for just one more second.

21          THE COURT: Yes, sir. I am going to ask you just to

22   be a little bit slower for court reporter and judge. Thank

23   you.

24          MR. MURPHY: Sure.

25          If you look at just a general say it's a quantum

1    meruit or a fair and reasonable -- remember.  In this

2    proceeding, your Honor, this is an equitable remedy.  It's in

3    your discretion.  You look at all the facts and circumstances,

4    and you decide what is fair and just.

5          Even if Mr. Tuy and I together got the same amount of

6    money -- and I don't know because he hasn't filed a motion

7    seeking a specific numerical value.  So I'm not really sure

8    what it is he's looking for -- I suspect it would be somewhere

9    in the vicinity of my number.  And you would still be less than

10   33 percent.

11         You'd be at or about 29 percent of the total recovery

12   if you double the 580,000 -- for example, you're at 1,160,000,

13   which is about 29 percent of the 4 million the Republic has

14   recovered in this case.

15         Those two fees together are eminently reasonable under

16   the circumstances of a case of this magnitude, of this

17   complexity, and of this difficulty.  To some degree, the

18   difficulty and the challenge to counsel in this case was a

19   result of the clients themselves and the roadblocks that they

20   put up and made work harder and the level of effort even more

21   substantial than a run-of-the-mill case.

22         THE COURT:  Sir, thank you.

23         Let me please turn to Mr. Tuy.

24         Mr. Tuy, I'm going to ask you just to keep using the

25   phone as a handset just to stop the echo.

```
1            Mr. Tuy, I think Mr. Murphy is correct that you have
2    not submitted to me a written document asking for fees.  I'll
3    ask you if you have.
4            Have you, sir?
5            Mr. Tuy, it may be the case that you have your phone
6    on mute.  I'll invite you to unmute yourself and try again.
7    Thank you.
8            Mr. Tuy, we've tried to unmute you from this side.
9            MR. TUY:  Hello.
10           THE COURT:  There you are, Mr. Tuy.  We're all happy
11   to hear from you, sir.  Let me ask my question again.
12           Mr. Tuy, thank you so much.
13           Have you submitted written requests?
14           MR. TUY:  No, your Honor.  I submitted our bills to
15   the PCGG.  This was pursuant to a formal agreement with the
16   PCGG that I will not be submitting any bill or any papers
17   charging the 7 percent.  Because as far as the PCGG is
18   concerned, they are claiming that there is no issue about my
19   fee or the 7 percent.
20           If I may refer your Honor to our last hearing on May 9
21   where I explicitly stated that there was no issue as to my fees
22   because my retainer with the 7 percent was cleared all the way
23   from the OSG to the Executive Secretary's Office.  They saw no
24   problem with it.
25           THE COURT:  If you could just pause a second, sir.
```

1          Mr. Tuy, I have a retainer agreement that is dated

2   June 15 of 2017.  And it is countersigned by someone.

3          Is this the retainer agreement that I should be

4   looking at?

5          MR. TUY:  Yes, your Honor.  I think because the

6   signature was signed by either Mr. Bulay or Mr. Munsayac.

7          THE COURT:  Fair enough.

8          Just for the court reporter's benefit, Mr. Bulay is

9   B-u-l-a-y.  And Mr. Mansayac is M-a-n-s-a-y-a-c.

10          Mr. Tuy, as I read this document, what it says on the

11   last page is that it is subject to Commission on Audit

12   confirmation pursuant to a Commission on Audit second

13   endorsement dated July 25 of 2017 regarding the approval of a

14   7 percent contingency fee.

15          Let me make sure I understand what that means.

16          MR. TUY:  My understanding of the PCGG is there is no

17   issue about the 7 percent.  As far as I'm concerned, the

18   Philippine government said they would pay the 7 percent.  That

19   is why, your Honor, I have not submitted a memorandum pursuant

20   to that informal agreement.

21          THE COURT:  Okay.  Sir, I saw a letter that is dated

22   March 11 of 2020.  It is a letter to me from Mr. Amatorio.

23          And it says that the Republic will not pay Mr. Tuy his

24   claimed contingency.  This decision is based on the Republic's

25   reading of the retainer agreement it signed with him.

