L8D8DISC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DISTRICT ATTORNEY OF NEW YORK
    COUNTY,
4
                    Plaintiff,
5
                v.                          14 Cv. 890 (KPF)
6
    THE REPUBLIC OF THE PHILIPPINES,
7   et al.,

8                   Defendants.             Remote Conference

9   ------------------------------x

10                                          August 13, 2021
                                            10:00 a.m.
11
    Before:
12
                    HON. KATHERINE POLK FAILLA,
13
                                            District Judge
14
                            APPEARANCES
15
    BAKER & BAKER
16       Attorneys for Estate of Roger Roxas and
         Golden Budha Corporation
17  BY:  WILLIAM E. BAKER, JR.
            -and-
18  BROWN LAW GROUP, PLLC
    BY:  DANIEL BROWN
19
    CARDENAS LAW OFFICE
20       Attorneys for Vilma Bautista
    BY:  J. ROBERTO CARDENAS
21
    CESAR DE CASTRO
22       Attorney for Leonor Hernandez and Ester Navalaksana

23

24

25

            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

L8D8DISC

1          (The Court and parties appearing via videoconference)

2          (Case called)

3          THE DEPUTY CLERK:  Counsel, please state your name for

4     the record, beginning with Mr. Baker.

5          MR. BAKER:  William Baker, Baker & Baker, on behalf of

6     the Estate of Roger Roxas and the Golden Budha Corporation.

7          THE COURT:  Sir, I thank you.

8          And I see Mr. Brown there as well.  Good morning to

9     you as well.

10          MR. BROWN:  Good morning, your Honor.  Daniel Brown,

11     Brown Law Group.  I am also joined on the phone by my summer

12     associate Sydney Craston, Brooklyn Law School.

13          THE COURT:  Welcome to Mr. or Ms. Craston.  I can't

14     tell from the dial-in information.  Certainly welcome to the

15     call.

16          Mr. Cardenas, good morning to you, sir.

17          MR. CARDENAS:  Good morning, your Honor.  I apologize

18     in advance for my lack of attire.  When you scheduled this I

19     was already abroad.  I am working, actually, in South America.

20     So I do apologize for the outfit.

21          THE COURT:  And yet Mr. Baker is in God's country, and

22     he is still dressed for the event.  But I completely

23     understand, sir.

24          MR. CARDENAS:  I apologize.

25          THE COURT:  Completely understood.  Thank you.

L8D8DISC

1          Ms. Bautista, I see you as well this morning.  Are you

2   able to see and hear those of us participating in this

3   conference?

4          MS. BAUTISTA:  Yes, ma'am.

5          THE COURT:  Thank you.

6          Mr. de Castro, last but certainly not least, good

7   morning to you, sir.

8          MR. DE CASTRO:  Good morning.  Cesar de Castro for

9   Leonor Hernandez and Ester Navalaksana.

10          THE COURT:  Thank you very much.

11          I appreciate your willingness to participate in a

12   conference call, especially for some of you at an early hour,

13   to resolve these matters on a Friday, Friday the 13th in

14   August.

15          I do have a lot of correspondence that I really wasn't

16   expecting to receive, and as much as I enjoyed working with you

17   for the past seven years, I was sort of happy not to see you as

18   well.

19          I will just note that I hope that for some of you in a

20   quiet moment, you look at some of the things that you have said

21   in these letters and regret that you have said some of the

22   things in these letters.  Some of the language, some of the

23   attachments were things I absolutely did not want to see.  But

24   let's move past that and talk about the issues.

25          For me, the first issue, simply because it is the

L8D8DISC

1    first set of motion papers that I received, was from Mr.

2    Cardenas, and it is regarding the possibility of a charging

3    lien.

4            Mr. Cardenas, let me please say to you, and to Ms.

5    Bautista, that I am trying to do what I can to be very mindful

6    of the attorney-client privilege that you share, and I am going

7    to do my best to minimize any intrusion that I would have on

8    that privilege.  So let me try and ask as basic and simple

9    questions as I can that really don't go into the substance of

10   the representation.

11           Mr. Cardenas, I would like to understand, please, in

12   light of Mr. de Castro's response, your belief that the funds,

13   that I understood the sisters to be receiving, are things to

14   which Ms. Bautista also has an interest.  What I understood you

15   to be referring to was a discussion of a credit from the sale

16   of the *Water Lilies* painting that I believe was shared by or

17   benefited both Ms. Bautista and her two sisters.  And I hope if

18   I use the term "the sisters," everybody knows what I am talking

19   about.  But Mr. Cardenas, is that the hook that you have for

20   seeking to have a charging lien on these proceeds, the credit

21   and its reference being for the benefit of Ms. Bautista and the

22   sisters?

