UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DISTRICT ATTORNEY OF NEW YORK,<br><br>                    Plaintiff,<br><br>                    -v.-<br><br>THE REPUBLIC OF THE PHILIPPINES, JOSE DURAN, ON HIS BEHALF AND AS REPRESENTATIVE OF A CLASS OF JUDGMENT CREDITORS OF THE ESTATE OF FERDINAND E. MARCOS, IMELDA MARCOS, AND FERDINAND R. MARCOS, VILMA BAUTISTA, ESTER NAVALAKSANA, LEONOR HERNANDEZ, AIDA HERNANDEZ, IMELDA MARCOS, JORGE Y. RAMOS, THE METROPOLITAN MUSEUM OF MANILA FOUNDATION, INC., GOLDEN BUDHA CORPORATION, and THE ESTATE OF ROGER ROXAS,<br><br>                    Defendants. | 14 Civ. 890 (KPF)<br><br>**ORDER** |

KATHERINE POLK FAILLA, District Judge:

Counsel for Defendant Vilma Bautista, J. Roberto Cardenas, seeks the Court's permission to file a motion for a charging lien. Mr. Cardenas submits that the Stipulation and Order filed on January 17, 2019, which resolved both this matter and a related case (14 Civ. 890 Dkt. #489, 14 Civ. 3829 Dkt. #86 (the "Settlement Agreement" or the "Agreement")), ensured that Ms. Bautista would receive certain proceeds under the Agreement. In particular, under Mr. Cardenas's interpretation of the Agreement, Ms. Bautista was entitled to a portion of the proceeds from the sale of certain interpleaded property — a condominium known as Unit 7G, 400 East 67th Street, New York, New York (the "Condominium"). What is more, Mr. Cardenas submits that in return for

his services in negotiating the Agreement, he is now entitled to move for a charging lien as to Ms. Bautista's portion of the Condominium sale proceeds.

Any funds given to Ms. Bautista from the sale of the Condominium would come from the proceeds that were distributed under the Settlement Agreement to her sisters, Defendants Ester Navalaksana and Leonor Hernandez (often referred to in this matter as the "Sisters").  Counsel for the Sisters has submitted an opposition to Mr. Cardenas's application that offers a different interpretation of the relevant portions of the Settlement Agreement.  After considering the parties' written submissions, the Court concludes that the Settlement Agreement does not entitle Ms. Bautista to any proceeds from the sale of the Condominium, and that Mr. Cardenas is not entitled to further payment.  The Court consequently denies Mr. Cardenas's application.

**BACKGROUND**

The Court has previously observed that a full history of the disputes between and among the parties in this interpleader action "would fill volumes," but has nonetheless endeavored to detail the factual and procedural histories of this case in prior Opinions and Orders, including at length in its March 29, 2018 Opinion and Order.  (Dkt. #429).  *See Dist. Att'y of N.Y.* v. *Republic of the Phil.*, 307 F. Supp. 3d 171 (S.D.N.Y. 2018) ("*Philippines*").  The Court will thus limit its factual recitation here to matters relevant to the instant application.

## A.   Ms. Bautista's Criminal Prosecution and the Commencement and Settlement of the Interpleader Action

On October 8, 2012, Ms. Bautista was indicted in the State of New York on charges that she had "illegally conspired to possess and sell valuable works

of art acquired by [Imelda] Marcos during her husband's presidency, keep the proceeds for herself, and hide those proceeds from New York State tax authorities and others" (the "Criminal Action"). *Philippines*, 307 F. Supp. at 184. Ms. Bautista's trial concluded with a conviction in November 2013. *Id.*[1]

During its investigation and prosecution of Ms. Bautista, the District Attorney's Office for New York County ("DANY") seized certain assets that were allegedly misappropriated by Ferdinand and Imelda Marcos during Mr. Marcos's presidency of the Philippines (the "Interpleader Property"). *Philippines*, 307 F. Supp. at 179-80. On February 11, 2014, DANY commenced this matter with the filing of an interpleader complaint, identifying various parties that had already asserted or were expected to assert claims to the Interpleader Property, including Ms. Bautista and her sisters, as well as multiple classes of victims of the Marcos regime. (Dkt. #2).[2] DANY thereafter transferred the Interpleader Property to this Court so that the rightful owner or

---

[1]     Ms. Bautista was found guilty on all counts, including conspiracy in the fourth degree, criminal tax fraud in the first degree, and offering a false instrument for filing in the first degree. *Dist. Att'y of N.Y.* v. *Republic of the Phil.*, 307 F. Supp. 3d 171, 184 (S.D.N.Y. 2018). On appeal, the Appellate Division reversed Ms. Bautista's conspiracy conviction but affirmed the remaining convictions. *Id.* (citing *People* v. *Bautista*, 18 N.Y.S.3d 47 (1st Dep't 2015)).