1                    Have you received a copy of that letter, sir?

2                    MR. TUY:  No, your Honor.  That's news to me honestly.

3                    THE COURT:  Let me just pause for a moment.  This may

4       have happened -- this is March of 2020.  We were at the

5       beginning stages of a pandemic, and you may have had office

6       issues.

7                    I have a letter saying that they were not paying you.

8       Until I opened my mouth, sir, did you understand, Mr. Tuy, that

9       you were cleared for payment by the Republic of the

10      Philippines, that you had worked everything out with them?

11                   MR. TUY:  Yes, your Honor.  I was under the impression

12      based on the pronouncement of Mr. Bulay.  And what I understand

13      from him is the 7 percent was not a problem.  I don't have a

14      copy of that letter that he sent to you, your Honor.

15                   THE COURT:  Just one moment, please.  Thank you.

16                   (Pause)

17                   THE COURT:  Mr. Tuy, again, so that the record is

18      clear for me, what you do believe you are owed from the

19      Republic?

20                   Are there invoices that you expect to be paid?  Is it

21      a contingency fee that you expect to receive?  Or is it a

22      combination of those two things?  Thank you.

23                   Just to make sure, what do you think you're owed, sir?

24      Tell me.

25                   MR. TUY:  Okay.  The Republic owes me for billings

1  dating back to the third quarter of 2018 up to the time I

2  withdrew.  The amount I have in front of me is $279,000 more or

3  less.

4          THE COURT:  Okay.  Approximately $279,000.

5          And additional to that, sir, you believe that you are

6  owed a 7 percent contingency fee.

7          Is that correct?

8          MR. TUY:  Yes, your Honor.  Our understanding is that

9  they would pay me 7 percent of $4 million which is $280,000.

10         THE COURT:  It is indeed.  Okay.  Actually, Mr. Tuy,

11 it may be, sir, that I ask you to give me something in writing.

12 We'll have to see where things go.

13         What I'm going to do now is try to give

14 Mr. Amatorio -- Mr. Tuy, I'm going to ask you to mute your

15 phone for a second.  Thank you so much.

16         Mr. Amatorio, are you still there?

17         MR. AMATORIO:  I am, your Honor.

18         THE COURT:  Mr. Amatorio, I know you've been listening

19 to us.  I guess I'd like to understand:  With respect to

20 Mr. Murphy, have I misstated the position of your current

21 client, the Republic of the Philippines, regarding his

22 entitlement to fees?

23         MR. AMATORIO:  Your Honor, first of all, with regards

24 the position of Mr. Murphy, I understand that the previous

25 administration, President Aquino and during the time of

1   Chairman Bautista, that he was paid the fees that he was asking

2   from PCGG.

3        However, he correctly noted that things had changed

4   when the current administration became -- the new PCGG officers

5   were sworn in.  They were very strict on the matter with

6   regards to the hiring of foreign counsel, including the

7   necessary approval from the OSG, or the Office of the Solicitor

8   General, and the requirements from the Commission on Audit.

9   That's why they have that issue on paying Mr. Murphy.

10       THE COURT:  Mr. Amatorio, I just want to pause you for

11  a moment, please.

12       I am correct, sir, that your client sources this

13  requirement to the Commission on Audit Circular of 95-011?

14       MR. AMATORIO:  That is correct, your Honor.  Their

15  objection is based on that requirement, your Honor.

16       THE COURT:  What should I make of Mr. Murphy's

17  statement to me, which I credit, that no one ever told him

18  about this obligation and, indeed, they paid him for a period

19  of three years almost before they stopped paying him?

20       MR. AMATORIO:  I understand the position of

21  Mr. Murphy, your Honor.  And that's why with that case, your

22  Honor, we yield to the decision of the Court with regard to

23  that because should the new PCGG commissioners, your Honor, pay

24  Mr. Murphy, despite knowing the circular, I think they would be

25  in violation of the circular in their home country.  And that

1    would put them in jeopardy, your Honor.

2           But if it's coming from you, your Honor, then they

3    will have to abide by the ruling of the Court.

4           THE COURT:  I see.  Here's my concern.  You just said

5    they would be violating the law of their home country.  That's

6    not my interest, having anyone on the PCGG prosecuted for

7    abiding by my court order.

8           Can you give me some assurance that my decision is not

9    going to impact their lives and liberties?