23           MR. CARDENAS:  Your Honor, that is correct.  When we

24   worked through this, and again, I have been very mindful also

25   of my responsibility to my client and not to put a lot of

L8D8DISC

1    information out there, but there was a lot of discussion that

2    was back and forth when we were negotiating this, and things

3    were done in a particular manner to protect my client and to

4    protect the entire situation and actually get it done.

5              As a consequence thereof, the one place where there

6    was a reference made to the actual benefit that my client would

7    be receiving was in reference to the sale of the art.  And when

8    that reference was made, it was clear that my client was a

9    beneficiary of some of the proceeds from the settlement herein.

10   That it wasn't directly attaching the proceeds from the sale of

11   the apartment, there was a lot of information, and again --

12             THE COURT:  Mr. Cardenas, I can take notes only so

13   quickly, sir.  If I could just trouble you to speak a bit

14   slower.

15             MR. CARDENAS:  I will take a breath.

16             THE COURT:  Thank you.  If you could repeat the last

17   sentence.

18             MR. CARDENAS:  In reference to the sale of the

19   apartment, those proceeds, although put in name of the sisters,

20   there was no question, when we were going through everything,

21   that in fact it was something that had originated with my

22   client.  I would say certain actions were taken for the

23   purposes of preserving the sisters and my client to receive

24   some benefits as opposed to receive minimal benefits, and

25   therefore we structured it the way that we did.  But,

L8D8DISC

nevertheless, my client is a beneficiary of the proceeds from the sale of the Monet.

At the time that the Monet was sold and certain moneys were distributed, my client was not in a position to address whatever outstanding bill I may have with her.  And then thereafter I lost contact with my client and didn't have the opportunity to discuss it with her, notwithstanding that she was out.  I did employ the same methods which I have employed in the last few weeks, as per your order, to communicate with her and see if I could resolve the issue, because, again, everything was done with her authorization and her understanding.

So, when we renegotiated my final payment in this case, she was incarcerated at that time, and when I asked her -- and I wrote this -- when I asked her to put it in writing, she declined to do so, but told me that in fact I would get paid.  Now, at the end of the case, we have the final set of proceeds that I believe could be used to make the same payment.  I think thereafter there is a high likelihood that I would not be paid.  Therefore, I am asking the Court for the permission to file the motion, and then I can elaborate a little bit more.  But I would ask that that motion be filed under seal, Judge, because I think there would be a lot of information coming out about my client and I that I don't think would be appropriate to divulge.

L8D8DISC

1          And I have taken quite a bit of care.  I haven't put

2     any numbers, except what the actual dispute is, in the letter

3     because I don't think that it's appropriate to put it out

4     there.  If your Honor was to direct me to do something

5     different I would, but I would be asking that that be filed

6     under seal nonetheless because the confidence is hers only to

7     divulge, not mine, and therefore the best that I can do is ask

8     for permission.

9          THE COURT:  I have a couple of thoughts before we

10     start talking about scheduling this.  And one is, I will

11     concede awareness that there were many, many settlement

12     discussions in which I was not involved, and there were many

13     different interests and stakeholders in the ultimate

14     settlement.

15          What I have, and what I signed, is a document that

16     references this credit as a reduction on the mortgage of a

17     property in Manhasset, and speaks not at all to Ms. Bautista's

18     entitlement to anything from the sale of the condominium.  And

19     so when I went looking through the settlement agreement, when

20     there is reference to the condominium, it is the sisters who

21     are listing it for sale, it is the sisters who are going to be

22     paying certain carrying costs of it, and then it is the sisters

23     who are supposedly receiving something from the liquidation of

24     the condominium.

25          And so, Mr. Cardenas, it would not shock me at all to

L8D8DISC

1   learn that everything was done in the sisters' name for

2   strategic reasons, or that people understood, or maybe just Ms.

3   Bautista and her sisters understood that somehow she would get

4   some money from them.  But I am stuck with, I think, an

5   unambiguous agreement in which Ms. Bautista gets nothing from

6   the sale of the condominium.

7          So I am not sure, given what I think is the lack of

8   ambiguity, how I get to consider the discussions that I think

9   you're telling me about, which, as I believe you're recounting

10  them to me, suggests that all along, even though we used the

11  name of the sisters, Ms. Bautista was always going to be a

12  beneficiary of the sale of the condominium.

13         So that's the issue that I have got.  Can you help me

14  or do you think that with a more detailed briefing you could

15  help me understand how I get to look past what to me is

16  unambiguous language in the agreement?

17         MR. CARDENAS:  Yes, your Honor, I do, but I think it

18  would take me having to divulge quite a bit of information that

19  took place, or conversations that took place between my client

20  and I.  And, although I do understand the Court's reluctance

21  facing an unambiguous agreement to go any further with this, I

22  don't believe it would be appropriate to divulge the

23  information you may otherwise need to go further.