[2]     One such class included human rights victims, led by Jose Duran (the "Duran Class"), who obtained judgments against both Mr. Marcos's Estate and Ms. Marcos in the United States District Court for the District of Hawaii. *Philippines*, 307 F. Supp. 3d at 186; *see also Hilao* v. *Est. of Marcos*, 103 F.3d 767 (9th Cir. 1996); *In re Est. of Marcos Human Rights Litig.*, 496 F. App'x 759 (9th Cir. 2012) (memorandum opinion). In 2012, the Duran Class filed an action in the Supreme Court of New York, New York County, pursuant to Section 5225 of the New York Civil Practice Law and Rules ("CPLR"), naming as respondents Ms. Bautista, her two nephews, and DANY, and seeking a writ of execution and turnover order requiring the respondents to transfer all property held for or belonging to Ms. Marcos to the settlement fund established by the District of Hawaii's decisions. *See Duran* v. *Bautista*, Index No. 654261/2012, Dkt. #1 (N.Y. Sup. Ct. 2012). That action was stayed in an oral decision issued by the Court on February 19, 2015. (*See* Dkt. #66 (transcript); Dkt. #72 (April 16, 2015 Order)).

owners could be determined.  (Dkt. #72).  On July 11, 2016, the Golden Budha Corporation along with the Estate of Roger Roxas (together, "GBC/Roxas"), having won a judgment against Mr. and Mrs. Marcos in Hawaii state court, filed a motion to intervene (Dkt. #237), which motion the Court granted on August 12, 2016 (Dkt. #262).

Following multiple rounds of briefing on dispositive motions — which motions were resolved by the Court on January 20, 2016 (Dkt. #137), March 29, 2018 (Dkt. #429), and May 3, 2018 (Dkt. #451 (transcript)) — the Court ordered that trial would commence on April 29, 2019 (Dkt. #481).  In the interim, the parties turned their focus to settlement discussions (*see* Dkt. #451, 459), ultimately informing the Court in a telephone conference held on December 20, 2018, that they had reached a settlement in principle  (Dkt. #486).  The Court subsequently endorsed the parties' Settlement Agreement on January 17, 2019.  (Dkt. #488).

**B.    The Settlement Agreement**

Over the course of thirteen pages, the Settlement Agreement details the disposition of the Interpleaded Property, "which included, *inter alia*, various paintings, jewelry, insurance policies and annuities and over $15 million in cash and funds from several bank accounts," as well as other allegedly misappropriated property.  (Settlement Agreement 2).  While the Settlement Agreement recognized that Ms. Bautista was one of five parties asserting claims to the Interpleaded Property (*id.* at 4), it proceeded to distribute the Interpleaded Property among the other four parties, including the Sisters, and

4

did not provide that any of the Interpleaded Property would be distributed to Ms. Bautista (*see generally id.*).  With respect to Ms. Bautista, the Agreement noted only that her sisters would receive an anticipated sum of $3,000,000, which sum would be reduced, *inter alia*, by a credit of $637,000 from the proceeds of the sale of Monet's *Le Bassin aux Nymphéas* (the "Water Lily" painting),[3] "which [in turn] reduced the outstanding mortgage upon the real property located at 199 Hummingbird Road, Manhasset, New York owned by [Ms. Bautista] and [Ms. Hernandez]." (*Id.* at 3, 5, 8-9).

Separately, the Agreement contemplated that the Sisters' anticipated disbursement would include a portion of the proceeds from the sale of the Condominium.  (Settlement Agreement 8-9).  In particular, the Agreement provided that the Sisters would list the Condominium for sale (*id.* at 7); that the sale proceeds would thereafter be distributed to an interest-bearing independent account established by the Escrow Holder following the settlement's final approval (*id.* at 9); and that the proceeds would be disbursed to the Sisters and GBC/Roxas as set forth in the Agreement (*id.* at 9-10).