10          MR. AMATORIO:  I don't believe, your Honor, because it

11   is a payment coming -- especially if the payment is coming from

12   a lien here in a foreign country.  It's not coming from the

13   coffers of the PCGG in the Philippines.

14          THE COURT:  I see.  It's a little bit like the

15   difference between begging for forgiveness and asking for

16   permission.  It's one thing if you have to pay out money.  But

17   if you're just getting a little bit less because of some crazy

18   judge in New York, not to name names, there's nothing they can

19   do about that.  I get that.  I appreciate the clarification,

20   sir.

21          Let's talk then again about the contingency as it

22   pertains to Mr. Murphy.

23          Why doesn't he get it?

24          MR. AMATORIO:  Your Honor, first of all, his statement

25   that he would have gotten more money for the Republic is, in my

1   view, speculative.  So we don't know what would have happened,

2   your Honor.

3           Second, it would put the Republic in a different

4   position.  I'll give an example, your Honor.  For instance, if

5   Mr. Murphy just worked for three months or two months -- it

6   doesn't matter whether he continues the case -- as long as he

7   has that retainer, he's entitled to 7 percent.  I think that's

8   the logic that Mr. Murphy was trying to tell the Court.

9           He has a retainer of 7 percent.  So since he has that

10  retainer, it doesn't matter whether he was the one who

11  recovered or someone else.  Because of the retainer, he's

12  entitled to 7 percent.  And I think it's not fair for the

13  Republic, your Honor.

14          THE COURT:  All right.  But let's be clear.  There is

15  a difference, I think, between Mr. Murphy putting in a notice

16  of appearance versus working on a case for three years and

17  participating in very hotly contested discovery and

18  participating in a lot of motion practice.

19          But I think your underlying point is you're concerned

20  about enforcing that provision of the agreement in a situation

21  where you believe, your client believes, he did not in fact

22  recover money for the Republic.

23          Is that correct?

24          MR. AMATORIO:  That is correct, your Honor.

25          THE COURT:  I do understand.  I heard you earlier

1    today say you're yielding to the decision of the Court.  At

2    least your client is.  I hope that remains the case.

3           I need more help, Mr. Amatorio, with respect to

4    Mr. Tuy because I have a retainer agreement that I don't fully

5    understand.  And actually I see -- and I'm asking you, sir:

6    You're listed here as of counsel at the time of the retainer

7    agreement being entered into.

8           Is that correct?

9           MR. AMATORIO:  That is correct, your Honor.

10          THE COURT:  Is there a conflict with you representing

11   the Republic now?

12          Is there a conflict with you making arguments in this

13   litigation, given that your name is on this letterhead?

14          MR. AMATORIO:  Well, in principle, your Honor, you

15   would see that it's a conflict.  But I discussed this with my

16   client, and they seem to be fine with that.  They waived the

17   conflict.

18          The only reason why I withdrew from representation

19   with Mr. Tuy, your Honor, was when we had disagreement with

20   regards to how the case would go.  And then that's why I

21   withdrew.

22          The conflict has been discussed with my client.  And

23   they're okay with my representing the Republic, your Honor.

24          THE COURT:  All right.  Although I'll note, as we're

25   having this conversation, sir, that as of this moment, you do

 1   not have a fully negotiated retainer agreement with your

 2   client.

 3           Is that not correct?

 4           MR. AMATORIO:  That is correct, your Honor.  Yes.  I

 5   have a pending approval from the Republic with regards to my

 6   retainer.

 7           THE COURT:  Mr. Amatorio, I hope that you will take

 8   this in the sincere light in which it is meant.

 9           Is there another contingency fee that I'm going to be

10   having to confront at some later date?

11           I mean this in all sincerity, sir.  Are you the third

12   claimant on this pot of money that I have in my court account?

13           MR. AMATORIO:  No, your Honor.  No.  I can guarantee

14   you I wouldn't go to you asking for 7 percent, your Honor.

15           THE COURT:  Or any percent, sir.  Okay.  I'm happy to

16   know that.

17           MR. AMATORIO:  Or any percent.

18           THE COURT:  Okay.  All right.

19           MR. AMATORIO:  I'll save you the trouble, your Honor.

20           THE COURT:  Thank you.

21           Mr. Amatorio, are you familiar with the retainer

22   agreement of June 15, 2017, that I have been referring to in

23   this conference?