24         THE COURT:  Of course.  I am not asking you to divulge

25  that information in this context.  My suspicion is that Mr.

L8D8DISC

1    Baker and Mr. Brown don't have horses in this particular race.

2    In the next race they do, but not in this one.  So perhaps I

3    could schedule sealed briefing that would just involve you,

4    your client, and to some degree I imagine Mr. de Castro.  I

5    think the three of you are the three I need to hear from.  Is

6    that not correct, sir?

7              MR. CARDENAS:  Your Honor, also, there was a lot of

8    discussion with -- why am I drawing a blank?

9              THE COURT:  Mr. Raible or Mr. Swift.

10             MR. CARDENAS:  Mr. Swift and Mr. Raible, but even more

11   so Mr. Swift.  It was something that was very well thought out.

12   It took a lot of work to get there.  Then Mr. Raible was the

13   one who drafted it.  So he and I went back and forth.  The idea

14   was with Swift, and we went back and forth with it, and we

15   developed it.  And then I had to keep going back and forth with

16   my client, where she was incarcerated, and we had multiple

17   discussions as to how we would lay this out.  When we finally

18   got to the idea we were going to do it this way, then it was

19   Mr. Raible and I who worked out the actual specific language.

20             Again, your Honor, as you pointed out, there's a lot

21   of underpinnings.  If the position is going to be that, faced

22   with an unambiguous agreement, I may not have a stake in this

23   particular race, I can certainly understand that.  But I think,

24   given the protracted manner in which this moved forward, and

25   the amount of time that was spent, it may behoove the Court

L8D8DISC

1    just to take a look, and if in fact you think it's not

2    appropriate to consider it, then to reject the same.  But I

3    would like the opportunity to present it.

4                THE COURT:  That's fair.

5                Sir, one reason that this is in my mind is something

6    you have no reason to know, which is that I heard right before

7    this call that I have been affirmed by the Second Circuit, and

8    that's always better than being reversed by the Second Circuit,

9    and I have gone ways.  But the particular case in which I am

10   being affirmed is a case in which everybody said to me that

11   there was a contractual provision that was nowhere in the

12   agreement.  They all understood it but nobody wrote it down.

13   And as a result, to my great dismay -- as a person, not as a

14   judge -- I wasn't able to find this agreement, and I have just

15   been upheld on that.  But, to be clear, I will listen to

16   anything you want to tell me and I will keep an open mind

17   because I haven't done any research this morning on the issue.

18   But I just want you to understand, what I tend to understand,

19   and what I tend to be told, is that in an unambiguous

20   agreement, where the provisions are unambiguous, I don't get to

21   look behind it.  But I appreciate what you're saying, and I do

22   know the many months, if not years, over which this was

23   negotiated.

24                Please hold on one moment.

25                Mr. de Castro, do you wish to be heard on this matter,

L8D8DISC

1    or is this something you do not wish to be heard on?

2              MR. DE CASTRO:  No, Judge.  If Mr. Cardenas wants to

3    brief it and I can take a look, and if it makes sense for us to

4    respond, or if the Court needs some input from me with respect

5    to Ms. Navalaksana and/or Ms. Hernandez, then I can respond.

6              THE COURT:  Mr. de Castro, let me ask the question a

7    little bit differently, please.

8              I am told that I can look at the agreement, and I have

9    the agreement right here, but that I need to understand, and

10   necessarily I do not understand, the entire back story to this

11   agreement.  If, Mr. de Castro, you also believed that the

12   nature of the negotiations were such that everybody understood

13   that Ms. Bautista was going to be the beneficiary of some

14   portion of the proceeds of the sale of the condominium, then

15   please let me know.  Because I am making these arguments based

16   on what I have in front of me and you know more than I do on

17   this issue.

18             MR. DE CASTRO:  The position from my clients I made

19   clear I think in our letter, but let me sort of reinforce it.

20             I think that the agreement itself, as your Honor put

21   it, is pretty unambiguous and pretty clear that, first, I

22   understand Mr. Cardenas's argument regarding an interest,

23   meaning it discusses benefits that the sisters, all three of

24   them, my clients and Ms. Bautista, received.  But it doesn't

25   necessarily give Ms. Bautista an interest in other properties.

L8D8DISC

1          So, for example, as your Honor noted, the condominium,

2     it's very clear that the interest is to the two sisters that

3     own that property.  It's in their name, moneys that were given

4     to them, and they used those moneys to purchase that apartment.

5     So the proceeds of that, the portion of the proceeds that they

6     would receive from that sale would go to those sisters.  That's

7     my understanding with my clients and that it's theirs.  I made

8     that very clear to them.

9          So I think it's pretty clear that it goes to Ms.

10    Navalaksana and Ms. Hernandez.  Ms. Bautista does not retain an

11    interest in it.  I suppose complicating the issue would be,

12    even if Ms. Bautista had an interest in it, then what do you do

13    with Mr. Cardenas's claim to money when there is also other

14    stakeholders in the world that have claims to money from Ms.