## C.   Mr. Cardenas's Representation of Ms. Bautista and the Retainer Agreement

Mr. Cardenas appeared in this action on behalf of Ms. Bautista on June 5, 2015 (Dkt. #92), and was subsequently substituted for Ms. Bautista's

---

[3]     The Water Lily painting was one of nine paintings purchased by Ms. Marcos in 1977. *Philippines*, 307 F. Supp. 3d at 182.  At some point, Ms. Bautista took possession of the paintings, and sold the Water Lily painting to a London gallery in 2010.  *Id.* at 183.  The sale of the painting precipitated DANY's investigation of Ms. Bautista, culminating in her indictment in 2012.  *Id.* at 184.

former counsel from The Hoffinger Firm, LLP (Dkt. #105).  Mr. Cardenas and
Ms. Bautista entered into a retainer agreement on April 27, 2015, which set
forth the terms of Mr. Cardenas's representation of Ms. Bautista in both the
instant matter, as well as the related state court action.  (Dkt. #563-2 (the
"Retainer Agreement")).  Pursuant to the Retainer Agreement, Mr. Cardenas
was given a retainer of $150,000, "for all services up but not including any
possible trial." (*Id.* at ¶ 1).  The Retainer Agreement further excluded from its
scope "any additional work in connection with appeals from any Court
decisions, orders or any other actions." (*Id.* at ¶ 4).  Notably, the Retainer
Agreement recited that it could not "be modified except by a document signed
by all parties." (*Id.* at ¶ 9(a)).  Further, the Agreement was to "be construed
under the laws of the State of New York." (*Id.* at ¶ 9(c)).

## D.     The Instant Application

On July 15, 2021, Mr. Cardenas submitted a letter to the Court
requesting permission to file a motion for a charging lien to attach to the
proceeds of the Condominium, the sale of which was described as "imminent."
(Dkt. #543).  Mr. Cardenas explained that while finalizing the Settlement
Agreement, he and Ms. Bautista had "renegotiated" their "financial agreement,"
and "agreed upon a satisfactory number to resolve all [their] financial issues."
(*Id.* at 1).  At the time of these renegotiations, Ms. Bautista was incarcerated in
connection with the Criminal Action.  (*See id.*).  Mr. Cardenas further explained
that he was seeking to recoup the additional legal fees agreed upon during this
renegotiation from the Condominium sale proceeds.  (*See id.*).

Following the Court's July 22, 2021 memorandum endorsement inviting responses to Mr. Cardenas's letter (Dkt. #545), counsel for the Sisters submitted a response on August 5, 2021, stating their opposition to Mr. Cardenas's request (Dkt. #547).  The Sisters' counsel appended to its submission a letter from Ms. Bautista, dated August 5, 2021, representing that Mr. Cardenas had been paid pursuant to the Retainer Agreement, and that "nothing else [was] due and owing." (Dkt. #547-1).

The Court subsequently scheduled a conference to address Mr. Cardenas's application, as well as a related dispute between the Sisters and GBC/Roxas regarding the appropriate distribution of certain funds under the Settlement Agreement.  (Dkt. #551).[4]  At the conference, held on August 13, 2021, Mr. Cardenas explained that in negotiating the Settlement Agreement, "certain actions were taken for the purposes of preserving the [S]isters and my client to receive some benefits as opposed to receive minimal benefits, and therefore we structured it the way that we did." (Dkt. #561 at 5 (transcript)). With respect to his Retainer Agreement with Ms. Bautista, Mr. Cardenas acknowledged: "Everything that was agreed upon in writing was paid." (*Id.* at 13).  But he submitted that Ms. Bautista had agreed to pay him an additional sum, and described the circumstances giving rise to the instant application thusly:

> So, when we renegotiated my final payment in this case,
> [Ms. Bautista] was incarcerated at that time, and when

---

[4]     Following the Court's conference with the parties, the Sisters and GBC/Roxas resolved their differences without further intervention of the Court.  (*See* Dkt. #557).