24           MR. AMATORIO:  That's Mr. Tuy's retainer agreement,

25   your Honor?

```
 1                THE COURT:  Yes.  I'm asking whether you are familiar
 2    with it, sir.
 3                MR. AMATORIO:  Yes, your Honor.
 4                THE COURT:  Do you have a copy of it?
 5                MR. AMATORIO:  I don't have a copy with me right now,
 6    your Honor.
 7                THE COURT:  Sir, it looks to me, looking at this
 8    agreement and looking at some other materials that I've seen,
 9    that at one point the Commission on Audit disallowed the
10    contingency portion of the agreement.  And then there seems to
11    be an endorsement here that suggests that the Commission on
12    Audit would reconsider or reapprove this contingency fee.
13                Do you know, as you're sitting here talking to me
14    today, whether the Commission on Audit or the Solicitor General
15    or anyone with the power to do so approved a contingency
16    provision with respect to Mr. Tuy?
17                MR. AMATORIO:  I have no specific clarification, your
18    Honor.  As far as I know, the Commission on Audit may have
19    given provisional authority for the Republic to pay Mr. Tuy.
20                THE COURT:  I just heard you say "provisional
21    authority."  Okay.  Thank you.
22                To the best of your knowledge, sir, was that
23    provisional authority ever withdrawn?
24                MR. AMATORIO:  I have no idea, your Honor.  The
25    Republic has not confirmed that to me.
```

1            THE COURT:  Okay.  Mr. Amatorio, did you send me a

2     letter in or about March of this year telling me that you've

3     been authorized to state that the Republic of the Philippines

4     will not pay Mr. Tuy his claimed contingency?

5            Is that something that you sent to me?

6            MR. AMATORIO:  I did, your Honor.  If I can go back to

7     that a little bit, your Honor.

8            Mr. Tuy referenced the statement from our Commissioner

9     Bulay that there is no objection to his retainer, with regards

10    to his billings, and the contingency fee at that moment, Judge.

11           For one thing, the retainer of Mr. Tuy has approval

12    and acquiescence both from the OSG and the Commission on Audit.

13    The question with regards the 7 percent, your Honor, was a

14    question from the Commission on Audit asking whether such

15    7 percent is in fact valid to be paid by the Republic.

16           And going back and forth between the Republic and the

17    Commission on Audit, I think they have an initial agreement

18    that took place later on, your Honor, after that disapproval

19    has been communicated by PCGG or commissioned by the new

20    government.

21           Moving forward, there was an issue with regards to the

22    representation of Mr. Tuy and his authority to represent the

23    Republic with regards to the settlement.  And I think all the

24    participants in the case were aware of what took place, your

25    Honor, that Mr. Tuy was not authorized to represent the

1    Republic with a settlement.

2          That was the subject of a motion by the Republic

3    afterwards.  That's why the payment of Mr. Tuy with regards to

4    the contingency became in question.

5          THE COURT:  I see.  Let's pause for a moment.

6          There have been requests -- there have been arguments

7    made to me -- that Mr. Tuy lacked authority to represent the

8    Republic in connection with the settlement.  And I believe

9    every time that argument has been presented to me, I have

10   rejected it.  And I believe you know that as well.

11         I don't know if I need to reject it anymore.  I think

12   your client is aware of my position.  Your client may disagree

13   with me, and that happens from time to time.  But the decision

14   is decided.

15         Correct?  I've made the decision.  Correct?

16         MR. AMATORIO:  Yes, your Honor, and we understand your

17   decision.

18         THE COURT:  As a result of my decision, what impact,

19   if any, does that have on Mr. Tuy getting paid by the Republic?

20         MR. AMATORIO:  That's a tough question right now, your

21   Honor, because based on that decision, your Honor, I think

22   Mr. Tuy -- I don't want to speak for Mr. Tuy.

23         But Mr. Tuy rejected the notion that he was not

24   authorized to represent the Republic.  I assume Mr. Tuy -- I

25   would say that he was the one who made recovery for the

1    Republic, and I assume he would say that he's entitled to

2    7 percent.

3           The statement made by me on behalf of the Republic

4    that he is not going to be paid -- that was prior to your

5    decision, your Honor.

6           THE COURT:  Okay.  That's great.  I gave Mr. Tuy a

7    heart attack unnecessarily.  For that, I do apologize.  Yes.