15    Bautista?

16         So that's my understanding.  I don't represent Ms.

17    Bautista, but from being involved in the case for so long, I am

18    aware that there are liens against her, tax liens and things

19    related to the criminal case.  So I don't really know how the

20    Court could even do that and sort of allow this particular

21    figure to jump a queue, if there is a queue.

22         THE COURT:  Mr. Cardenas, before you respond, let me

23    ask you this question.  There is the related issue, and that is

24    my understanding that the debt, if there is a debt for Ms.

25    Bautista, and I am not making a final decision on this point,

L8D8DISC

1    is something that is the product of an oral modification to the

2    retainer agreement.

3              May I please understand, Mr. Cardenas, absent that

4    oral modification, were you paid in full?

5              MR. CARDENAS:  Yes, your Honor.

6              THE COURT:  And the oral modification is a subject of

7    some dispute.

8              Sir, you have seen Ms. Bautista's letter to me

9    preliminary to this conference, correct, sir?

10             MR. CARDENAS:  I have, your Honor.

11             THE COURT:  I think it best, and I will speak to her

12   momentarily, but I think it best not to get into the gory

13   details, to use the colloquialism, of that oral modification,

14   if indeed it happened, in this call.  Do you have a different

15   view?

16             MR. CARDENAS:  No, your Honor.  As a matter of fact, I

17   agree with Ms. Bautista's letter.  It's accurate.  Everything

18   that was agreed upon in writing was paid.  There is no

19   question.  And, yes -- there are no gory details, your Honor,

20   in reference to the oral modification.  It was a very

21   straightforward thing based on the numbers.

22             And Mr. de Castro brings up the exact reason why the

23   considerations were taken into account when we were preparing

24   the agreement.  There are quite a few people.  I don't believe

25   that anybody is queued up at this point, but there are quite a

L8D8DISC

few people that are owed money.  And in order to try to

preserve some assets, for Ms. Bautista to be able to address

that, we structured the agreement in the manner in which we

did, and this was with my client's full authority.  And it was

thereafter that we had to renegotiate everything because there

was no money left.  And in part it's because of the other two

gentlemen, who haven't responded to anything yet this morning,

when they came into the case, they changed the entire panorama.

They came in at the end, and then all of a sudden numbers had

to move, and that's when things got insanely interesting.

        Hence, I agree with, in part, what Mr. Cardenas said.

I don't know that I can or can't jump the queue.  I am not sure

that there is a queue.  I am certain that there are other

creditors out there.

        THE COURT:  By the same token, sir, you are certain

that there is an outstanding debt that Ms. Bautista owes you.

        MR. CARDENAS:  Yes, your Honor, I am.

        THE COURT:  Ms. Bautista, I am not going to ask you a

lot of questions about this.  You have heard me speaking with

Mr. Cardenas.  I think you understand the manner in which the

settlement of this case was structured.  Have you seen the

settlement agreement, Ms. Bautista?

        MS. BAUTISTA:  I have no agreement at all with any of

these things.  As a matter of fact, I don't even know what was

going on when I was incarcerated, and I just found out most of

L8D8DISC

1   these things a few days ago.

2            THE COURT:  I see.  Ms. Bautista, I am going to give

3   you and Mr. Cardenas and Mr. de Castro a greater opportunity to

4   speak to these issues.  It sounds like this is not something I

5   can resolve today.  But you have heard Mr. Cardenas refer to an

6   oral modification to your retainer agreement that was

7   negotiated while you were incarcerated.  I don't want the

8   specifics, if that meeting happened or didn't happen.  I just

9   want to know, this is a yes or no answer to my question, did

10  you agree orally to modify your retainer agreement, the amount

11  of money that you agreed to pay Mr. Cardenas in this case?

12           MS. BAUTISTA:  No.

13           THE COURT:  And he believes otherwise and we will have

14  to hear about that.  Thank you.

15           Mr. Baker, it was my understanding and I hope I did

16  not misspeak when I said that you and Mr. Brown didn't have a

17  horse in the particular race of Mr. Cardenas's fees issue.  But

18  I will hear from you now if you think you do.

19           MR. BAKER:  No issue.  What they do with their money

20  is up to them.

21           THE COURT:  Understood, sir.

22           Then I shall move to the second issue, and that is the

23  issue regarding the dispute between Golden Budha and the estate

24  of Mr. Roxas and the sisters.

25           Mr. Cardenas and Ms. Bautista, it seems to me that if

L8D8DISC

1    you would like to get off of this call, you are invited to,

2    because I don't think this particular issue concerns you.  If

3    you would like to stay on, that's fine as well, if it interests

4    you or you have got nothing better to do this morning.  But I

5    am just letting you know that if you wish to leave the call,

6    you may disengage at this time.