> I asked her — and I wrote this — when I asked her to put it in writing, she declined to do so, but told me that in fact I would get paid. Now, at the end of the case, we have the final set of proceeds that I believe could be used to make the same payment. I think thereafter there is a high likelihood that I would not be paid. Therefore, I am asking the Court for the permission to file the motion, and then I can elaborate a little bit more.

(*Id.* at 6). In response, the Court noted:

> Mr. Cardenas, it would not shock me at all to learn that everything was done in the [S]isters' name for strategic reasons, or that people understood, or maybe just Ms. Bautista and her sisters understood that somehow she would get some money from them. But I am stuck with, I think, an unambiguous agreement in which Ms. Bautista gets nothing from the sale of the condominium.

(*Id.* at 7-8). The Court nonetheless offered Mr. Cardenas the option to provide more detailed briefing on his interpretation of the agreements, and Mr. Cardenas accepted the opportunity to expand on his arguments. (*See id.* at 8-9). On September 3, 2021, Mr. Cardenas submitted a letter setting forth his arguments in favor of his anticipated motion for a charging lien (Dkt. #560); on September 13, 2021, counsel for the Sisters filed a letter opposing Mr. Cardenas's application (Dkt. #563); and Mr. Cardenas filed a letter in reply on September 17, 2021 (Dkt. #564).[5]

---

[5]    Ms. Bautista attended the August 13, 2021 conference, during which she was invited by the Court to participate in the forthcoming briefing. (Dkt. #561 at 16). The Court understands that Ms. Bautista was subsequently apprised of the parties' briefing schedule. (*See* Dkt. #557, 559 (directing Mr. Cardenas to transmit copies of the scheduling orders to Ms. Bautista)). However, Ms. Bautista opted not to submit any further responses to Mr. Cardenas's application.

## DISCUSSION

Although the Court realizes that it is somewhat counterintuitive to begin by addressing the question of whether Ms. Bautista is entitled to the Condominium sale proceeds under the Settlement Agreement, rather than the threshold question of whether the Retainer Agreement between Ms. Bautista and Mr. Cardenas was amended or otherwise superseded by a subsequent oral agreement, the Court addresses the issues in the order in which they were briefed by Mr. Cardenas and counsel for the Sisters.  To preview, the Court finds that (i) the Settlement Agreement does not grant Ms. Bautista any rights to the Condominium sale proceeds, and (ii) Mr. Cardenas has not established any right to additional attorneys' fees that would entitle him to a charging lien.

### A.    Ms. Bautista Is Not Entitled to the Condominium Sale Proceeds Under the Unambiguous Terms of the Settlement Agreement

Mr. Cardenas concedes that the Settlement Agreement does not expressly entitle Ms. Bautista to a portion of the Condominium sale proceeds or to any other recovery.  (*See* Dkt. #560).  He instead argues that the "entire" Settlement Agreement was "intentionally and consistently ambiguous" with respect to Ms. Bautista so as to "preserve some assets for Ms. Bautista" while ensuring that they remained "effectively sheltered from her creditors." (*Id.* at 3).  While the Agreement provided that the proceeds from the Condominium sale would be distributed to the Sisters and GBC/Roxas, Mr. Cardenas submits that both he and Ms. Bautista understood that Ms. Bautista would receive some part of those proceeds.  (*Id.*).  In support, he observes that the Agreement stated that the Sisters' distribution would be reduced by $637,000

from the proceeds of the sale of the Water Lily painting, which proceeds had in

turn reduced the outstanding mortgage on a separate property owned by Ms.

Bautista and her sister, Ms. Hernandez, in Manhasset, New York.  (*Id.*

(referencing Settlement Agreement 8-9)).   Under the terms of the Agreement:

> The Sisters and Bautista acknowledge that the release
> herein precludes any claim by the other Parties
> concerning the use of Proceeds to reduce that
> outstanding mortgage and that Bautista and/or the
> Sisters have, thereby, benefitted in the amount of
> $637,000 plus accrued legal interest thereon from the
> date paid to satisfy the mortgage until the GBC/Roxas
> receive an amount equal to the above [credits to the
> Sisters' distribution, including accrued interest].

(Settlement Agreement 9).   From this, Mr. Cardenas concludes that "Ms.