8    He's smiling.  So I think he understands that we're all getting

9    new information here.

10          Mr. Amatorio, as a result of my decision and as it

11   stands right now, working in little pieces here, will the

12   Republic pay Mr. Tuy the approximately $279,000 in billings

13   that he just mentioned to me a few moments ago?

14          MR. AMATORIO:  First, your Honor, the Republic has no

15   problem with Mr. Tuy being paid for his legal hours.  It was

16   never an issue, except I believe that the reason why he wasn't

17   paid at the time is the budgetary constraints in the Republic.

18          But the Republic has a commitment to pay him with

19   regards his billable hours, provided it's verified, your Honor.

20          THE COURT:  Okay.  That is one thing I'm not going to

21   worry about.

22          Just so that I'm clear, Mr. Amatorio, with respect to

23   Mr. Murphy -- I don't want to jump back and forth between your

24   two predecessor counsel -- but my recollection is that

25   Mr. Murphy had some outstanding billings on the order of about

1   $50,000 of cost and expenses.

2          Putting aside for the moment your view as to whether

3   Mr. Murphy gets a contingency fee, will the Republic repay him

4   for that?

5          MR. AMATORIO:  Right now, your Honor, the Republic's

6   position is not, because, number one, because of the Commission

7   on Audit's ruling.  And it would be difficult for the Republic

8   to say he's going to be paid the balance and not for the

9   contingency fee because the problem starts with the same thing,

10  your Honor, the Commission on Audit's ruling.

11         THE COURT:  Very fair, sir.

12         Mr. Amatorio, if I ordered that he be paid from the

13  money that was going to the Republic of the Philippines, would

14  your client abide by my order?

15         MR. AMATORIO:  I believe everyone has to abide by your

16  order, your Honor.

17         THE COURT:  I always wish that, sir.  Thank you.

18         Now let's talk about Mr. Tuy's entitlement or not to a

19  contingency fee.  Let me start with the most fundamental

20  question to me, sir:

21         From your client's perspective, were there two

22  7 percent contingency fees or one or some other number?

23         I've always tried to figure out whether Mr. Murphy and

24  Mr. Tuy were supposed to share that money or whether each of

25  them was entitled, if successful, to 7 percent.

```
 1            MR. AMATORIO:  I believe, your Honor, it should be

 2   one, if ever.  But in that position, the position of the

 3   Republic is Mr. Murphy is not entitled to it.

 4            THE COURT:  The position of the Republic is Mr. Murphy

 5   is not entitled to it because he didn't recover things.  I'm

 6   not agreeing.  I'm simply stating it.

 7            What's your position with respect to Mr. Tuy's

 8   entitlement to a contingency fee?

 9            MR. AMATORIO:  You broke up, your Honor.

10            THE COURT:  Excuse me, sir.

11            I'm interested in the Republic's position on Mr. Tuy's

12   entitlement or not to the contingency fee portion of his

13   retainer agreement.

14            MR. AMATORIO:  Your Honor, like I've said before,

15   there was no issue with Mr. Tuy, with the 7 percent based on

16   his retainer because his retainer had the approval both from

17   the Office of the Solicitor General and the Commission on

18   Audit.

19            The only time that the Republic objected to his

20   payment was because of the question on whether he had the

21   authority, which has been moot already, your Honor.

22            THE COURT:  It's been mooted by my decision, sir, is

23   what you're saying.

24            MR. AMATORIO:  Yes, your Honor.

25            THE COURT:  At some point, Mr. Tuy will get his money.
```

1    And the question just becomes -- and I guess I'm the one who

2    ultimately answers this question -- whether he gets the

3    7 percent or something less than 7 percent because the Republic

4    is not taking the position that this wasn't a provision in its

5    agreement.  They're not taking the position that there wasn't a

6    recovery.

7              They adhere.  They continue to take the position that

8    he was not authorized to bind the Republic.

9              Is that correct, sir?

10             MR. AMATORIO:  That's correct, your Honor.

11             THE COURT:  Thank you.  I appreciate that.

12             Mr. Amatorio, I've asked you questions that have been

13    causing me some concern in an effort to try and understand

14    better the issues in this case.

15             If there is something from your client's perspective

16    that I have not asked you but you want to make sure is on the

17    record, would you please do that now.