7            Mr. Cardenas, my hope, sir, because you are in a

8    foreign country and I don't know how long you are going to be

9    there, is that you could reach out to Mr. de Castro to talk

10   about a briefing schedule and propose something to me.

11           Ms. Bautista, I will give you an opportunity to be

12   heard, and I will give you some time to be heard, but just

13   because I believe that you are more local than Mr. Cardenas is,

14   I was hoping that he could propose a briefing schedule.

15           Ms. Bautista, does that work for you?

16           MS. BAUTISTA:  Yes.

17           THE COURT:  Mr. Cardenas, may I understand that when

18   you return you will speak with Mr. de Castro about a briefing

19   schedule?

20           MR. CARDENAS:  Yes, your Honor.  I will definitely get

21   it done by Monday or Tuesday, at the latest.  I am back on the

22   red-eye Monday morning.  Unless Cesar is sitting on trial,

23   which he does a lot of, I will definitely find him.

24           THE COURT:  I appreciate that.  Thank you.

25           Let me then, please, move from the charging lien issue

L8D8DISC

1      to the dispute.

2              Mr. Baker, is it you or Mr. Brown with whom I should

3      be discussing this?

4              MR. BAKER:  I believe me.  I rely on Mr. Brown to make

5      sure I don't do anything wrong in federal court and in

6      compliance with New York law.  So if an issue comes up that has

7      to do with either of those things, I will turn my attention to

8      Mr. Brown.

9              THE COURT:  I appreciate that.  Although I am seeing

10     Mr. Cardenas raise his hand, which suggests to me that there is

11     a lingering issue in his charging lien matter that I would like

12     to resolve.

13             Yes, sir.

14             MR. CARDENAS:  No, your Honor.  That matter I think we

15     have already fully addressed.

16             Reiterating what you said, now I have to change hats a

17     little bit, because now I am the advocate on behalf of my

18     client.  And at least in part what transpired, and what is

19     going to be discussed in the second half of this particular

20     conference, was something that I was very privy to.  Cesar

21     wasn't even as privy.  I know Phil Raible was.  There is quite

22     a bit out there.  But I think I am not going to absent myself

23     from the conference.  I am going to remain on the conference.

24     My client may do as she wishes, but I think there may be some

25     validity to remaining on the line.  If not, then I will gladly

L8D8DISC

1    get off the line.

2         THE COURT:  Absolutely.  I appreciate that.

3         Ms. Bautista, then I will just direct my comments to

4    you.  You can stay if you want.  You can go if you want.  And I

5    will know by seeing whether you remain on this call or not.

6    But I thank you very much for your participation this morning.

7         MS. BAUTISTA:  Yes.  I have been away for so long, and

8    so I think I would rather stay and know more about what I did

9    not know before.

10        THE COURT:  Welcome.  Then that is fine.  OK.

11        Mr. Baker, I read the parties' submissions, and I do

12   understand the 9 percent and where it usually comes into play.

13   I would have thought, and I guess this is the way I interpreted

14   the agreement when I received it, that this was a situation in

15   which there was, in fact, a document, a contractual provision

16   that fixed the legal rate of interest upon an obligation, and

17   that was the mortgage.  So when I was reading this, what I

18   understood it to be was the mortgage.

19        Now, we may be in a pickle if that mortgage document

20   can't be found.  And Mr. de Castro should know that I am not

21   really buying his 5 percent because she would have

22   renegotiated.  So I was thinking that this was something in the

23   6-1/2 to 7 percent because that's what would have been what the

24   mortgage rate was.  And that's why I am surprised if the

25   parties believed that 9 percent was always going to apply,

L8D8DISC

1   because there was in fact, I would have thought people would

2   have assumed, a mortgage document with a rate of interest.

3          MR. BAKER:  Well, the existence or nonexistence of a

4   mortgage document was never referenced in any of the settlement

5   discussions, nor was any document ever provided.  I copied

6   documents where interest was first raised in a conference that

7   I had with Mr. Brown, and then with Mr. Cardenas, and legal

8   interest was the amount discussed and it was 9 percent in New

9   York, 10 percent in California.  No mortgage documents were

10  ever produced and no mortgage interest rate was ever discussed.

11         So, to have an argument today that, well, we were

12  talking about the mortgage rate of interest, that's an unknown.

13  Mr. de Castro never provided any documents or any indication of

14  an interest rate, other than the legal interest rate in New

15  York of 9 percent, according to the statutes that I have cited

16  in my letters back and forth to them.

17         Mr. Cardenas is present.  I did have a conversation

18  specifically with him concerning 9 percent, and he validated

19  New York interest, legal interest, was 9 percent.  Daniel Brown

20  confirmed that, researched it and said, I confirm it's 9

21  percent.