Bautista retained an interest in the proceeds of the sale of the Sisters'

condominium for which she had originally paid" (Dkt. #560 at 3), and

"notwithstanding the language that the Sisters receive the proceeds from the

sale of the condominium, Ms. Bautista unequivocally received part of the

proceeds sufficient and necessary to effectuate the settlement agreement" (*id.*

at 4).

"A settlement agreement is a contract that is interpreted according to

general principles of contract law." *Powell* v. *Omnicom*, 497 F.3d 124, 128 (2d

Cir. 2007).   In interpreting a contract under New York law,[6] the Court's

---

[6]   New York law governs the instant dispute pursuant to the choice of law provisions of
the Settlement Agreement and the Retainer Agreement. (Settlement Agreement 13;
Retainer Agreement ¶ 9(c)). Additionally, both Mr. Cardenas and counsel for the Sisters
have relied upon New York law in their briefing.  (*See* Dkt. #560, 563).  *Celle* v. *Filipino
Rep. Enters. Inc.*, 209 F.3d 163, 175 (2d Cir. 2000) ("Since no party has challenged the
choice of New York [ ] law, all are deemed to have consented to its application."
(citations omitted)).

primary objective "is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp.* v. *Bank of N.Y. Mellon Tr. Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks, citation, and alterations omitted). "When analyzing the meaning of a contractual provision, a threshold question the Court should address is whether the contract is ambiguous." *U.S. Bank, Nat'l Ass'n* v. *Triaxx Asset Mgmt. LLC*, No. 16 Civ. 8507 (AJN), 2017 WL 3610584, at *7 (S.D.N.Y. July 26, 2017); *see also Alexander & Alexander Servs., Inc.* v. *These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998).

Importantly, under New York law, a contract may not be found to be ambiguous merely because litigants present alternative interpretations. *Law Debenture Tr. Co. of N.Y.* v. *Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010). Rather, ambiguity requires that "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Goldman Sachs Grp., Inc.* v. *Almah LLC*, 924 N.Y.S.2d 87, 90 (1st Dep't 2011) (internal quotation marks and citation omitted); *see also Broder* v. *Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005). And "when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the

contract[.]" *Howard* v. *Howard*, 740 N.Y.S.2d 71, 71 (2d Dep't 2002) (citations omitted).

Here, the Court finds that there is no ambiguity in the Settlement Agreement.  While it is true that Ms. Bautista is mentioned in the Agreement, there is no reasonable reading under which she is entitled to proceeds from the Condominium sale.  Rather, the Agreement expressly provides that the sale proceeds, along with any other funds in the Escrow Holder's account, are to be distributed between the Sisters and GBC/Roxas.  (*See* Settlement Agreement 9-10).  Given that the Agreement delimits the distribution of proceeds to these two parties, the Court cannot find that Ms. Bautista is entitled to a portion of this distribution.  *See Brands* v. *Urban,* 587 N.Y.S.2d 698, 700 (2d Dep't 1992) ("The court may not write into the contract conditions the parties did not insert, by adding or excising terms under the guise of construction."); *see also Wegmann* v. *Young Adult Inst.*, — F. App'x —, 2021 WL 3573753, at *2 (2d Cir. Aug. 13, 2021) (summary order) (rejecting interpretation of pension plan that "imposed a standard not required by the [contract's] provisions" and was "inconsistent with [the contract's] plain words" (quoting *McCauley* v. *First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008) (internal quotation marks and alternations omitted))).  Importantly, the Agreement's acknowledgment that Ms. Bautista and her Sisters benefited from the reduction of the mortgage on the Manhasset property, and that the Sisters would receive a corresponding

reduction to their distribution, does not confer upon Ms. Bautista any right to the *Condominium* sale proceeds.[7]

While Mr. Cardenas asserts that he and his client made a conscious decision not to expressly provide that Ms. Bautista was entitled to the Condominium sale proceeds, their decision does not render the Agreement ambiguous — it merely means that it was strategically designed and crafted. As it noted at the August 13, 2021 conference (Dkt. #561 at 7-8), the Court accepts that Mr. Cardenas may well have employed this stratagem so as to provide for Ms. Bautista while shielding her assets from her creditors. But the Court is bound by the express and unambiguous terms of the Agreement, and thus cannot find that Ms. Bautista had any right to the Condominium sale proceeds. After all, finding such a right would arguably require the Court to countenance a fraud on Ms. Bautista's creditors. This the Court will not do.