18             MR. AMATORIO:  I couldn't think of any, your Honor.

19             THE COURT:  Okay.  Thank you.  I was just really

20    thorough with my questioning, sir.  Thank you.

21             Mr. Murphy, you've now heard from Mr. Tuy, and you've

22    heard from Mr. Amatorio.  I would be interested in hearing from

23    you in reply.

24             MR. MURPHY:  PCGG reminds me of a bunch of

25    politicians.  They just want to clean their hands and not make

 1    this decision because it's coming down to politics, which is

 2    fine.

 3          They've admitted to me repeatedly that I'm owed my

 4    money, but they can't authorize it.  So now they're coming with

 5    this COA and this OSG issue, which is contrary to New York law.

 6    It's basically made up at this point.

 7          They just want to distance themselves from the last

 8    administration's decisions, but the last administration should

 9    be bound by their decision.  I don't have my retainer agreement

10    in front of me.

11          But nothing says, if KC Murphy gets this money, then

12    he's only entitled to it with a recovery, whatever the recovery

13    is.  They got their recovery.  As I sit here, I've never seen

14    Salvador Tuy, his submission, as I mentioned.

15          He's a nice gentleman, and I really don't want to

16    fight with him over the 7 percent, which I think is exactly

17    what, to some degree, maybe the Republic would have liked.

18    Although based on the statements their counsel just made, maybe

19    that's not so.  Maybe they just said, he should get the

20    7 percent and Murphy should get nothing.

21          Your Honor, the amount of work that I put into this

22    case compared to Mr. Tuy is shocking.  I don't want to get into

23    that comparison with him, but I gave you detailed invoices.

24          And I don't know if I sent you unredacted copies.  I

25    know I uploaded the redacted invoices.  But if you want to see

1    the unredacted bills, I can send you those.  I didn't even bill

2    for everything I did on this case because of the nature of it

3    with the cap and the incentive fee.

4            I did even more work than what's memorialized in those

5    documents.  And yet today I've learned for the first time that

6    he's owed another $260,000 that they're saying he's going to

7    get.  And he was already I'm sure paid a large sum of money

8    before the $260,000 that's owed.  And then he's going to get

9    the 7 percent on top of that.  I mean, that's simply

10   inequitable if you look at the volume of work that the two of

11   us did.

12           But I go back to what I said before, your Honor.  I

13   believe we can both get paid, and it's totally consistent with

14   New York law based on our respective engagement letters and a

15   smart-enough client that knew about the agreement they entered

16   into.  They knew about the agreement they entered with me in

17   2013 or 2014.

18           THE COURT:  '14.

19           MR. MURPHY:  And they knew about the agreement they

20   entered into with Salvador Tuy in 2017.  And they also knew

21   when they entered into that agreement with him that Mr. Murphy,

22   from day one, was saying, hey.  I'm owed my money, folks.  This

23   is not fair.  I did my work.  I need to get paid.

24           So I think that Your Honor can craft a decision here

25   that would be eminently reasonable under your discretion within

1    the four corners of a great deal of body of case law in

2    New York that would authorize me to get my full fee.

3           It sounds like they're going to agree to give him his

4    full fee.  And still at the end of the day, the Republic nets

5    out a very nice recovery.  We can argue whether it could have

6    been better or worse.  That's irrelevant.

7           My point is simply that the value of my services --

8    you can look at it in two ways.  You can look at it just based

9    on a contract theory that this is the agreement they entered

10   and this is what I'm entitled to, or you can look at it on a

11   quantum meruit basis, that the number of hours and the amount

12   that I billed and the amount of work I did -- this was not a

13   run-of-the-mill commercial case I did in the commercial

14   division in the Southern District of New York.

15          This was high-stake litigation, as your Honor knows

16   because you know it better than anybody, with a very aggressive

17   adversary where I had to jump in on a case I knew nothing

18   about.  And I had to read transcripts.

19          The volume of work I did on this thing --

20          THE COURT:  Slow down, sir.  Thank you.

21          MR. MURPHY:  Sorry.  The volume of work that I had to

22   do on this thing, to now be told you're not entitled to any

23   more money, you're not entitled to anything because COA didn't

24   approve it, and then to say, oh, by the way, you didn't have

25   anything to do with the recovery is utterly unjust and untrue,

1   because, A, COA doesn't matter based on general agency

2   principles; and B, any lawyer involved in this case would

3   attest to the fact that I had a great deal to do with moving

4   the ball up the field in this matter and getting it where we

5   got it.