22         When I would have a conversation with Roberto about

23  something, Cesar would follow up concerning that conversation I

24  had with Roberto.  So I knew that the two of them were talking,

25  and they were going through the same documents and the same

L8D8DISC

1   language that Dan Brown and I were going through, and the term

2   "legal interest" maintained its presence in the document, in my

3   mind, and I am sure in Dan Brown's mind, and according to my

4   conversation with Roberto, it was 9 percent legal interest, New

5   York rate.

6          So this new argument of mortgage rate, without a

7   document even being referenced three years ago, or two years

8   ago, or without a document even being provided today, is pure

9   speculation and it runs contrary to everything I understood

10  when we were negotiating the agreement.

11         THE COURT:  Perhaps somewhat differently from my

12  discussions with Mr. Cardenas, I suppose there may be room for

13  ambiguity here.

14         Mr. Baker, let me just ask this question.

15  Recognizing, as Mr. de Castro now does, that I am not biting at

16  the 5 percent interest rate, although it was a good try, is

17  there any utility or are we just past the point where you and

18  he could come to an accommodation somewhere between 7 percent

19  and 9 percent?

20         MR. BAKER:  I guess my client can tell me to do

21  anything, but the discussions with Dan Cathcart, the primary

22  attorney who brought me into the case before he died, and our

23  client, the administrator of the estate, who is also the

24  president of the Golden Budha Corporation, was 9 percent.  It

25  was 9 percent when it was being negotiated.  It's been 9

L8D8DISC

1    percent since the order has been in effect.  And it's still 9

2    percent today.

3         All of this discussion about some other rate of

4    interest was a complete shock and surprise to me, when Mr. de

5    Castro raised these various potential interest rates that could

6    apply, to which I referred him to Black's Law Dictionary on

7    what legal interest means.  To me it was a first year law

8    school issue that I learned.

9         THE COURT:  Sir, I am neither agreeing with it or

10   disagreeing with it, but I will say this.  We have now had to

11   spend time and expense preparing the letters for this

12   conference.  Mr. de Castro is asking for an opportunity to have

13   plenary briefing on this issue.  I can do that, because if I

14   didn't have this case, I would have my 400 others.  But I just

15   want to know, before we go down that road, whether we really

16   need to go down that road.  Because it seems to me that the

17   difference is over a percentage point or two, and I feel like

18   that is a waste of all of your time, but I am willing to engage

19   in it.  So that's why I am asking the question.

20        MR. BAKER:  I will be happy to broach that subject

21   with my client and her other lawyers with whom she is

22   consulting.  I can say yes, your Honor, I will discuss that

23   with her and see if there is an interest rate that perhaps Mr.

24   de Castro will likewise agree to that is somewhere between

25   whatever rate he proposed and the 9 percent legal rate.

L8D8DISC

1      THE COURT:  So the average interest rate in 2007 was

2   approximately 6-1/2 percent.  I rounded that up to 7, even

3   though I know that was not fair.  I was hoping for something in

4   the 7 to 8 range.  But if you can't live with that, then we

5   will go down the route of briefing.

6      On the issue of the dispute over closing costs, sir, I

7   have to tell you, this is the e-mail exchange I really didn't

8   want to read.  I think better of both of you, and I really

9   didn't like what I was seeing.  It does appear, Mr. Baker, that

10  you did agree to a $5,000 fee.  To tell me now I should have

11  not said that is not so helpful to me.  So my hope was that you

12  would bite the bullet on the particular $5,000 fees, but I will

13  hear from you if we are still going to be fighting about that.

14      MR. BAKER:  Your Honor, I am not going to argue over

15  $2500.  But I do have to say that the context of the request

16  for him to be paid the fee, I have no problem with him getting

17  $5,000.  Just as we went through -- forced to go through the

18  details of the order, paragraph 5 pops out that the sisters are

19  to pay all costs, and that's a cost.  So, again, I am an

20  advocate for my client, your Honor.  I believe if the sisters

21  were to pay all costs, that's a cost.  And I had to put it in

22  my letter to him.

23      THE COURT:  All right.

24      Mr. Cardenas, I will hear from you, but I do want to

25  hear from Mr. de Castro soon.  So if what you have to say is

L8D8DISC

brief, I will listen to you first.

MR. CARDENAS:  It's brief in that I agree with what
Mr. Baker said, he and I are the ones who did negotiate this,
and then everything was brought to Cesar, because I had greater
access to him, in reference to ratification of the same.  I do
disagree with Mr. Baker in reference to the $5,000 because that
was something we specifically carved out.  And again, Judge,
because I was protecting my client's interests, as an indirect
beneficiary of the settlement, I was the one who was handling
everything on behalf of.  Certainly, I couldn't agree on behalf
of Cesar.  I could not.  The point was I took the front on this
one and it was he and I who did it.