## B.   Mr. Cardenas Has Not Established the Existence of an Agreement Entitling Him to Additional Attorneys' Fees

Given that Mr. Cardenas seeks to move for a charging lien with respect to the Condominium sale proceeds, the Court's determination that Ms. Bautista is not entitled to any such proceeds under the Settlement Agreement would seem to moot Mr. Cardenas's application. Nevertheless, in the interest of

---

[7]     The Court's understanding of the Agreement is unchanged by Mr. Cardenas's assertion that GBC/Roxas's portion of the Condominium sale proceeds was calculated by determining the "sum of the principal … [of] $637,000, plus 7.75% interest." (Dkt. #560 at 3-4). This is consistent with the plain terms of the Agreement, which contemplate that the Sisters' distribution will be reduced by a credit of that amount. (*See* Settlement Agreement 8-9).

completeness, the Court will address Mr. Cardenas's argument that he entered into an amended or superseding Retainer Agreement with Ms. Bautista.

Mr. Cardenas submits that he entered into a new retainer agreement with Ms. Bautista while she was incarcerated, which agreement was "not part and parcel of the original retainer agreement." (Dkt. # 560 at 5-6). He argues that such agreements have been enforced by New York courts. (*Id.* at 6). And he reminds the Court that "hundreds of hours were expended trying to reach a settlement." (*Id.*).

The Court does not minimize Mr. Cardenas's role in the settlement negotiations in this case and credits his work in those discussions. But even were the Court to accept that Mr. Cardenas's and Ms. Bautista's renegotiations transpired as described in Mr. Cardenas's submissions, it nonetheless cannot find that those renegotiations resulted in a separate and enforceable retainer agreement. As counsel for the Sisters notes, under New York law, "parties may modify a written contract by subsequent oral agreement, subject to the statute of frauds, especially if the agreement does not specifically prohibit oral modification." (Dkt. #563 at 2 (quoting *Feder Kaszovitz LLP* v. *Rosen*, No. 17 Civ. 2954 (CM), 2018 WL 3708662, at *8 (S.D.N.Y. Aug. 3, 2018))). *See also Faust Harrison Pianos Corp.* v. *Allegro Pianos, LLC*, No. 09 Civ. 6707 (ER), 2013 WL 2292050, at *15 (S.D.N.Y. May 24, 2013) ("Under New York law … a written contract may be modified by subsequent oral agreement if it does not contain a provision prohibiting oral change.").

14

Here, Mr. Cardenas entered into an agreement "for all services up but not including any possible trial" that excluded from its scope only "any additional work in connection with appeals from any Court decisions, orders or any other actions." (Retainer Agreement ¶¶ 1, 4). The Retainer Agreement further provided that it could not be modified "except by a document signed by all parties." (*Id.* at ¶ 9(a)). Mr. Cardenas's involvement in the settlement negotiations plainly falls within the scope of this original Retainer Agreement. The Court thus cannot find that he entered into an entirely separate agreement during his renegotiations with Ms. Bautista inasmuch as the required written modification does not exist. Therefore, Mr. Cardenas's ability to recover any potential proceeds under the Retainer Agreement turns on whether he and Ms. Bautista orally modified the Agreement.

"Even when a contract provides that modifications must be in writing and signed, New York will enforce oral modifications in two circumstances — where there has been [i] partial performance, or [ii] reliance — *but only where the subsequent performance or reliance is unequivocally referable to the modification.*" *Am. Int'l Tel., Inc.* v. *Mony Travel Servs., Inc.*, No. 99 Civ. 11581 (CM) (LMS), 2001 WL 209918, at *4 (S.D.N.Y. Feb. 23, 2001) (citing *John St. Leasehold LLC* v. *Fed. Deposit Ins. Corp.*, 196 F.3d 379, 382 (2d Cir. 1999)) (emphasis added). "'Unequivocally referable' conduct is conduct which is inconsistent with any other explanation." *Toobian* v. *Golzad*, 148 N.Y.S.3d 114, 119 (2d Dep't 2021) (internal citations omitted). Mr. Cardenas cannot demonstrate that either exception applies here for the same reasons discussed