6          And I think that you can, without a problem under the

7   law, award me my attorney's fees that I wholeheartedly believe

8   I'm entitled to.

9          THE COURT:  All right.  Thank you very much.

10          Mr. Tuy, you almost might do better by not talking,

11   sir, because it sounds like the Republic is inclined to pay

12   your fees.  And I did not mean to scare you earlier.  I simply

13   had the information I had.  If you want to be heard further,

14   Mr. Tuy, I will hear from you now.

15          MR. TUY:  I totally agree with Mr. Murphy.  I think I

16   wrote a lot on what he actually did before me.  I believe, your

17   Honor, that he should be entitled to 7 percent too because when

18   I entered into this case, the PCGG and COA knew already that

19   Mr. Murphy's retainer had the 7 percent.

20          And it was my understanding from the beginning that

21   even if Mr. Murphy was given the 7 percent, the 7 percent that

22   would be due me is on top of that.  So I really have nothing to

23   say.  I have so much respect for Mr. Murphy's work.

24          I would like also to comment on the circular that was

25   cited, 95-011.

1          THE COURT:  Yes.

2          MR. TUY:  Your Honor, my understanding of this

3     Commission on Audit Circular is that this is only applicable to

4     the Philippines.  In fact, the heading shows that.  It cites

5     the case law of *Municipality Of Pilla v. Court of Appeals*.

6          We could give you a copy of that decision.  This was

7     precisely to prevent the hiring of private counsel in civil

8     cases.  It has nothing to do with the PCGG case.

9          THE COURT:  I see.  Just for the benefit of the court

10    reporter, the case cited here is P-i-l-l-a.  Thank you.

11         Mr. Tuy, you're asking me to take a better look at

12    this circular and to see that it may not actually apply here.

13    Is that correct?

14         MR. TUY:  Yes, your Honor.  It doesn't apply to this

15    case, your Honor.  That's my understanding of the case.

16         THE COURT:  Okay.  I will look at that.

17         Anything else, sir?

18         MR. TUY:  Yes, your Honor.  While we're here, I'm sure

19    that Mr. Murphy would insist on being paid from the $4 million

20    that is within the Court's jurisdiction.  And I would also

21    insist on the same.

22         The problem is because I anticipate that if I wait for

23    the PCGG to pay me out of the coffers, what actually happens is

24    if the money is transferred to the Philippines, it goes to the

25    general fund.  If that money goes into general fund,  it will

1    take probably a year before we get paid.

2          So I was going to ask the Court, subject to the

3    (inaudible) of the Philippines, I think the Court has authority

4    to disburse whatever the amount is, the 7 percent to Mr. Murphy

5    and our 7 percent plus my billings, from the $4 million.  That

6    is the only addition I have.  I'm sure that is within the

7    Court's power.

8          THE COURT:  Mr. Amatorio, let me speak with you about

9    this issue.

10         With other claimants in this particular proceeding,

11   for example, the Duran class and Mr. Swift, with regard to

12   Mr. Swift's law firm, I presume he took out his fees and then

13   disbursed the money to his clients.

14         Mr. Tuy is asking me to do that here, to disburse the

15   attorney's fees and then send the rest I suppose to you, sir.

16   I don't know where else it would go.

17         What was your contemplation about how this money, when

18   it's disbursed, would be disbursed?

19         MR. AMATORIO:  Candidly, your Honor, we haven't been

20   to that point yet.  Whatever is the decision of the Court, I

21   believe the Republic will abide with that, your Honor.  I will

22   ask the Republic with regards to that, your Honor.

23         THE COURT:  I think from an efficiency perspective, it

24   would be easier for me to just cut checks from here if I'm

25   permitted to do so.  By "permitted," I mean if my clerk's

1   office allows me to do so.

2          I'll look at it from this end.  I think you should

3   stick from you'll abide by my decision, but I think it makes

4   sense for you to inquire of your clients.

5          MR. AMATORIO:  I will, your Honor.

6          THE COURT:  Thank you.

7          Let me thank each of you.  I hope this was useful to

8   you.  It was very, very useful to me.  I will get you a

9   decision as soon as I am capable.