I think there are a lot of issues there.  I will leave
Mr. de Castro to respond, but what Mr. Baker has said is
accurate.  I do disagree about the 5,000, but again, I think
this goes to the earlier issue, which is there was a very
strong interest on behalf of my client, which is exactly --

THE COURT:  Slow down, sir.  Thank you.

MR. CARDENAS:  There was a very big interest on behalf
of my client, not the penultimate interest, and therefore I
took the lead on that.  And then Cesar agreed, disagreed,
ratified or worked through what he had to do.  But I will let
Mr. de Castro speak for himself.

THE COURT:  Mr. de Castro, again, I didn't mean to
rain on your parade, but I did feel that, while I might be

L8D8DISC

1    willing to accept the mortgage document, I wasn't willing to

2    accept a supposition as to what the mortgage might have been.

3    I was hinting pretty strongly, because you know I lack

4    subtlety, that perhaps you and Mr. Baker could work out

5    something between 7 and 9 as a settlement.  Can you do that,

6    sir, or should we have more discussions about what you

7    understood the discussions to have concerned?

8           MR. DE CASTRO:  The short answer is yes, we have been

9    willing to come to the table the entire time.  I understand his

10   position.  I have said this to him all along, which is I

11   understand your position is 9 percent.  It's not that I don't

12   understand the position.  I disagree.  They are very adamant

13   about it.  But my view is that, the reason I asked Mr.

14   Cardenas, I asked Mr. Raible, I asked the people that -- if the

15   Court remembers, we had a court conference, where I was sitting

16   there and the Court invited me to come up, when I learned for

17   the first time that there was a whole set of settlement

18   negotiations that I was not invited to.

19          THE COURT:  Yes.

20          MR. DE CASTRO:  And I had to remind Mr. Baker, Mr.

21   Brown, Mr. Raible, Mr. Swift that Mr. Cardenas does not speak

22   for me and my clients.  OK?  To the extent that they are

23   getting that impression, it's just not the case.  And so, if

24   you're going to have settlement discussions, don't tell me

25   that, Oh, I spoke to Mr. Cardenas about this and so now all of

L8D8DISC

1    a sudden there is some agreement.

2           Now, just because my clients are related to his client

3    does not mean they agree.  So this notion that, Oh, I discussed

4    this with Mr. Cardenas and we understood this, never did I hear

5    the words 9 percent, never did Mr. Raible, to my understanding,

6    ever hear the term 9 percent.  In fact, he thinks it's grossly

7    inappropriate, is my understanding.  And he drafted the

8    agreement.

9           So the point is that what concerns me is that there is

10   this kind of mistaken belief by Mr. Baker, maybe Mr. Brown,

11   that Mr. Cardenas at some point was speaking for me.  So this

12   negotiation that happened, all of these negotiations that may

13   have happened, I wasn't there.  And this assumption that, Oh,

14   Roberto, or Mr. Cardenas, calls me and tells me every little

15   thing, that's not the case.  But that being said, as I said

16   from the beginning with Mr. Baker, yes, we are not far apart.

17   And I think I said it in my letter to the Court.  We are not

18   far apart.  Can we just split the difference and be done with

19   it?  It's a very significant amount of money, but not in the

20   global.

21          So I am perfectly happy to come to the table.  That

22   was the purpose of a call that I had with Mr. Baker, but I was

23   not going to participate in getting yelled at and told about

24   every disciplinary rule in the world and now I am raising

25   frivolous claims.  That doesn't get me anywhere so I ended that

L8D8DISC

1  conversation.  But I am totally happy working through it.  But

2  my understanding from Mr. Baker is that he has no authority to

3  do it.  We have been talking about this for weeks and he has

4  had no authority to do it, they are at 9 percent, forget it,

5  and that's that.

6          THE COURT:  But I have just told Mr. Baker to go back

7  to his client and to tell them that I would prefer that you

8  negotiate a resolution rather than spending more money in

9  motion practice.  If you can't do it, fine, we will do the

10  motion and I will see you again.

11          MR. BAKER:  I am happy to do that.

12          THE COURT:  Mr. Baker, talk to your client and see

13  what you can do.

14          MR. BAKER:  I will.

15          THE COURT:  Mr. de Castro, on the issue of closing

16  costs, the legal fee issue seems to be resolved.  Are there

17  other things that are in dispute with the parties?

18          MR. DE CASTRO:  Mr. Baker raised these issues of,

19  there is a cleaning fee.

20          THE COURT:  Right.

21          MR. DE CASTRO:  I think he is wrong about the move-out

22  fee because that actually does get credited against us.  But

23  these are all standard, most of them are standard closing costs

24  in New York.