15

above.  *First,* Mr. Cardenas cannot establish that there has been partial performance under the terms of the alleged oral agreement because the services he performed clearly fall within the scope of his original Retainer Agreement.  *Second,* Mr. Cardenas's services were not "unequivocally referable" to his oral agreement with Ms. Bautista because, once again, such services were contemplated by the parties' original Retainer Agreement.  The Court is unable to find that the renegotiations resulted in an amended agreement.  *See Am. Int'l Tel., Inc.,* 2001 WL 209918, at *4 ("If the conduct that allegedly constituted partial performance of the oral agreement to modify was in fact compatible with the original agreement, the oral agreement will not be enforced." (quoting *Towers Charter & Marine Corp.* v. *Cadillac Ins. Co.,* 894 F.2d 516, 522 (2d Cir. 1990))).[8]

---

[8]    Further, "a party seeking to prove modification must submit 'proof of each element requisite to the formulation of a contract,' including mutual assent to its terms." *Feder Kaszovitz LLP* v. *Rosen,* No. 17 Civ. 2954 (CM), 2018 WL 3708662, at *8 (S.D.N.Y. Aug. 3, 2018) (quoting *Dallas Aerospace, Inc.* v. *CIS Air Corp.,* 352 F.3d 775, 783 (2d Cir. 2003)); *see also Faust Harrison Pianos Corp.* v. *Allegro Pianos, LLC,* No. 09 Civ. 6707 (ER), 2013 WL 2292050, at *15 (S.D.N.Y. May 24, 2013) ("[O]ral modifications to written contracts must be proved by clear and convincing evidence, such as contemporaneous documentary support." (citation and internal quotation marks omitted)).  On the face of Mr. Cardenas's submissions, and in light of Ms. Bautista's representation that Mr. Cardenas has been paid pursuant to the original Retainer Agreement, and "nothing else is due and owing," the Court is unable to conclude that Ms. Bautista assented to any modification of the Retainer Agreement.  (*See* Dkt. #547-1).  *See Feder Kaszovitz LLP,* 2018 WL 3708662, at *8 ("I am constrained to conclude that [the client] did not assent to [the attorney's] proposed modification of the Retainer Agreement — there was no meeting of the minds.").

Relatedly, counsel for the Sisters contends that the oral agreement is also barred under the Statute of Frauds.  (Dkt. #563 at 2).  In New York, "[e]very agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith ... if such agreement ... [b]y its terms is not to be performed within one year[.]"  N.Y. Gen. Oblig. Law § 5-701(a)(1).  As relevant here, "contracts of indefinite duration are deemed to be incapable of being performed within a year, and thus fall within the ambit of the Statute of Frauds." *In re Bayou Hedge Fund Litig.,* 534 F. Supp. 2d 405, 419 (S.D.N.Y. 2007) (citation omitted).  Mr. Cardenas has not provided any details on whether the oral agreement reached with Ms.

Mr. Cardenas's arguments are unavailing.  He refers the Court to Part 1215.1 of Title 22 of the New York Codes, Rule, and Regulations ("NYCRR"), which requires that "an attorney who undertakes to represent a client and enters into an arrangement for, charges or collects any fee from a client … provide to the client a written letter of engagement before commencing the representation, or within a reasonable time thereafter" unless "otherwise impracticable" or "the scope of services to be provided cannot be determined at the time of the commencement of representation." 22 NYCRR § 1215.1.  Mr. Cardenas further refers the Court to certain exceptions to this requirement, although the only potentially applicable exception appears to be "representation where the attorney's services are of the same general kind as previously rendered to and paid for by the client." *Id.* § 1215.2.