10          But I will also be candid with you and tell you that

11   my docket is largely out of my control these days because I

12   have a lot of defendants making compassionate release

13   applications.  So they have to take precedence, and they are

14   taking precedence.

15          When I can get to this, I will.  If it is easier to do

16   so orally, I'll bring you back just like I'm doing right now.

17          Mr. Amatorio, can I ask you, please, to obtain in the

18   ordinary course a transcript of this proceeding.  And when you

19   get it, I will get a copy automatically.  But I'd like to have

20   it as I'm putting together my thoughts.

21          Will you do that, sir?

22          MR. AMATORIO:  Yes, your Honor.

23          THE COURT:  Counsel, thank you for your time this

24   afternoon.

25          MR. TUY:  Can I submit to you a redacted copy of the

1    pending bills that I have with the Republic in the event that I

2    may be allowed to draw down that amount?  The unpaid billings.

3          THE COURT:  I will accept those, but I would actually

4    appreciate perhaps a greater, more detailed document of the

5    work that you did on this case.

6          MR. AMATORIO:  What I would suggest, your Honor, with

7    Mr. Tuy -- I'm not trying -- what I would say is maybe he

8    should first submit those documents to the Republic and see if

9    the Republic will approve or have questions with the bills.

10         And if the Republic says there's no problem, then

11   Mr. Tuy can submit just the amount.  If the Republic says no,

12   then Mr. Tuy can give the details so that the Court could see

13   it.

14         THE COURT:  Mr. Amatorio, let me explain my concern

15   about that.  Mr. Murphy has just suggested to me this afternoon

16   that one thing that would be useful to me in understanding his

17   work and the value of his work is to compare it with the amount

18   of work that Mr. Tuy put into this case.  So I'm not opposed to

19   these things being submitted under seal.

20         Mr. Murphy, let me ask you this:  Would you consent to

21   Mr. Tuy submitting these bills to me in camera just so that

22   there would be no question about privileged communications

23   being disclosed?

24         MR. MURPHY:  I have somewhat of a concern about that

25   honestly because I feel if this is part of my argument in terms

1    of the equitable remedies, I should kind of be able to look at

2    his bills.

3          I'd be happy to share with him my bills.  We had the

4    same client.  It's not as though there's going to be anything

5    in there I see as being an issue.

6          If your Honor orders it, I'll have to live with it.

7    It is what it is.  I was interested I admit in kind of getting

8    some flavor for what Mr. Tuy had done, and this is the first

9    I'm hearing of it today in terms of the volume of work and

10   things of that nature.

11         But if your Honor thinks that's the better course,

12   then I'm not going to stamp my feet up and down.

13         THE COURT:  I think I have an understanding of your

14   work, Mr. Murphy, and I'd like to have a better understanding

15   of Mr. Tuy's.  So Mr. Tuy can submit to me in camera the bills.

16         I do think, however, what I'd want from Mr. Tuy is a

17   narrative explanation -- and it can be just a page or two or

18   three -- of what he did.  That does have to be filed on the

19   public docket so that people have an understanding of the work

20   that he did.

21         That will be for me amplified and corroborated by the

22   bills.  But for now, I think he should, as well, put something

23   on the docket to let us know what he did.

24         So, Mr. Tuy, you can do that.  And I'll look for it.

25   I'll look for the submission in camera, and I'll look for the

1    submission on the docket.

2           Counsel, anything else today?

3           MR. MURPHY:  No, your Honor.

4           You don't need my unredacted bills then?

5           THE COURT:  I think the redacted ones give me a sense

6    of what you did.

7           MR. MURPHY:  Fine.  No problem.  I'm not looking for

8    more work for myself.

9           THE COURT:  No.  I appreciate that.  Sir, if it turns

10   out I need more, I will certainly let you know.

11          MR. MURPHY:  I appreciate that.

12          THE COURT:  All right.  Counsel, I thank you very

13   much.  With that, we are adjourned.  Go forth in good health.

14   Thank you.

15          MR. MURPHY:  Thank you, your Honor.

16          MR. AMATORIO:  Thank you, your Honor.

17          MR. TUY:  Thank you, your Honor.

18          (Adjourned)

19

20

21

22

23

24

25