25          Now, the issue of this freezer repair and these minor

L8D8DISC

1    numbers, when we were doing the distributions, what these

2    parties agreed to was to hold back a certain amount of funds

3    for overhead costs related to closing on the apartment.  So the

4    cleaning, for example, was, hey, let's make it look nice, after

5    there had been an issue with a leak above.

6          THE COURT:  There was a leak.  I remember that.

7          MR. DE CASTRO:  We had the whole place redone and,

8    thankfully, with not a penny from anybody.  It was all

9    insurance.  I was able to negotiate the insurance number and

10   then negotiate with a contractor to take that exact number to

11   fix the apartment, which they did, and they did very well.  And

12   then we had to have it cleaned to show and look good to

13   maximize the amount.  So my belief was that these were costs

14   for what we wanted to hold back.

15         Look, if they are going to be adamant about it, I am

16   not going crazy about $2,000 over it.  My clients are not going

17   crazy about that.  My understanding is that was part of what we

18   agreed to, but if they can't go there, then they can't go

19   there.

20         THE COURT:  OK.  I am not sure I would go to the mat

21   for $2,000, and I think you understand that as well.

22         Mr. de Castro, let me say this.  I was a spectator for

23   some of these proceedings, and I remember very distinctly a

24   period of time where you felt as though decisions were being

25   made without your involvement, and so I have that recollection.

L8D8DISC

1   So I absolutely can conceive of a situation where everybody

2   talked about the legal rate of interest other than you, yeah.

3   Again, I have got the agreement that I have got, which to me I

4   thought was the mortgage issue, but I really do think you and

5   Mr. Baker should play nice with each other, stop threatening

6   disciplinary proceedings, because you will just come before me.

7   I chair the disciplinary committee so we will see each other

8   again.  But let me let you have that opportunity.

9           Mr. de Castro, how much time do you think you need to

10  speak with Mr. Baker and Mr. Brown?  Is the rest of the month

11  sufficient; and if that fails, you will give me a briefing

12  schedule?

13          MR. DE CASTRO:  For me, Judge, I already have

14  authority from my clients to negotiate this.  So no issue for

15  me.  The question really is for Mr. Baker on how much time he

16  would need.  I can talk to him today about the number and come

17  to a conclusion today.

18          THE COURT:  But he's in God's country, remember?

19          Mr. Baker, let me give you the option to speak, sir.

20          MR. BAKER:  First and foremost, I never, ever, under

21  any circumstances, threatened any sort of disciplinary

22  proceedings against Mr. de Castro.  My intention was just to

23  call him to mind of his responsibilities in arguing something

24  other than what legal interest meant.

25          So that was the purpose and that's the substance of my

L8D8DISC

letters.  Each of the documents that related to the drafting of
the document that contained legal interest went to Mr. de
Castro.  It was negotiated.  So I am willing to talk to my
client about resolving this, negotiating the settlement
agreement, final conclusion with an interest rate, and I would
strongly recommend 8 percent, a median between 7 and 9, just as
a matter to resolve it without further court proceedings.

         Now, I will be contacting in writing my client today.
I will call her and see if I can get an agreement with her.
But I know she is going to want to talk to the probate attorney
in Hawaii and bounce it off him to make sure that she is doing
everything right in her position as the executor of her
father's estate.  So it's easy for me.  If I had the authority,
I would have it resolved in a minute, but I need to go through
the process, and because of language issues it's not real
simple.  I think two weeks can probably get it done, and I will
certainly do my best.

         THE COURT:  That's all I can ask for.  That's fine.

         In fact, we can go till Labor Day, basically, that
gives you an extra week, but let's see what happens.  I will
wait to hear from each of you.  I have got your positions.  I
understand them.  I will hear something about Mr. Cardenas's
motion, I will hear something about the need for Mr. de
Castro's motion, and we will go from there.  But again, to my
mind, as nostalgic as I get for these appearances, we have all

L8D8DISC

1    moved on, we all have other things to deal with, so let me let

2    you go and do that.

3           Mr. Brown, I wasn't trying to exclude you.  Is there

4    something else you would like me to know, sir?

5           MR. BROWN:  No.  I am good.

6           I guess the only thing I would add, and I am confident

7    that we will be able to resolve this, is Mr. Raible's opinion

8    on what this order says is frankly, in my view, irrelevant.

9    The only person's opinion that matters is your Honor's.  We

10   have an agreement and a disputed term and there is New York law

11   that speaks to this, but I am confident we will be able to

12   resolve this.

13          THE COURT:  So am I.  Let me let you go do that.  If

14   you need my help, you know where to find me.  I am still here.

15   I am not in the very interesting places that some of you are

16   today.  Thank you very much.

17          Please, to you, to your clients, to your families,

18   continued safety and good health during this pandemic.

19          We are adjourned.  Thank you.

20          (Adjourned)

21

22

23

24

25