The Court finds that this exception does not salvage Mr. Cardenas's case for the same reasons that were stated earlier: the services encompassed by the alleged oral agreement fell within the scope of the initial Retainer Agreement, and thus there is no separate agreement for "the same general kind" of services.  The cases cited in Mr. Cardenas's letter briefing are inapposite for similar reasons, namely that they involved parties who did not have an operative retainer agreement in place at the time they purportedly reached an oral agreement.  *See, e.g.*, *Beech* v. *Gerald B. Lefcourt, P.C.*, 820 N.Y.S.2d 841, 841 (N.Y. Civ. Ct. 2006) (dismissing complaint seeking return of legal fees paid

---

Bautista contained any temporal limitation, and to the extent he seeks to enforce the terms of an open-ended oral agreement lasting indefinitely into the future, the Court agrees that he is unable to do so under the Statute of Frauds.

pursuant to oral retainer agreement); *In re Feroleto*, 791 N.Y.S.2d 809, 810-12 (N.Y. Sur. Ct. 2004) (awarding petitioner fees on a quantum meruit basis where petitioner maintained that retainer agreement was mailed to their client, but conceded that agreement was never signed).

Finally, Mr. Cardenas notes that the Appellate Division has permitted attorneys to recover in quantum meruit "the fair and reasonable value of the services rendered" despite their failure to obtain a written retainer agreement or letter of agreement.  *See, e.g.*, *Seth Rubenstein, P.C.* v. *Ganea*, 833 N.Y.S.2d 566, 572-73 (2d Dep't 2007).  And the Court recognizes that New York courts have held that "an attorney's noncompliance with section 1215.1 does not preclude the recovery of legal fees in quantum meruit." *Popal* v. *Slovis*, No. 12 Civ. 3916 (LGS), 2015 WL 10687614, at *7 (S.D.N.Y. Apr. 28, 2015) (collecting cases), *aff'd*, 646 F. App'x 35 (2d Cir. 2016) (summary order).  However, "as the attorney who failed to properly document the fee agreement in writing as required by 22 NYCRR 1215.1," Mr. Cardenas "bears the burden of establishing that the terms of the alleged fee arrangement were fair, fully understood, and agreed to" by Ms. Bautista.  *Seth Rubenstein, P.C.*, 833 N.Y.S.2d at 573.

The Court doubts that Mr. Cardenas has met his burden of establishing his entitlement to recover in quantum meruit.  *See Gary Friedman, P.C.* v. *O'Neill*, 982 N.Y.S.2d 359, 360 (2d Dep't 2014) (affirming dismissal of complaint seeking attorneys' fees where "the court properly found that the plaintiff failed to comply with 22 NYCRR 1215.1 and failed to establish that the

terms of the fee arrangement were fair, fully understood, and agreed to by the defendant"); *cf. Avalon Risk Mgmt. Ins. Agency, L.L.C.* v. *Taylor*, No. 12 Civ. 3934 (LGS), 2015 WL 1821406, at *7 (S.D.N.Y. Apr. 20, 2015) ("[W]hile this Court is mindful of its 'responsibility to protect its own officers in such matters as fee disputes,' the Court notes that, in this case, the Chalos Firm has failed to take appropriate steps to protect *itself* — and has failed to facilitate resolution of this matter — by neglecting its obligation to provide the DiChiaras with a written engagement letter." (emphasis in original) (citation omitted)).[9] Further, "New York law does not permit recovery in quantum meruit ... if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim." *Mid-Hudson Catskill Rural Migrant Ministry, Inc.* v. *Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (collecting cases). Mr. Cardenas's quantum meruit claim is thus foreclosed by the original Retainer Agreement. As such, even were Ms. Bautista entitled to any proceeds arising from the Settlement Agreement, Mr. Cardenas has no claim to any portion of those proceeds by dint of any oral agreement with Ms. Bautista that succeeded the Retainer Agreement.

---

[9]     Moreover, to "make out a claim in quantum meruit, a claimant must establish [i] the performance of the services in good faith, [ii] the acceptance of the services by the person to whom they are rendered, [iii] an expectation of compensation therefor, and [iv] the reasonable value of the services." *L. Off. of Howard M. File, Esq., P.C.* v. *Ostashko*, 875 N.Y.S.2d 502, 504 (2d Dep't 2009) (citation omitted). Mr. Cardenas does not address these elements in his briefing, and the Court thus cannot find that he has made the required showing.

**CONCLUSION**

For the foregoing reasons, Mr. Cardenas's request to file a motion for a charging lien is DENIED.  The Clerk of Court is directed to terminate the motions at docket entries 543, 544, and 560.  Mr. Cardenas is directed to transmit a copy of this Order to Ms. Bautista through any previously-used means of communication.

SO ORDERED.

Dated:   October 12, 2021
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

20